**epic.org**

~~FILED~~ *Received*

JAN 2 7 2010

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

January 15, 2010

Clerk of the United States District Court for the Northern District of California
San Jose Division
280 South 1st Street
San Jose, CA 95113

Attention: The Honorable Richard G. Seeborg

Re:     Lane et. al v. Facebook et. al, proposed settlement
        Case No. 5:08-cv-03845-RS

1718 Connecticut Ave NW

Suite 200

Washington DC 20009

USA

+1 202 483 1140 [tel]

+1 202 483 1248 [fax]

www.epic.org

Dear Judge Seeborg:

The signatories of this letter are privacy and consumer protection non-profit organizations who oppose the Facebook Beacon settlement, as currently proposed, on the grounds that the representative plaintiffs have not adequately and fairly represented the interests of the class during the settlement negotiations. Pursuant to the requirements of the Federal Rules of Civil Procedure, the representative parties must be "fairly and adequately protect[ing] the interests of the class."[1]

This letter seeks first to identify the various ways in which the Settlement Agreement is deficient and counter to the interests of the represented class, and then second to urge you to condition your approval of the Settlement Agreement on modification of those terms so that the Agreement will more adequately represent those interests.

I.    The Representative Plaintiffs Did Not Adequately and Fairly Represent the Interests of the Represented Class.

A. The amount of the settlement is insufficient.

The parties have set forth a proposed settlement with several provisions. First, Facebook "denies any and all wrongdoing," but agrees to terminate the Beacon program.[2] The settlement also establishes a settlement fund totaling $9.5 million, that is likely to leave approximately $6 million after attorneys fees and administrative costs are deducted.[3] This is significantly smaller than the potential liability Facebook and its affiliates are exposed to under just one of the allegedly violated statutes—the Video Privacy Protection Act (VPPA). Under the VPPA, each violation is punishable by "(A) actual damages but not less than liquidated damages in an amount of $2,500; (B) punitive

---

[1] Fed. R. Civ. P. 23(a)(4).
[2] *See* Settlement Agreement at 6, 12.
[3] *Id.* at 8.

damages; (C) reasonable attorneys' fees and other litigation costs reasonably incurred; and (D) such other preliminary and equitable relief as the court determines to be appropriate."[4] Facebook currently boasts more than 350 million active users.[5] If only 350,000 users—0.1% of the total user base—had their rights violated under the VPPA, Facebook would be exposed to $875 million in liquidated damages. The $6 million figure proposed is clearly insufficient, and most significantly, the class members currently receive $0.

### B.   As structured, the proposed Privacy Foundation would not satisfactorily represent the interests of the class.

If the Settlement Agreement is approved as written, Facebook will deposit the sum in "a separate bank account specifically established by Facebook for purpose of this Settlement."[6] The settlement also provides for the formation of a Privacy Foundation. Under the terms of the settlement, a Privacy Foundation will be established "to fund projects and initiatives that promote the cause of online privacy, safety, and security. . . ."[7]

While the goal of protecting online consumer privacy through a non-profit foundation is commendable, the "Privacy Foundation" described in the Settlement Agreement will not achieve these goals, because Facebook's influence will be too great. The foundation will have three directors, "chosen by mutual agreement of the parties."[8] Future directors will be "nominated and selected in accordance with the charter and by-laws of the foundation."[9] The foundation will also have a two-member Board of Legal Advisors, who will "offer nonbinding advice on compliance with the provisions of this Agreement, attend all formal meetings and offer nonbinding advice to the officers and directors."[10] The initial Advisors will be Michael Rhodes, counsel of record for Facebook, and Scott Kamber, one of two counsels of record for the representative plaintiffs, or their designees.[11] In its first year, the Board of Legal Advisors will determine a plan for selecting future Advisors.[12]

With this structure, the proposed Privacy Foundation will not be sufficiently independent of Facebook to serve as an effective tool for consumer privacy protection. In fact, for several reasons, the foundation as proposed is likely to become a public relations organization for Facebook. Facebook will have a direct hand in selecting the foundation's directors. Future directors will be selected based on the foundation's charter, which

---

[4] 18 U.S.C. § 2710(c) (2006).
[5] Facebook, *Statistics*, http://www.facebook.com/press/info.php?statistics (last visited Dec. 9, 2009).
[6] Settlement Agreement at 12.
[7] *Id.* at 11–12.
[8] *Id.* at 12.
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*

Facebook will presumably create while forming the foundation, and the foundation's bylaws, which the inaugural, Facebook-selected directors will presumably write. Moreover, the named counsel representing Facebook has a powerful position as a member of the Board of Legal Advisors. Under these conditions, it is nearly inevitable that the foundation will express views on privacy issues that are consistent with the goals of its key board member. As such, it will become a branch of Facebook's public relations department, clothed in the garb of an independent non-profit.

