MARK A. CHAVEZ (California Bar No. 90858)
mark@chavezgertler.com
**Chavez & Gertler, LLP**
42 Miller Ave.
Mill Valley, CA 94941
Telephone: (415) 381-5599

PHILIP S. FRIEDMAN (California Bar No. 131521)
psf@consumerlawhelp.com
**Friedman Law Offices, PLLC**
2401 Pennsylvania Ave., NW
Suite 410
Washington, DC 20037
Telephone: (202) 293-4175

GREGORY A. BECK (to be admitted pro hac vice)
gbeck@citizen.org
**Public Citizen Litigation Group**
1600 20th St. NW
Washington, DC  20009
Telephone: (202) 588-7713

Attorneys for Objector Ginger McCall

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| SEAN LANE, et al., | Case No. 5:08-cv-03845-RS |
| Plaintiffs, | Judge Richard Seeborg |
| v. | **OBJECTIONS OF CLASS MEMBER GINGER MCCALL TO PROPOSED CLASS ACTION SETTLEMENT AND NOTICE OF INTENT TO APPEAR** |
| FACEBOOK, INC., et al., | |
| Defendants. | Hearing Date: February 26, 2010 |
| | Time:          9:30 a.m. |
| | Courtroom:  Courtroom 4, 5th Floor |
| | 280 South First Street |
| | San Jose, CA 95113 |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ...............................................................................................................1

BACKGROUND ................................................................................................................2

    A.  The Underlying Class Action...............................................................................2

    B.  The Proposed Settlement ....................................................................................2

IDENTITY OF OBJECTOR AND INTENT TO APPEAR.....................................................4

STANDARDS UNDER RULE 23(e) ....................................................................................4

ARGUMENT .....................................................................................................................6

I.    The Court Should Refuse to Approve the Settlement Because It Provides No Real Relief to the Class. ...................................................................................................6

    A.    The Class Will Receive No Monetary Compensation...........................................7

    B.    The Class Will Not Benefit from the Other "Relief" Because Facebook Has Already Nearly Eliminated Beacon, And Agreeing to Terminate What Remains of the Program Is Meaningless. ...................................................................................................9

    C.    Creating the Facebook Foundation Is an Inappropriate Cy Pres-Like Remedy That Provides No Value to the Class. ......................................................................11

        1.    The Facebook Foundation Is Unneeded. ............................................. 12

        2.    Facebook Would Retain Unwarranted Influence Over the Foundation................. 14

II.    The General Release Is Overbroad and Allows Defendant Blockbuster to Escape Liability in Litigation Currently Pending in the Fifth Circuit................................15

CONCLUSION...............................................................................................................16

OBJECTIONS OF CLASS MEMBER GINGER MCCALL TO PROPOSED CLASS ACTION SETTLEMENT
Case No. 5:08-cv-03845-RS

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                    **Page(s)**

*Acosta v. Trans Union, LLC*,
   243 F.R.D. 377 (C.D. Cal. 2007)..................................................................5

*In re Agent Orange Product Liability Litigation MDL No. 381*,
   818 F.2d 179 (2d Cir. 1987)........................................................................15

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)......................................................................................4

*Class Plaintiffs v. City of Seattle*,
   955 F.2d 1268 (9th Cir. 1992) ......................................................................4

*In re Folding Carton Antitrust Litigation*,
   744 F.2d 1252 (7th Cir. 1984) ....................................................................13

*In re General Motors Corp. Engine Interchange Litigation*,
   594 F.2d 1106 (7th Cir. 1979) ....................................................................15

*In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*,
   55 F.3d 768 (3d Cir. 1995)............................................................................5

*Harris v. Blockbuster, Inc.*,
   No. 3:09-cv-217 (N.D. Tex.) ......................................................................15

*Jamison v. Butcher & Sherrerd*,
   68 F.R.D. 479 (E.D. Pa. 1975).....................................................................10

*Mars Steel Corp. v. Continental Illinois National Trust Co.*,
   834 F.2d 677 (7th Cir. 1984) ........................................................................5

*In re Matzo Food Products Litigation*,
   156 F.R.D. 600 (D.N.J. 1994).......................................................................11

*Maywalt v. Parker & Parsley Petroleum Co.*,
   67 F.3d 1072 (2d Cir. 1995)..........................................................................4

*In re Mego Financial Corp. Securities Litigation*,
   213 F.3d 454 (9th Cir. 2000) .....................................................................5, 8

*In re Microsoft Corp. Antitrust Litigation*,
   185 F. Supp. 2d 519 (D. Md. 2002) ............................................................14

*Molski v. Gleich*,
   318 F.3d 937 (9th Cir. 2003) ........................................................................5

*Mullane v. Central Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950)......................................................................................16

*Norman v. McKee*,
   290 F. Supp. 29 (N.D. Cal. 1968), *aff'd*, 431 F.2d 769 (9th Cir. 1970) ......10

*Officers for Justice v. Civil Service Commission*,
   688 F.2d 615 (9th Cir. 1982) ................................................................................4, 5

*Powell v. Georgia-Pacific Corp.*,
   119 F.3d 703 (8th Cir. 1997) ...............................................................................7, 11

*Powers v. Eichen*,
   229 F.3d 1249 (9th Cir. 2000) ..................................................................................5

*Six Mexican Workers v. Arizona Citrus Growers*,
   904 F.2d 1301 (9th Cir. 1990) .............................................................................7, 11

*Staton v. Boeing Co.*,
   327 F.3d 938 (9th Cir. 2003) ....................................................................................4

*In re TD Ameritrade Accountholder Litigation*,
   Case No. 07-2852 (N.D. Cal.).................................................................................6, 7

*Weinberger v. Great N. Nekoosa Corp.*,
   925 F.2d 518 (1st Cir. 1991) .....................................................................................5

**STATUTES AND RULES**

Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (1986)...............................................2