The Settlement Agreement's description of the goals of the proposed foundation demonstrates this approach as well. The Agreement states that the foundation is "to fund and sponsor programs designed to educate users, regulators, and enterprises regarding critical issues relating to protection of identity and personal information online through user control, and to protect users from online threats."[13] This reads like public relations and lobbying efforts on behalf of Facebook.

Facebook is not accused of failing to effectively "educate" users and regulators. Facebook is accused of inappropriately disclosing its users' personal information in direct violation of state and federal law. A foundation whose primary goal is the education of users regarding business practices is not an appropriate remedy where it is the business practices that caused the harm.

II. Approval of the Settlement Agreement Should Be Conditioned on Modifications that Will Protect the Interests of the Class.

As discussed, the $9.5 million fund set aside by the settlement is insufficient, particularly in light of the number of potential class members and the potential for statutory liquidated damages. The amount should be amended to more accurately reflect the damages inflicted by the Beacon program, as well as the defendants' potential liability exposure.

If, however, the Court decides not to augment the amount of money set aside by the settlement, the Court should treat the money as a *cy pres* remedy and ensure that it adheres to the principles animating that remedy. "[T]he term 'cy pres' derives from the Norman French expression *cy pres comme possible*, which means 'as near as possible.'"[14] The *cy pres* doctrine arose in the law of equity and originated as a rule of construction to save a testamentary charitable gift that would otherwise fail, allowing "the 'next best' use of the funds to satisfy the testator's intent 'as near as possible.'"[15]

Courts have also utilized *cy pres* distributions "[w]hen a class action involves a large number of class members but only a small individual recovery, the cost of separately proving and distributing each class member's damages may so outweigh the

---

[13] *Id.* at 11.
[14] *Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n*, 84 F.3d 451, 455 n.1 (D.C. Cir. 1996).
[15] *Id.*

potential recovery that the class action becomes unfeasible."[16] In such cases, a *cy pres* award "avoids these difficulties by permitting aggregate calculation of damages, the use of summary claim procedures, and distribution of unclaimed funds to indirectly benefit the entire class."[17] The purpose of the equitable *cy pres* remedy is to benefit members of a class, and the public, indirectly by distributing the funds to interested third parties who will advance and promote the interests of the class.

In this case, the class action involves a large number of class members and, because of the inadequacy of the settlement fund, only a small potential individual recovery. If the amount of funds set aside by the settlement is not augmented, the Court should treat the funds as a *cy pres* remedy. And, for the foregoing reasons, the proposed distribution of the funds do not adhere to *cy pres* principles because the proposed foundation does not satisfactorily represent the interests of the class. In order to adhere more closely to the principles of the *cy pres* remedy, the settlement should be disbursed directly to existing privacy advocates or distributed through a neutral third party-trustee. At minimum, the proposed foundation should be restructured as a truly independent entity.

## A.  The settlement funds should be distributed directly to non-profit organizations working to safeguard consumer privacy.

The best way to fairly and adequately represent the interests of the class is to allocate the *cy pres* money among the several well-established non-profits that already serve the functions proposed to be served by the new foundation. The proposed foundation will ostensibly "educate users, regulators, and enterprises regarding critical issues relating to protection of identity and personal information online through user control, and to protect users from online threats."

The Electronic Privacy Information Center (EPIC) has a long history of effectively accomplishing very similar goals. EPIC is a public interest research center established in 1994 to focus public attention on emerging privacy and civil liberties issues. EPIC has issued a wide range of publications and reports intended to educate the public regarding the state of privacy, security, and civil liberties.[18] EPIC has long been a leading voice regarding privacy and social networking,[19] and, more specifically, privacy and Facebook.[20]

However, EPIC is certainly not alone among non-profits that work with emerging online privacy issues, and the proposed foundation would, at best, unnecessarily duplicate their efforts as well. Among the organizations in this field are the Privacy Rights Clearinghouse, the Consumer Federation of America, the Center for Digital Democracy,