Electronic Communications Privacy Act, 18 U.S.C. § 2510 (1986) .................................2

Video Privacy Protection Act, 18 U.S.C. § 2710 (1988)..............................................2, 8

S. Rep. No. 100-599, at 8 (1988) ........................................................................................8

Fed. R. Civ. P. 23(e)(2).......................................................................................................4

2003 Advisory Committee Notes, Fed. R. Civ. P. 23(h) ...................................................5

California Computer Crime Law,
   Cal. Penal Code § 502.................................................................................................2

California Consumers Legal Remedies Act,
   Cal. Civ. Code § 1750.................................................................................................2

**OTHER AUTHORITIES**

American Law Institute, *Principles of the Law of Aggregate Litigation* (Proposed
   Final Draft Apr. 2009) ................................................................................................7

Articles of Incorporation of Digital Trust Foundation,
   http://www.beaconclasssettlement.com/Files/ByLawAndFormation.pdf ...................3

Center for Digital Democracy, *About CDD*,
   http://www.democraticmedia.org/about_cdd.............................................................12

Childnet International, *About Childnet International*,
   http://www.childnet-int.org/about.............................................................................13

**OTHER AUTHORITIES (cont'd)**

Common Sense Media, *Commensense Media: Our Mission*,
    http://www.commonsensemedia.org/about-us/our-mission ...................................................... 13

CyberAngels, *About CyberAngels*, http://www.cyberangels.org/about.php.................................. 13

Davis, Wendy, *Privacy Groups Question Beacon Settlement, Facebook's Control
    Over Foundation*, Online Media Daily, Jan. 26, 2010, http://www.mediapost.com/
    publications/?fa=Articles.showArticle&art_aid=121321 ...................................................... 14

Electronic Frontier Foundation, *About EFF*, http://www.eff.org/about ........................................ 12

Electronic Privacy Information Center, *About EPIC*, http://epic.org/epic/about.html ................... 12

Facebook Connect, http://www.facebook.com/advertising/?connect.............................................. 10

Facebook Platform Developer Forum, Post of lshepard_fb, Jan. 15, 2009,
    http://forum.developers.facebook.com/viewtopic.php?pid=120697 ...................................... 9, 10

Family Online Safety Institute, *About FOSI*,
    http://fosi.org/cms/index.php/abouttheinstitute.html .......................................................... 13

i-SAFE Inc., http://www.isafe.org ................................................................................................ 13

Matyszczyk, Chris, *Zuckerberg: I know that people don't want privacy*, CNET News,
    Jan. 10, 2010, *available at* http://news.cnet.com/8301-17852_3-10431741-71.html ............ 1, 15

Newberg on Class Actions (4th ed. 2002) .................................................................................... 11

Press Release, *Facebook to Enhance User Safety Through Formation of Global
    Advisory Board*, http://www.facebook.com/press/releases.php?p=133745 .............................. 12

Privacy Rights Clearinghouse, *About the Privacy Rights Clearinghouse*,
    http://www.privacyrights.org/about_us.htm ...................................................................... 12

Rose Foundation, *Consumer Privacy Rights Fund*,
    http://www.rosefdn.org/article.php?id=260 ...................................................................... 12

Smith, Justin, *Is Facebook Shutting Down Beacon?*,
    http://www.insidefacebook.com/2008/09/20/ is-facebook-shutting-down-beacon ..................... 9

Stone, Brad, *Facebook Aims to Extend Its Reach Across the Web*, N.Y. Times, Nov.
    30, 2008 ........................................................................................................................ 10

Story, Louise & Stone, Brad, *Facebook Retreats on Online Tracking*, N.Y. Times,
    Nov. 30, 2007 .................................................................................................................... 9

Vauhini Vara, *Facebook's Tracking of User Activity Riles Privacy Advocates,
    Members*, Wall St. J., Nov. 21, 2007 ................................................................................ 9

World Privacy Forum, *World Privacy Forum: About Us*,
    http://www.worldprivacyforum.org/aboutus.html .............................................................. 12

1

Zuckerberg, Mark, *Facebook Across the Web*, Dec. 4, 2008,
   http://blog.facebook.com/blog. php?blog_id=company&blogger=4......................................... 10

2

Zuckerberg, Mark, *Thoughts on Beacon*, Dec. 5, 2007,
   http://blog.facebook.com/blog.php?post=7584397130 ............................................................ 9

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OBJECTIONS OF CLASS MEMBER GINGER MCCALL TO PROPOSED CLASS ACTION SETTLEMENT
Case No. 5:08-cv-03845-RS

## INTRODUCTION

This is a putative class action against Facebook over its former "Beacon" program, which posted users' private information on the Facebook website without warning or consent.  Under the proposed settlement, the only "relief" for the class would be a privacy foundation established by Facebook—an organization whose founder and CEO, Mark Zuckerberg, believes that people no longer care about personal privacy. *See* Chris Matyszczyk, *Zuckerberg: I know that people don't want privacy*, CNET News, Jan. 10, 2010, http://news.cnet.com/8301-17852_3-10431741-71.html ("People have really gotten comfortable not only sharing more information and different kinds, but more openly and with more people.  That social norm is just something that has evolved over time."). But the proposed settlement is more than just ironic—it is also unfair and inadequate to the class.  The settlement provides no damages or other relief for class members other than Facebook's promise to disband a program that it voluntarily shut down long ago. Rather than providing actual relief, the settlement would create an unneeded foundation over which Facebook retains unwarranted influence. In exchange, class members would release valuable claims, including claims for statutory damages, against not only Facebook, but more than forty other defendants who participated in the Beacon program. Compounding the problem, the summary notice fails to even mention the release of claims against these other companies, leaving class members unaware that they are giving up claims against defendants that will contribute nothing in return.