---

[16] *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 1990).
[17] *Id*. (citing *Developments in the Law - Class Actions*, 89 Harv.L.Rev. 1318, 1517 (1976)).
[18] EPIC, *EPIC Reports*, http://epic.org/reports (last visited Dec. 9, 2009).
[19] EPIC, *Social Networking Privacy*, http://epic.org/privacy/socialnet (last visited Dec. 9, 2009).
[20] EPIC, *Facebook Privacy*, http://epic.org/privacy/facebook (last visited Dec. 9, 2009).

the World Privacy Forum, the Electronic Frontier Foundation, and the American Civil Liberties Union. All of these organizations would be appropriate recipients for funds intended to protect the interests of the class.

### B. Alternatively, the settlement sum should be distributed to existing organizations by a neutral third-party trustee.

Moreover, there is a well-established process for identifying deserving organizations and awarding them *cy pres* settlement funds, particularly in the context of consumer privacy rights. The Rose Foundation[21] administers the Consumer Privacy Rights Fund, which "was created from a series of legal settlements involving consumer privacy issues. It awards grants to support privacy-related research, education, advocacy and policy development. Since its inception in 2002, the Fund has awarded over $4.5 million to support privacy protection in California and throughout the US."[22] Thus, if the parties to the proposed settlement wish to dedicate funds to the protection of consumer privacy, channeling funds through the Rose Foundation provides a well-established way of doing so.

If the Consumer Privacy Rights Fund is not specific enough for the parties' needs, the Rose Foundation also has considerable experience acting as trustee over specialized funds based on requirements of individualized settlements. Because of the quantities involved here, this may be the best solution for this settlement." Even in cases where a settlement mandates the support of specifically designated projects, the Foundation's centralized administration, experience, and accountability can add considerable value to the process."[23]

### C. In the alternative, the proposed Privacy Foundation should be restructured to protect the interests of the class.

If the court decides that the establishment of a true independent foundation to improve and protect online privacy for consumers would actually be a good use of the settlement funds, the proposed foundation must be restructured in order to achieve true independence.

First, Facebook should not have so much influence on the selection of the board of directors of the foundation. For this to be a true settlement, Facebook should have no influence at all on the foundation. Rather than filling the directorships as the Agreement describes, the directors should instead be appointed by neutral third parties. These appointments could be made by any number of disinterested entities, including the court, government actors (e.g. the director of the California Department of Consumer Affairs), academia (e.g. the Stanford Center for Internet and Society or the Berkeley Center for

---

[21] Rose Foundation, *Index*, http://www.rosefdn.org (last visited Dec. 9, 2009).

[22] Rose Foundation, *Consumer Privacy Rights Fund*,
http://www.rosefdn.org/article.php?id=260 (last visited Dec. 9, 2009).

[23] Rose Foundation, *How We Administer Restitution and Cy Pres Funds*,
http://www.rosefdn.org/article.php?list=type&type=112 (last visited Dec. 9, 2009).

Law & Technology), or experts in the world of nonprofit foundations (e.g. the Rose Foundation, discussed above). Similarly, once the foundation is established, it should select its own legal advisers, or find counsel willing to serve in a pro bono capacity, rather than rely on the parties' counsel for legal advice.

Second, the charter of the foundation should be changed. If the foundation is going to be any use at all in redressing the sort of violations at issue in this case, its mission must be broader. Instead of focusing primarily on the education of users, regulators, and enterprises, the foundation should focus on protecting consumer privacy. User education should be the responsibility of Facebook itself. And the Settlement Agreement's proposed "programs to educate . . . regulators" can be more aptly described as lobbying. Without these changes, the proposed foundation will be nothing more than a non-profit wing of Facebook, presenting public relations in the form of "education" and failing to represent the interests of class members.

Conclusion

Regardless of the solution chosen, we urge you to condition acceptance of the settlement on modification of the terms of the proposed Settlement Agreement in order to more fairly and adequately represent the interests of the class, as required by the Federal Rules of Civil Procedure.

Sincerely,

Electronic Privacy Information Center

Center for Digital Democracy

Consumer Action

Consumer Federation of America

Privacy Rights Clearinghouse

Patient Privacy Rights

cc: Michael G. Rhodes, Cooley Godward Kronish LLP
    Scott A. Kamber, KamberEdelson, LLC
    David A. Stampley, KamberEdelson, LLC
    Joseph H. Malley, Law Office of Joseph H. Malley