Other than class members, practically everyone involved in this case stands to benefit from the settlement: the named plaintiffs receive monetary compensation; all defendants, including those that have contributed nothing to the settlement, are released from liability in this and other related actions; and class counsel receives attorneys' fees in excess of $3 million.  Class members, however, lose their rights in exchange for nothing, leaving them worse off than if this case had never been brought.  Plaintiffs have not and cannot meet their burden of demonstrating that the settlement is fair, reasonable, and adequate for absent class members.  For these reasons, the Court should reject the proposed settlement.

**<u>BACKGROUND</u>**

**A.     The Underlying Class Action**

Facebook, Inc. operates the popular social media and networking website, Facebook.com, which has more than 350 million active users.  In November 2007, Facebook launched a program called "Beacon," which allowed Facebook to learn about actions taken by its users on the websites of Facebook's partners. After collecting the information, which included users' online activities on the websites of defendants Blockbuster, Fandango, Hotwire, STA Travel, Overstock.com, Zappos.com, Gamefly, and forty others, Beacon published it on the Facebook website without warning and without the users' consent.

Plaintiffs contend that Facebook and its Beacon merchant partners violated their privacy rights.  In their complaint, plaintiffs allege violations of (1) the Electronic Communications Privacy Act, 18 U.S.C. § 2510 (1986); (2) the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (1986); (3) the Video Privacy Protection Act, 18 U.S.C. § 2710 (1988); (4) California's Consumers Legal Remedies Act, California Civil Code § 1750; and (5) California's Computer Crime Law, Penal Code § 502.  After negotiations and mediation sessions, but before the Court considered any dispositive motion or a motion for class certification, and apparently before the parties took any discovery, counsel for both parties reached a proposed settlement.[1]  On October 23, 2009, the court gave preliminary approval to the settlement.  *See* Dkt. Entry No. 67 (Preliminary Approval and Notice Order).

**B.     The Proposed Settlement**

Under the terms of the proposed settlement, defendant Facebook will pay $9.5 million into a settlement fund.   Settlement Agreement ("SA") ¶ 4.5.  Facebook will distribute that money principally to a foundation established by Facebook.  *Id.* ¶¶ 4.6, 4.19.  The $9.5 million fund will

---

[1] The parties have put forth no evidence that any formal discovery has taken place.  When they moved for preliminary approval of the settlement, plaintiffs' counsel informed the Court only that "[f]or over three months prior to the filing of the complaint," class counsel and his colleagues had spent "hundreds of hours" "investigating facts and developing legal theories contained in the complaint."  *See* Dkt. Entry No. 38-6, ¶ 3 (Declaration of Scott A. Kamber in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement Agreement).

1   also cover fees for class counsel (which may total one-third of the $9.5 million), incentive awards,

2   and administrative costs. *Id.* ¶¶ 4.6, 4.12. The named plaintiffs will receive monetary compensation

3   ranging from $1,000 to $15,000 each. *Id.* ¶ 4.16.[2] Aside from the named plaintiffs, class members

4   will receive no money from the fund. Additionally, although Facebook changed the Beacon

5   program to end the nonconsensual sharing of users' private information long before this litigation

6   even commenced, the settlement provides that Facebook will terminate what remains of Beacon. *Id.*

7   ¶ 4.23. In exchange for what amounts to worthless "relief," all class members will release all

8   Beacon-related claims against Facebook and the Beacon merchant partners. *Id.* ¶ 5.1.

9          At the heart of the proposed settlement is the foundation that Facebook will pay itself to

10  establish. *See id.* ¶ 4.19. Facebook will create a non-profit foundation "to fund projects and

11  initiatives that promote the cause of online privacy, safety, and security." *Id.* The foundation will

12  "fund and sponsor programs designed to educate users, regulators, and enterprises regarding critical

13  issues relating to protection of identity and personal information online through user control, and to

14  protect users from online threats." *Id.* ¶ 4.20. The settlement contemplates that the foundation will

15  have three directors who are chosen initially by mutual assent of the parties; failing that, each party

16  will nominate one director, and each party will also nominate a proposed third director who will be

17  selected by a mediator. *Id.* ¶ 4.21.[3] The three directors must "unanimously determine a plan for

18  terms and succession of its officers and directors and a permanent name" for the privacy foundation.

19  *Id.* The foundation will also have a two-person "Board of Legal Advisors." *Id.* ¶ 4.22. Class

20  counsel Scott Kamber, and counsel for Facebook, Michael Rhodes, will serve as the initial members

21

22

23  [2] Sean Lane will receive $15,000, Sean Martin and Mohannaed Sheikha will receive $7,500 each,

24  and all other named plaintiffs will receive $1,000 each. SA ¶ 4.16. The settlement does not explain why one named plaintiff will receive fifteen times the incentive award of others.

25  [3] The three initial directors will be Tim Sparapani, Larry Magid, and Chris Jay Hoofnagle. Articles

26  of Incorporation of Digital Trust Foundation, http://www.beaconclasssettlement.com/Files/ByLawAndFormation.pdf. Mr. Sparapani is Facebook's Director of Public Policy. Mr. Magid is a

27  journalist and commentator who writes on technology-related issues. Mr. Hoofnagle is the director of the Berkeley Center for Law and Technology's information privacy program.

28

1  of the board of legal advisors.  *Id.*  In its first year, the board of legal advisors will "determine a plan

2  for terms and succession of members of the board of legal advisors."  *Id.*

### IDENTITY OF OBJECTOR AND INTENT TO APPEAR

4         These objections are filed on behalf of Class Member Ginger McCall.  *See* Declaration of

5  Ginger McCall.  As detailed in her declaration, McCall, a Facebook user during the specified class

6  period, used the Blockbuster.com website to rent the film *Untraceable* and a television show, *The X-

7  Files, Season 5*.  Those rentals triggered the Beacon program to publish information concerning her

8  rental activity on Facebook without her consent.  *Id.* ¶¶ 3, 12, 13, 15, 16. McCall values her personal

9  privacy and, as a lawyer at the Electronic Privacy Information Center ("EPIC"), is an advocate for

10 privacy interests. McCall intends to appear at the Final Approval Hearing through counsel and

11 present argument in support of her objections.

### STANDARDS UNDER RULE 23(e)

13        Under Rule 23, a district court may approve a class action settlement "only after a hearing

14 and on finding that it is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2); *see Staton v.

15 Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).  "In approving a proposed class action settlement, the

16 district court has a fiduciary responsibility to ensure that 'the settlement is fair and not a product of

17 collusion, and that the class members' interests [are] represented adequately.'"  *Maywalt v. Parker &

18 Parsley Petroleum Co.*, 67 F.3d 1072, 1078 (2d Cir. 1995) (quoting *Grant v. Bethlehem Steel Corp.*,

19 823 F.2d 20, 22 (2d Cir. 1987)).  The purpose of this requirement is "the protection of those class

20 members … whose rights may not have been given due regard by the negotiating parties."  *Officers

21 for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 624 (9th Cir. 1982). The settling parties bear the

22 burden of showing that the settlement satisfies this standard.  *Staton*, 327 F.3d at 952.  Although a

23 court may need to balance several factors to determine whether a proposed settlement is fair,

24 reasonable, and adequate, "[t]he relative importance to be attached to any particular factor will

25 depend upon the nature of the claims, the types of relief sought, and the unique facts and

26 circumstances presented by the individual case." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268,

27

28

1    1291 (9th Cir. 1992) (citing *Officers for Justice*, 688 F.2d at 625).[4]   The essence of the inquiry is

2    whether the settlement reflects a reasonable compromise in light of the prospects of further litigation.

3    The proposed settlement here requires a higher level of scrutiny because it was reached prior

4    to class certification. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620-21 (1997); *In re Mego*

5    *Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000); *Weinberger v. Great N. Nekoosa Corp.*,

6    925 F.2d 518, 520 (1st Cir. 1991). "With less information about the class, the judge cannot as

7    effectively monitor for collusion, individual settlements, buy-offs (where some individuals use the

8    class action device to benefit themselves at the expense of absentees), and other abuses." *In re Gen.*

9    *Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig.*, 55 F.3d 768 (3d Cir. 1995); *accord*

10   *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 397 (C.D. Cal. 2007). Extra scrutiny is also required

11   because the parties are no longer in an adversarial posture, and in light of the inherent tension

12   attributable to class counsel's self-interest in achieving a settlement that, like this one, involves a

13   substantial proposed attorneys' fee award in an unlitigated case. *See Staton*, 327 F.3d at 959- 60; *see*

14   *also Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000). This concern is especially relevant

15   where, as here, the settlement offers no direct compensation to the class. *See Mars Steel Corp. v.*

16   *Cont'l Ill. Nat'l Trust Co.*, 834 F.2d 677, 681 (7th Cir. 1984). The Court has a responsibility to

17   ensure that the settlement provides real value by offering relief that the class will actually use. *See*

18   2003 Advisory Committee Notes, Fed. R. Civ. P. 23(h) ("Settlements involving nonmonetary

19   provisions for class members also deserve careful scrutiny to ensure that these provisions have actual

20   value to the class.").

21   As explained below, the Court should deny final approval of the proposed settlement in this

22   case because unnamed class members receive no direct compensation; the Facebook foundation is

23   unneeded and, of greater worry, subject to Facebook's control; the termination of the Beacon

24

25

---

26   [4] Those factors include, but are not limited to (1) the strength of plaintiffs' case, (2) the risk,
     expense, and complexity of continued litigation, (3) the extent of discovery completed and the stage
27   of the proceedings, and (4) the reaction of the class members to the proposed settlement. *Molski v.*
     *Gleich*, 318 F.3d 937, 953 (9th Cir. 2003).
28

program provides no value to the class; and the summary notice fails to advise class members that they are releasing all of their claims against Facebook and all Beacon merchant partners.

## ARGUMENT

**I.   The Court Should Refuse to Approve the Settlement Because It Provides No Real Relief to the Class.**

Settlements that provide only illusory benefits to class members are routinely rejected by the courts. In *Molski v. Gleich*, 318 F.3d 937, for example, the Ninth Circuit upheld the district court's rejection of a proposed settlement in a class action brought under the Americans with Disabilities Act on behalf of mobility-impaired individuals who claimed they had been denied access to public accommodations. Under a proposed settlement, the defendant agreed to make its facilities accessible to those with impaired mobility, to pay monetary damages to the named plaintiff, to pay attorneys' fees, and to make donations to various disability rights organizations. In return, class members released their claims and received no monetary compensation.

In rejecting the adequacy of the settlement, the Ninth Circuit did not mince words: "[T]he class members received nothing." *Id.* at 954. There, as here, minimal discovery had been taken, and the settlement agreement had been reached long before a class was certified. *Id.* There, as here, practically everyone involved other than the class members stood to benefit from the proposed settlement. There, the defendant agreed to make its facilities more accessible (as it was already required to by law); here, Facebook has agreed to terminate the Beacon program (which it has already altered in response to a backlash by users and concerns expressed by privacy rights advocates). There, the defendant agreed to donate money to disability-rights charities; here, Facebook proposes to use its money to establish and fund an unneeded foundation over which it has significant control.

Similarly, Chief Judge Walker recently rejected a proposed class action settlement (brought by the same class counsel who brought this case) in which the class would have received nothing of value. *In re TD Ameritrade Accountholder Litig.*, Case No. 07-2852 (N.D. Cal.) (Exh. 1). In that case, a security breach at the brokerage firm TD Ameritrade exposed private accountholder information to hackers. The rejected settlement would have required TD Ameritrade to (1) hire

-6-

security experts to test its systems' vulnerabilities, (2) retain a separate firm to investigate possible identity theft, and (3) provide each class member with a unique identification number to obtain a free, one-year subscription (or renewal) for an anti-virus, anti-spam internet security product.  Exh. 1, at 8.   The proposed security testing and identity theft countermeasures were "very temporary" fixes that did "not convince the court that [TD Ameritrade] has corrected or will address the security of client data in any serious way, let alone provide discernible benefits for the class."  *Id.* at 9.  The free subscription to the anti-virus, anti-spam security product likewise conferred no benefit on the class because many class members either owned anti-spam software or used one of several freely available anti-spam email services.  The court concluded that the proposed settlement conferred "no discernible benefit upon the class" and rejected it.  *Id.* at 8.  There, as here, the class received nothing of value. For the same reason, the proposed settlement in this case should be rejected.

### A.   The Class Will Receive No Monetary Compensation.

Under the terms of the proposed settlement, the class receives no compensation.  Facebook's $9.5 million payment, after subtracting fees for class counsel (which may be one-third of the total), incentive awards, and administrative costs, will be used to start Facebook's foundation.  No money will go to the class for the release of their damages claims.

Before this Court even considers approval of a *cy pres*-like award distribution of settlement funds, much less a scenario in which the funds are paid by the defendant to a foundation over which it retains unwarranted influence, it should first be confident that direct relief to the class is uneconomical or impractical.  *See, e.g., Powell v. Georgia-Pacific Corp.*, 119 F.3d 703, 706 (8th Cir. 1997) (*cy pres* traditionally used in cases in which class members are difficult to identify); *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 1990) (*cy pres* traditionally used in cases with a large number of class members but only a small individual recovery); American Law Institute, *Principles of the Law of Aggregate Litigation* § 3.07 cmt. b (Proposed Final Draft Apr. 2009) (*cy pres* favored "only when direct distributions to class members are not feasible— either because class members cannot be reasonably identified or because distributions would involve such small amounts that, because of the administrative costs involved, such distributions would not be economically viable").  Here, because the parties have apparently taken no discovery, the Court

has no basis for assessing the size of the class, the potential value of the claims, or potential barriers to providing relief to individual class members.  Although formal discovery is not "a necessary ticket to the bargaining table," the parties and the Court must have "sufficient information to make an informed decision about settlement." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 459 (settlement approved where parties had conducted investigation and research, and had worked with damages and accounting experts).  No such information has been presented in this case.

The absence of any monetary relief for class members is telling evidence that the settlement is unfair, unreasonable, and inadequate.  The class action complaint seeks, among other things, significant monetary relief (including statutory damages), restitution, and disgorgement of ill-gotten gains.  To be sure, the potential recovery in this lawsuit, as in any lawsuit, may be difficult to predict.  Here, however, Plaintiffs seek damages under several causes of action, including statutory damages of at least $2,500 per class member under the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710(c)(2)(A).  The VPPA imposes liability for disclosing personally identifiable information about consumers' video rentals regardless of the disclosing entity's intent or knowledge. *See id.* § 2710(b)(1).  The statute imposes strict liability and evinces Congress's intent to draft a robust privacy law enforceable by those directly harmed.  As the Senate Committee Report explained, the VPPA's private right of action is the statute's exclusive remedy provision:

> The civil remedies section puts teeth into the legislation, ensuring that the law will be enforced by individuals who suffer as the result of unauthorized disclosures. It provides that an individual harmed by a violation of the Act may seek compensation in the form of actual and punitive damages, equitable and declaratory relief and attorneys' fees and costs.
>
> Statutory damages are necessary to remedy the intangible harm caused by privacy intrusions. Similar remedies exist in the federal wiretap statute as revised by this committee in 1986.  The absence of such a remedy in the Privacy Act of 1974 is often cited as a significant weakness.

S. Rep. No. 100-599, at 8 (1988).

The VPPA therefore represents Congress's attempt to protect individual privacy rights by arming consumers with a strict liability cause of action and subjecting violators to significant statutory damages.  The parties have presented no evidence of how many Facebook users, like McCall, had their movie rentals posted online. It is thus impossible to evaluate the value of the

1    VPPA claim, but the recovery classwide is potentially far greater than the $9.5 million agreed to

2    under the proposed settlement. Even if statutory damage claims are available to only a small portion

3    of the class, those class members may make up a viable subclass with significant monetary claims.

4    Under the settlement, however, that subclass forfeits its valuable VPPA claims in exchange for

5    nothing.

6    **B.    The Class Will Not Benefit From the Other "Relief" Because Facebook Has Already Nearly Eliminated Beacon, and Agreeing to Terminate What Remains of the Program Is Meaningless.**

7

8          Facebook's promise to terminate the Beacon program also provides no value to the class.  At

9    the time of its launch, Beacon was mandatory for Facebook users—the program could not be

10   disabled, and it automatically disclosed users' personal information to third parties.  *See* Mark

11   Zuckerberg, *Thoughts on Beacon*, Dec. 5, 2007, http://blog.facebook.com/blog.php?post=

12   7584397130.   Largely in response to the efforts of non-profit groups and a backlash among

13   Facebook users, Facebook previously modified Beacon to require users to affirmatively opt-in to

14   each disclosure.  *Id.*; *see* Louise Story & Brad Stone, *Facebook Retreats on Online Tracking*, N.Y.

15   Times, Nov. 30, 2007; Vauhini Vara, *Facebook's Tracking of User Activity Riles Privacy Advocates,*

16   *Members*, Wall St. J., Nov. 21, 2007.  On December 5, 2007, long before the complaint in this case

17   was filed, Facebook modified the program to give users the option of turning off Beacon entirely.

18   Zuckerberg, *Thoughts on Beacon*.  In September 2008, also before this action was filed, Facebook

19   removed Beacon from its "Business Solutions" website, and the Beacon home page ceased to exist.

20   *See* Justin Smith, *Is Facebook Shutting Down Beacon?*, http://www.insidefacebook.com

21   /2008/09/20/is-facebook-shutting-down-beacon.  By January 2009, one Facebook administrator

22   stated that "the Beacon program is permanently closed."  Facebook Platform Developer Forum,  post

23   of lshepard_fb, Jan. 15, 2009, http://forum.developers.facebook.com/viewtopic.php?pid=120697.

24          The complaint makes plain that what was problematic about the Beacon program was that it

25   operated without the consent of Facebook users and non-users, and that it was designed with no way

26   to opt-out.  Complaint ¶¶ 82, 83, 85, 86.  By late 2007, long before the complaint was filed,

27   Facebook had already altered the Beacon program to cure what privacy advocates and users had

28   claimed was wrong with it.  Given Facebook's voluntary, significant gutting of the Beacon program

1   prior to the inception of litigation, terminating what remains of Beacon is not meaningful relief for

2   the class.  *See Jamison v. Butcher & Sherrerd*, 68 F.R.D. 479, 482 (E.D. Pa. 1975) (rejecting

3   settlement where class members received nothing beyond the amount to which they were already

4   entitled under a separate SEC settlement); *Norman v. McKee*, 290 F. Supp. 29, 32-34 (N.D. Cal.

5   1968) (holding that defendants' agreement to repay brokerage commissions was not consideration

6   because "defendants were already under an obligation to repay under a previous SEC order"), *aff'd*,

7   431 F.2d 769 (9th Cir. 1970).

8           Moreover, nothing in the settlement prevents Facebook from launching programs that are

9   functionally very similar to Beacon under a different name.  Indeed, it appears that most of the

10  functionality of what remains of Beacon continues to exist on Facebook, now rebranded as

11  "Facebook Connect."   In January 2009, the same Facebook administrator who stated that "the

12  Beacon program is permanently closed" added that "all functionality has been subsumed by

13  [Facebook] Connect."  Facebook Platform Developer Forum, post of lshepard_fb, Jan. 15, 2009,

14  http://forum.developers. facebook.com/viewtopic.php?pid=120697.  Facebook Connect is a "viral

15  sharing loop" that allows partner websites to post users' actions to their Facebook profiles. *See*

16  Facebook Connect, http://www.facebook.com/advertising/?connect; Brad Stone, *Facebook Aims to*

17  *Extend Its Reach Across the Web*, N.Y. Times, Nov. 30, 2008 ("Like Beacon, the controversial

18  advertising program that Facebook introduced and then withdrew last year after it raised a hullabaloo

19  over privacy, [Facebook] Connect also gives members the opportunity to broadcast their actions on

20  those sites to their friends on Facebook.").  As Mark Zuckerberg has explained:

21          [Y]ou can use Facebook Connect with the reviews website, Citysearch.  You can
            easily log in using your Facebook account, and from there, you'll be able to interact
22          with all of your Facebook friends.  They'll be able to see some of the same profile
            information they can see on Facebook, which is fully controlled by your privacy
23          settings. *When you write a review for a restaurant, you'll have the option to publish*
            *that story back to Facebook, where your friends can see it, too.*
24
25  Mark Zuckerberg, *Facebook Across the Web*, Dec. 4, 2008, http://blog.facebook.com/blog. php?

26  blog_id=company&blogger=4 (emphasis added).   To terminate the remnants of Beacon while

27  continuing to offer the same functionality with Facebook Connect is, in effect, to do nothing at all.

28

**C.      Creating the Facebook Privacy Foundation Is an Inappropriate Cy Pres-Like Remedy That Provides No Value to the Class.**

*Cy pres* is a mechanism by which money damages can be distributed via third-party project funding.  Newberg on Class Actions, § 11:20 (4th ed. 2002).  *Cy pres* is appropriate when locating class members is difficult and costly, or when the class is large and each member's individual recovery is projected to be very small.  *See Six Mexican Workers*, 904 F.2d at 1305; *Powell*, 119 F.3d at 704.  *Cy pres* awards should provide indirect benefits to absent class members or further the purpose of the statutes that formed the basis for the underlying litigation.  *See In re Matzo Food Prods. Litig.*, 156 F.R.D. 600, 605 (D.N.J. 1994).  The purpose for which the funds are used should relate to the alleged injury suffered by the class.  *See, e.g.*, *Powell*, 119 F.3d at 707 (in a case alleging racial discrimination, *cy pres* award funded scholarships for African-American high school students).

This case sought to remedy Facebook's violations of privacy rights under state and federal statutes.  The settling parties propose that Facebook establish a privacy foundation "to fund projects and initiatives that promote the cause of online privacy, safety, and security," and to "fund and sponsor programs designed to educate users, regulators, and enterprises regarding critical issues relating to protection of identity and personal information online through user control, and to protect users from online threats." SA ¶¶ 4.19, 4.20.  Creating the Facebook foundation is an inappropriate *cy pres*-like remedy that provides no value to the class because (1) the foundation is unneeded—numerous established organizations already advocate for improved online privacy, safety, and security by educating users, regulators, and businesses; and (2) Facebook, whose founder and CEO questions whether privacy rights should be safeguarded, retains unwarranted influence over the proposed foundation.  In essence, Facebook is paying itself money to gain a broad release of its users' legal claims and to create an unneeded foundation over which it will have significant control. It is difficult to imagine a greater abuse of the *cy pres* remedy.

**1.      The Facebook Foundation Is Unneeded.**

The mission of the proposed Facebook foundation, according to the settlement, is to promote the cause of online privacy, safety, and security, and to educate users, regulators, and enterprises

1   regarding online privacy.  Numerous independent, non-profit groups already exist to do precisely

2   that.  A list of such organizations, although not comprehensive, includes the Electronic Privacy

3   Information Center ("established in 1994 to focus public attention on emerging civil liberties issues

4   and   to   protect   privacy,   the   First   Amendment,   and   constitutional   values,"

5   http://epic.org/epic/about.html), the Electronic Frontier Foundation ("educates the press and public"

6   by   "defending   free   speech,   privacy,   innovation,   and   consumer   rights   today,"

7   http://www.eff.org/about), Privacy Rights Clearinghouse ("two-part mission—consumer information

8   and consumer advocacy" with goals to "[r]aise consumers' awareness of how technology affects

9   personal privacy, and to empower consumers to take action to control their own personal

10   information," http://www.privacyrights.org/about_us.htm), the Center for Digital Democracy

11   (addressing privacy issues while promoting "an electronic media system that fosters democratic

12   expression and human rights," http://www.democraticmedia.org/about_cdd), and the World Privacy

13   Forum ("focused on conducting in-depth research, analysis, and consumer education in the area of

14   privacy," http://www.worldprivacyforum.org/aboutus.html).  In addition, the Rose Foundation's

15   Consumer Privacy Rights Fund, created from a series of settlements in cases involving consumer

16   privacy issues, awards grants to support privacy-related research, education, advocacy, and policy

17   development.    Rose Foundation, *Consumer Privacy Rights Fund*, http://www.rosefdn.org/

18   article.php?id=260. In addition to being well-established, these organizations have the advantage of

19   not being controlled by Facebook.[5]

20          The Facebook foundation also purports to advance the cause of online safety—a worthy

21   cause, but unrelated to the claims in this case.  In any event, numerous organizations also exist to

22   promote online safety, and Facebook has already teamed with several of them to launch its own

23   Facebook Safety Advisory Board—further evidence of the Facebook foundation's redundancy.

24   Press Release, *Facebook to Enhance User Safety Through Formation of Global Advisory Board*,

25   http://www.facebook.com/press/releases.php?p=133745.   Some of those organizations include

26

27   [5] McCall is employed by EPIC and counsel Philip S. Friedman is a volunteer member of EPIC's
    board of directors.

28

-12-

OBJECTIONS OF CLASS MEMBER GINGER MCCALL TO PROPOSED CLASS ACTION SETTLEMENT
Case No. 5:08-cv-03845-RS

1   Childnet International ("to work in partnership with others around the world to help make the

2   Internet a great and safe place for children," http://www.childnet-int.org/about), The Family Online

3   Safety Institute ("non-profit membership organization dedicated to working to develop a safer

4   Internet.  There are four pillars to the work of the Institute; these are events, public policy,

5   technology and education," http://fosi.org/cms/index.php/abouttheinstitute.html), and Common

6   Sense Media ("Common Sense Media is dedicated to improving the lives of kids and families by

7   providing the trustworthy information, education, and independent voice they need to thrive in a

8   world of media and technology," http://www.commonsensemedia.org/about-us/our-mission). Other

9   organizations devoted to online safety include i-SAFE ("worldwide leader in Internet safety

10  education," "non-profit foundation dedicated to protecting the online experiences of youth

11  everywhere," http://www.isafe.org), and CyberAngels ("one of the oldest and most respected online

12  safety education programs in the world," http://www.cyberangels.org/about.php).

13       The Facebook foundation, as described in the proposed settlement, adds no unique

14  perspective or approach to these existing organizations.  This Court should be skeptical of a

15  foundation that adds nothing to those that already exist.  In *In re Folding Carton Antitrust Litigation*,

16  744 F.2d 1252, 1253-55 (7th Cir. 1984), the Seventh Circuit held that the district court abused its

17  discretion by approving a class settlement that would have established an "unneeded Foundation" to

18  "promote the study of complex litigation and various substantive and procedural aspects of antitrust

19  law."  *Id.*  Because there had already been "voluminous research with respect to multidistrict

20  antitrust litigation and the substantive and procedural aspects of the antitrust laws by judges, lawyer

21  specialists, law schools, bar associations, Congressional committees, the Department of Justice and

22  the Federal Trade Commission, and it is a continuing project of all those concerned," the court

23  observed that the proposed foundation was not necessary.  *Id.* at 1254-55.  Here, as in the settlement

24  rejected by the Seventh Circuit, "the establishment of the proposed Foundation would be carrying

25  coals to Newcastle."  *Id.* at 1254.

26       **2.    Facebook Would Retain Unwarranted Influence Over the Foundation.**

27       The settlement improperly provides Facebook with a role in drafting the charter and bylaws

28  and appointing members to the Board of Directors and Board of Legal Advisors. SA ¶ 4.20.  Indeed

-13-

OBJECTIONS OF CLASS MEMBER GINGER MCCALL TO PROPOSED CLASS ACTION SETTLEMENT
Case No. 5:08-cv-03845-RS

1    one of the initial three directors is a Facebook employee and the company's chief lobbyist.  *See*

2    Wendy Davis, *Privacy Groups Question Beacon Settlement, Facebook's Control Over Foundation*,

3    Online   Media   Daily,   Jan.   26,   2010,   http://www.mediapost.com/publications/?fa=Articles.

4    showArticle&art_aid=121321.  Moreover, the Facebook-controlled director will have significant

5    control over the others because the settlement requires the directors to "unanimously determine a

6    plan for terms and succession of its officers and directors." *Id.* ¶ 4.21.  That the defendant accused

7    of violating its users' privacy rights will be charged with structuring a foundation whose purported

8    mission is to promote online privacy is both ironic and dangerous.  Moreover, the settlement would

9    appoint counsel for the settling parties to the Facebook foundation's board of legal advisors, leaving

10    that board in the hands of the attorneys responsible for creating the unneeded foundation in the first

11    place.  *Id.* ¶ 4.22.

12          In a proposed settlement in a case brought against Microsoft for alleged antitrust violations,

13    *In re Microsoft Corp. Antitrust Litig.*, 185 F. Supp. 2d 519 (D. Md. 2002), Microsoft agreed to

14    donate money to establish a national eLearning Foundation to provide computer technology through

15    a grants program to the nation's most economically impoverished public schools.  *Id.* at 521.

16    Microsoft also agreed that 200,000 refurbished personal computers (Microsoft products) would be

17    made available to eligible schools, along with free software.  *Id.* at 528.  The court denied even

18    preliminary approval to the settlement, expressing concern that it "might depress the development of

19    software designed for use in Macs, further reducing the attractiveness of Apple products over time."

20    *Id.* at 529-30.  Likewise, here, in a case brought against Facebook for alleged violations of privacy

21    rights, the Court should be concerned that permitting Facebook to retain influence over the

22    foundation will actually undermine  the precise "issues relating to protection of identity and personal

23    information online through user control" and "online threats" that the foundation is designed to

24    address.  Although Facebook may use its own money to lobby "users, regulators, and enterprises"

25    about its vision of the "new social norm" for privacy, it should not be permitted to use money that

26    ostensibly belongs to class members as a result of Facebook's violation of their protected privacy

27    rights to promote Facebook's own business purposes.

28

OBJECTIONS OF CLASS MEMBER GINGER MCCALL TO PROPOSED CLASS ACTION SETTLEMENT
Case No. 5:08-cv-03845-RS

1   This Court has no assurance that even a self-proclaimed "independent" foundation will

2   possess independent, disinterested judgment.  *See, e.g.*, *In re Agent Orange Prod. Liability Litig.*

3   *MDL No. 381*, 818 F.2d 179, 185 (2d Cir. 1987).  The foundation created by the settlement,

4   however, is far from independent. Given Facebook founder and CEO Mark Zuckerberg's comments

5   that he believes that privacy is no longer a social norm worth safeguarding, *see* Chris Matyszczyk,

6   *Zuckerberg: I know that people don't want privacy*, CNET News, Jan. 10, 2010,

7   http://news.cnet.com/8301-17852_3-10431741-71.html, to put the foundation under Facebook's

8   control would leave the fox to guard the henhouse. At a minimum, any foundation created by the

9   settlement should be free from the influence of Facebook, and the board's composition and

10  succession should be subject to court approval and supervision.

11  **II.    The General Release Is Overbroad and Allows Defendant Blockbuster to Escape
        Liability in Litigation Currently Pending in the Fifth Circuit.**

12
13          Under the proposed settlement, the class "fully, finally, and forever" releases Facebook and

14  the more than forty other defendants in this case, including Blockbuster, from liability arising from

15  any and all claims made in connection with those alleged in this lawsuit.  *See* SA ¶¶ 5.1, 5.2.  In

16  addition to stripping class members of their potentially valuable statutory damages claims, the broad

17  general release also protects Beacon merchant partners—none of whom is a signatory to the

18  settlement, and none of whom has given any consideration in exchange for receiving the proposed

19  liability shield.  *See In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1133 (7th

20  Cir. 1979) ("A settlement by its very nature is an agreement where both sides gain as well as lose

21  something") (quoting *Patterson v. Stovall*, 528 F.2d 108, 115 (7th Cir. 1976)).  The release applies in

22  this or any matter containing claims emanating out of the Beacon program, including *Harris v.*

23  *Blockbuster, Inc.*, No. 3:09-cv-217 (N.D. Tex.), which is currently on appeal in the Fifth Circuit.  *See*

24  Dkt. Entry No. 61, at 49-51 (Transcript of Hearing on Motion for Preliminary Approval of Proposed

25  Settlement).  By releasing the class's claims and ending current litigation in exchange for nothing of

26  value, the settlement would leave the class worse off than if this case had never been brought.

27          This serious deficiency is amplified by the failure of the summary notice to adequately

28  communicate the breadth of the release to the class. Due process requires that absent class

-15-

OBJECTIONS OF CLASS MEMBER GINGER MCCALL TO PROPOSED CLASS ACTION SETTLEMENT
Case No. 5:08-cv-03845-RS

1   members receive notice of material terms of class settlements.  *Mullane v. Cent. Hanover Bank*

2   *& Trust Co.*, 339 U.S. 306, 313 (1950).  Although a summary notice may omit technical or

3   unimportant details of a settlement for purposes of readability, the fact that the class is releasing

4   all of its Beacon-related claims against Facebook, Blockbuster, and all Beacon merchant partners

5   in exchange for no relief is a material fact that should be prominently disclosed.  SA Exh. 3.  The

6   failure to include that information in the summary notice is an independent reason why the

7   settlement is unfair.

8                                    **<u>CONCLUSION</u>**

9           For the foregoing reasons, the proposed settlement should be rejected.

10

    Dated:  February 1, 2010                    Respectfully submitted,
11

12                                                 _/s/ Mark A. Chavez_

13                                              MARK A. CHAVEZ (California Bar No. 90858)
                                                mark@chavezgertler.com
14                                              **Chavez & Gertler, LLP**
                                                42 Miller Ave.
15                                              Mill Valley, CA 94941
                                                Telephone: (415) 381-5599
16

17                                                 _/s/ Philip S. Friedman_

18                                              PHILIP S. FRIEDMAN (California Bar No. 131521)
                                                psf@consumerlawhelp.com
19                                              **Friedman Law Offices, PLLC**
                                                2401 Pennsylvania Avenue, NW
                                                Suite 410
20                                              Washington, DC 20037
                                                Telephone: (202) 293-4175
21

22                                                 _/s/ Gregory A. Beck_

23                                              GREGORY A. BECK (to be admitted *Pro Hac Vice*)
                                                gbeck@citizen.org
24                                              **Public Citizen Litigation Group**
                                                1600 20th St. NW
                                                Washington, DC  20009
25                                              Telephone: (202) 588-7713

26                                              Attorneys for Objector Ginger McCall

27

28

-16-