Scott A. Kamber
*skamber@kamberlaw.com*
David A. Stampley
*dstampley@kamberlaw.com*
KamberLaw, LLC
11 Broadway, 22nd Floor.
New York, NY. 10004
Telephone:  (212) 920-3072
Facsimile:   (212) 202-6364

David Parisi (Cal. Bar. No. 162248)
*dparisi@parisihavens.com*
Parisi & Havens LLP
15233 Valleyheart Drive
Sherman Oaks, California 91403
Telephone: (818) 990-1299
Facsimile:  (818) 501-7852
Attorneys for Plaintiff
(Additional attorneys listed on Memorandum of Law)

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| SEAN LANE, *et al.*, <br><br>      Plaintiffs <br><br> v. <br><br> FACEBOOK, INC., *et al.*, <br><br>      Defendants. | **No. C 08-3845 RS** <br><br> [Assigned to the Hon. Richard Seeborg] <br><br> **DECLARATION OF SCOTT A. KAMBER IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT** <br><br> Judge:     The Hon. Richard Seeborg <br> Date:      February 26, 2010 <br> Time:     9:30 a.m. <br> Location: Courtroom 8 <br>                 280 South First Street <br>                 San Jose, California 95113 |

I, Scott A. Kamber, declare as follows:

1.     I am an attorney-at-law duly licensed to practice before all of the courts of the State of New York and am admitted *pro hac vice* before this court. I am a managing member of KamberLaw, LLC ("KamberLaw"). I am the attorney primarily responsible for the handling of

1  this litigation on behalf of KamberLaw, LLC. I make this declaration based upon my own
2  personal knowledge. If called to testify, I could and would testify to the facts contained herein.
3     2.   I represent that the disclosures contained herein relating to mediation and
4  negotiation between the parties are with the consent of Michael Rhodes of Cooley Godward
5  Kronish LLP and are not violative of any settlement or mediation privilege.

## I. PRELIMINARY STATEMENT ON THE SETTLEMENT

7     3.   This case has been vigorously litigated from its commencement in August 2008
8  through the settlement in September 2009, which was only reached after two full-day mediation
9  sessions with mediator Antonio Piazza and dozens of hours of negotiation sessions with defense
10 counsel over a period from December 2008 through September 2009.

11    4.   At every stage of the litigation, counsel for defendants asserted aggressive
12 defenses, contested plaintiffs' positions on nearly every issue, and expressed their belief that the
13 Class could not prevail on the claims asserted. The settlement was not reached until our law
14 firms, *inter alia*, (1) thoroughly investigated the potential claims, including consultation with
15 experts; (2) defendants filed a motion to dismiss the Complaint; (3) defendants produced certain
16 documents for discussion purposes; (4) two mediation sessions and many hours of negotiations;
17 and (5) motions to intervene and/or stay the proceedings were fully briefed.

18    5.   The settlement of this litigation was negotiated with the assistance and oversight of
19 Mr. Antonio Piazza, who presided over two full day mediation sessions, after which the parties
20 continued settlement discussions. The settlement is the product of dozens of hours of arm's length
21 negotiations over the course of over six months between counsel for the parties. The parties did
22 not discuss the amounts of any incentive fee or payment to class counsel until after the terms of
23 the settlement were agreed upon.

24    6.   The settlement is product of hard-fought litigation and takes into consideration the
25 significant risks specific to the case. It was negotiated by experienced counsel for plaintiffs and
26 defendants with a solid understanding of both the strengths and weaknesses of their respective
27 positions.

7. Plaintiffs believe that this settlement represents an excellent result for the class, especially under the circumstances of this case. Substantial investigation, the motion to dismiss filed by defendant Facebook and legal research informed plaintiffs that, while they believe their case meritorious, it also had weaknesses which had to be carefully evaluated in determining what course (*i.e.*, whether to settle and on what terms, or to continue to litigate through class certification, summary judgment and a trial on the merits) was in the best interests of the class. As set forth in further detail below, despite the fact that plaintiffs' allegations and claims were arguably supported by legal authority, expert opinion and other evidence, the specific circumstances involved here presented many uncertainties in plaintiffs' ability to prevail if the case proceeded to a motion for class certification, summary judgment, and/or trial.

8. Plaintiffs also took into account the actual costs of making any distribution to the Class, the size of the class and the financial wherewithal of the defendants to be able to pay any judgment that may be able to be obtained after judgment and appeal.

9. These issues and others were considered by plaintiffs and their counsel in deciding to settle the litigation on terms which would provide the class with a benefit of $9.5 million and injunctive relief that directly redresses the harm alleged in the complaint. In reaching the determination to settle, plaintiffs and lead counsel have weighed the documentary evidence and legal authority supporting their allegations against the documents and legal authority that defendants assert undercut plaintiffs' claims, as well as defendants' characterizations and interpretations of the evidence in this case.

10. On balance, considering all the circumstances and risks both sides faced, plaintiffs came to the conclusion that settlement on the terms agreed upon was in the best interests of the class. The settlement confers substantial benefit on the class and eliminates the prejudice to the Class that may come with delay in resolution and continued use of Beacon, the significant costs of continued litigation, the risk that certification would be denied, and the risk that summary judgment and/or trial would not be in plaintiffs' favor. It is respectfully submitted that the settlement should be approved as fair, reasonable, and adequate.

11. The following is a summary of the nature of the settlement class's claims, the principal events that occurred during the course of this litigation, and the legal services provided by Co-Lead Counsel. It also includes relevant information that demonstrates the errors and improper purposes of certain objections that have been lodged with this Court.

## II. FACTUAL SUMMARY OF PLAINTIFFS' CLAIMS

12. On October 23, 2009, this Court certified for settlement purposes a class of Facebook users who used Beacon (Dkt. 67). According to information that was provided to Class Counsel by Facebook, this is a class that consists of 3,663,651 Facebook members.

13. Plaintiffs alleged claims for damages, injunctive, and declaratory relief arising out of Defendants' failure to provide appropriate notice and obtain informed consent before acquiring and transmitting personal information about consumers from Beacon-affiliated websites to Facebook.

14. Plaintiffs alleged that defendants' actions violated the Electronic Communications Privacy Act ("ECPA"), the Video Privacy Protection Act ("VPPA"), the Computer Fraud and Abuse Act ("CFAA"), the California Consumer Legal Remedies Act ("CLRA") and the California Computer Crime Law ("CCCL"). (Dkt. 1).

15. This case impacted millions of class members and dealt with highly technical areas of the implementation of the sharing of class member information between Internet sites by Facebook and Facebook's implementation of the consent mechanism.

16. As alleged in the Complaint, the Beacon mechanism when it first was introduced operated as an opt-out program and did a poor job obtaining informed consent of users. After a relatively short-lived period as an opt-out program, between November 7 and December 5, 2007, inclusive, Facebook attempted to "convert" Beacon to an opt-in program. As plaintiffs alleged and our investigation confirmed, that was never effective. It is my understanding that the programming of Beacon made it almost impossible for it to be used with an effective opt-in system. This was one major reason why eliminating the Beacon program permanently and effectively became a key component in the Settlement.

### III. THE HISTORY OF THE LITIGATION AND ITS SETTLEMENT

17. On August 12, 2008, Plaintiffs filed a complaint on their own behalf and on behalf of a purported class of all Facebook members who had visited the websites of one or more entities affiliated with Facebook, including Facebook's co-defendants in this matter, and whose activities on those affiliated sites were communicated to Facebook via Facebook's Beacon program.

18. At all times, Defendants have denied and continue to deny that they have engaged in any wrongdoing or committed, threatened to commit, or attempted to commit any wrongdoing of any kind, including that alleged in the complaint in this matter.

19. From the earliest stage of the litigation, Michael Rhodes, lead outside counsel for Facebook, made it clear that Facebook sought to take the lead among defendants and was, ultimately, the primary actor for the litigation (or eventually resolution) of this matter. Most of the initial contact between the Parties was on ministerial matters, primarily the issue of whether all Parties would consent to, at that time, Magistrate Judge Seeborg, for all purposes.

20. On October 10, 2008, Facebook, pursuant to Federal Rules of Civil Procedure 12(b)(6), moved to dismiss plaintiffs' causes of action under Count I, alleging ECPA violations; Counts III and IV, alleging violations of VPPA against Facebook, and regarding which Facebook argued that it is not a "Video Tape Service Provider" as defined in the statute and that it cannot be held secondarily liable; Count V, alleging violations of the CLRA by defendants Facebook, Fandango, Hotwire, Gamefly and STA and regarding which Facebook argued that the Complaint lacked the particularity required by Federal Rule of Civil Procedure 9(b) and that the plaintiffs were not "consumers" as defined by the statute; and Count VI, alleging violations of the CCCL against Defendants Facebook, Fandango, Hotwire, Gamefly, and STA, alleging, *inter alia*, that plaintiffs failed to adequately plead damages or losses attributable to Facebook's conduct. Facebook did not challenge Count II, alleging VPPA violations by Blockbuster, Fandango, Overstock and Gamefly. (Dkt. 14.)

21. Plaintiffs' counsel briefed their response to Facebook's motion to dismiss, however prior to filing it the initial discussions between the Parties had blossomed into settlement

1  negotiations. I personally was the point of contact between plaintiffs and defense counsel in this
2  action. While there were conceptual discussions of settlement by telephone there were no
3  substantive discussions prior to the first mediation. In fact, it was my position based on past
4  experience that having a substantive dialogue on possible class-wide resolution without the
5  assistance of a mediator could expose an early settlement to procedural attack by what I
6  colloquially refer to as "the professional objectors of the northern district."

7      22.    Because of the nature of technology cases and the fact that I believed that the
8  Beacon program presented an ongoing risk of harm to the class, I worked with Mr. Rhodes to
9  schedule mediation as quickly as possible. We agreed to Mr. Antonio Piazza because of his
10 unrivaled reputation, experience and demonstrated ability to resolve some of the most difficult
11 litigations.

12     23.    Prior to the mediation we had thoroughly researched the law and understood the
13 strengths and weaknesses of our case (*see* infra at 31). Further, we understood and were able to
14 confirm at mediation that the class size numbered in the millions. Thus, prior to attending the
15 mediation we received an informal estimate as to the administrative cost of distributing a
16 common fund among a large class. I recently rechecked those numbers. It would cost between
17 $.45 and $.65 in administrative costs per check per class member depending on whether it was a
18 single or double-sided post card used to send the check. These facts made it impossible to have an
19 meaningful distribution of funds to the class that was not significant orders of magnitude larger.

20     24.    On December 9, 2008, representatives of Facebook and plaintiffs met with Mr.
21 Piazza in his San Francisco office. Throughout the day, the parties' representatives met
22 unilaterally with Mr. Piazza. In addition, representatives of the parties met with each other to
23 view and discuss examples of users' interactions on Facebook's website and on the websites of
24 affiliates deploying the Beacon program. After a full day of mediation, the parties agreed on all
25 substantive relief and memorialized their mutual understanding in a document outlining the
26 principal terms of the settlement. Present at the litigation were some of the most senior members
27 of the Facebook management team, including Jeffrey Zuckerberg.

28

25. The most complex issue that had been agreed to but needed to be detailed through further due diligence and site visits for discussions with the Facebook programmers was the specific breadth of the injunctive relief and how it would impact the obtaining of user consent and impact Beacon moving forward. As detailed below, this ultimately became a stumbling block that almost unraveled the entire settlement. It required another six months of work between the Parties and ultimately a last ditch mediation session to conclude the settlement. I became convinced during this period and finally at the final mediation session in July that the only effective means of resolving the litigation was to require that the Beacon program be ended immediately.

26. After the status conference on December 16, 2008, by stipulation dated January 22, 2009, the defendants agreed to remove their motions to dismiss from the court calendar

27. On February 11, 2009, representatives of both parties met at Facebook's offices to continue to discuss the mechanics of users' online experiences when interacting with the websites of Facebook and its affiliates. Over the following months, the parties continued to negotiate, exchange information regarding settlement details, and examine creative approaches to potential injunctive relief that would prevent further harm.

28. In the late spring, the parties appeared to reach an impasse regarding the details of injunctive relief involving changes to the Facebook website and Beacon program operation. In my opinion the parties were unable to resolve this impasse without substantially deviating from the framework agreed upon in the principal terms of the settlement previously memorialized during mediation. Since this required revisiting a previously agreed-to substantive term, I refused to engage in any resolution of this issue outside the presence of the mediator and requested that the parties schedule an additional mediation session in an effort to conclude the settlement process.

29. On July 28, 2009, the parties' representatives again met in person with mediator Antonio Piazza and, afterwards, continued negotiating the details of a settlement agreement. Less than a month later, the parties had given their consent to the terms contained in the settlement agreement. To break the impasse over the terms, the parties, with the active input of the mediator,

agreed Facebook would terminate the Beacon program itself within 60 days of preliminary approval. I believed this provided clarity with respect to the relief being offered and was beneficial to the class. With the assistance of Mr. Piazza, the parties were able to successfully conclude the negotiation of the major sticking points with the settlement agreement.

30. Less than a month later, all parties had given their consent to the terms contained in the settlement agreement. It was ultimately the substitution of the complex injunctive relief with the immediate cessation of Beacon upon preliminary approval that permitted the Settlement Agreement to be concluded. Having reached full agreement on terms and conditions of a settlement, the parties sought this Court's preliminary approval of the settlement on September 18, 2009.

### IV. PLAINTIFFS UNDERSTOOD THE STRENGTHS AND WEAKNESSES OF THE CASE

31. Based on the publicly available documents, documents received from defendants, and their own investigation and consultations with experts, plaintiffs believed that they had adduced and would continue to adduce substantial evidence to support their claims. They also realized, however, that they faced considerable risks and defenses as the case proceeded. Some of the most serious risks are discussed in the following paragraphs. Plaintiffs carefully considered these risks during the months leading up to the settlement and during their settlement discussions with defendants.

32. Plaintiffs recognized that Facebook would not be liable for violations of the VPPA as it is not a Video Tape Service Provider as defined in the statute and cannot be held secondarily liable. While there may still be claims against Blockbuster regarding this statute, it appears it would be a small subset of a much larger class, and would run into obstacles regarding Blockbuster's mandatory arbitration clause.

33. Plaintiffs also recognized that defendants contended that plaintiffs failed to adequately plead damages or losses attributable to Facebook's conduct. While plaintiffs have strong arguments to counter these contentions, they recognize that this issue was unresolved and could turn in defendants' favor.

34. Plaintiffs further recognized the defense contended that plaintiffs did not plead its CLRA allegations with particularity as required by Federal Rule of Civil Procedure 9(b). While plaintiffs believe that this could be remedied by an amendment to the Complaint, it is possible that this could also turn in defendants' favor.

35. Prior to entering into the settlement agreement and advising our clients of same, we took into account, *inter alia*, the criteria for determining whether a settlement is fair, reasonable and adequate. The recognized criteria include:

(a) the strength of plaintiffs' case;

(b) the risk, expense, complexity, and likely duration of any further litigation;

(c) the risk of certifying a class and then maintaining class action status through trial;

(d) the amount offered in settlement;

(e) the extent of discovery completed and the stage of the proceedings; and

(f) the experience and views of counsel believe that, weighing the circumstances in light of these criteria, as further detailed below, the settlement is fair, reasonable, and adequate.

36. Together with my co-counsel as well as discussion with the named plaintiffs, we carefully assessed the probability of ultimate success on the merits *vis-à-vis* the risks of establishing liability and damages. While we believe that our case is strong, we could not discount defendants' defenses or the potential difficulties plaintiffs would face in certifying a class. In addition, defendants' are represented by very capable counsel whom we believe would mount a vigorous defense. Should litigation continue, the inevitable motion and appellate practice could easily extend the litigation for years.

37. Another risk considered was the need for and reliance on expert witnesses were the case to proceed to another class certification hearing and then to trial. To establish liability and damages in a case of this sort, expert testimony would be essential. The evaluation and development of complex factual issues would require substantial expert testimony. Yet, the

acceptance of expert testimony by a jury is always far from certain, regardless of how distinguished the source. Settlement of this action avoids the costs of competing experts and the risk of jury fact-finding that could result in a dispositive finding or ruling against plaintiffs and the class members.

38. In reaching the settlement, plaintiffs and counsel weighed the duration and cost of the litigation that would be necessary to undertake a further motion for class certification, trial and any appeals, against the likelihood of obtaining a better result than the settlement provides and determined that, under the circumstances, the settlement is fair, reasonable and adequate. We believe that the settlement falls within the parameters of settlements in similar actions and is justified in light of the substantial benefits conferred on the class members as well as the risks avoided.

39. Plaintiffs believe that they could have prevailed on the merits of the case. Defendants were just as adamant that plaintiffs would fail. There was a very real risk, as discussed above, that plaintiffs would not prevail on their motion for class certification or at trial. Had plaintiffs successfully reached trial, plaintiffs faced the risk that the jury would not understand plaintiffs' allegation, that plaintiffs would not convince a jury that defendants caused loss to plaintiffs, or that plaintiffs had suffered any loss. There was also the very real risk that even if plaintiffs prevailed at trial, defendants would appeal, which would take years to resolve and bore the risk of reversal

### IV. THE HARRIS CASE AND THE PROPOSED INTERVENORS

40. Shortly after we filed papers for preliminary approval, I was contacted by Jeremy Wilson and Thomas Corea of the Corea Firm, PLLC. It was my understanding from them that they served as counsel in the *Harris v. Blockbuster* case in Texas. The details of the initial discussions with them are fully set forth in the papers supporting the preliminary approval of the settlement.

41. On October 2, 2009, Counsel for the *Harris* Plaintiffs in a class action against Blockbuster filed a motion for limited intervention and/or to stay this case. Plaintiffs and

Facebook both filed objections to the motion. This Court denied their motion and granted the motion for preliminary approval of the settlement on October 23, 2009.

42. Shortly after Preliminary Approval was granted, I was approached by Jeremy Wilson and Tom Corea of the Corea Firm to (i) help them better understand the details underlying the Settlement and why it was fair, reasonable and adequate to all class members, including those that used Beacon through Blockbuster; and (ii) assist them in bringing Blockbuster to the table so that additional injunctive relief could be obtained by the Corea firm on behalf of their client that would provide a further benefit to the Settlement Class.

43. I would estimate that I have had no fewer than a dozen phone conferences and an in-person meeting with lawyers from the Corea Firm in the three months since Preliminary Approval. During that time I was impressed with what seemed a genuine desire of these lawyers to understand the settlement and seek to obtain additional benefit for the class through the *Harris* Case. I think we came to a common understanding as to why the *Lane* Settlement was fair, reasonable and adequate to Ms. Harris and the others they perceived to be part of their putative class. Ultimately, the additional injunctive relief they were able to obtain could only benefit the class as a whole and I think was the final component in eliminating their concerns about this settlement. A copy of the *Harris v. Blockbuster* settlement agreement is attached hereto as Exhibit 1.

44. It also became clear from the research of my firm, and was consistent with the determinations of the Corea Firm, that the financial condition of Blockbuster had rapidly deteriorated since the Harris case was filed and would likely be a significant impediment to *any* significant recovery and would set a particularly low bar for damages a court may determine are annihilative.

45. As part of the above-referenced settlement in *Harris v. Blockbuster*, the Harris Plaintiffs took steps to drop their appeal in this action regarding intervention and agreed to support the *Lane* Settlement. Further, Mr. Wilson has submitted a declaration detailing the reasons that their prior concerns that led to the motion to intervene have been alleviated and that

they understand the *Lane* Settlement to be in the best interests of all class members and that it is fair, reasonable and adequate.

### V. NOTICE WAS PROVIDED PURUANT TO THE ORDER GRANTING PRELIMINARY APPROVAL

46. The Preliminary Approval Order required notice to be sent by electronic means to the "updates" section of class members inboxes on Facebook as well as publication notice. As detailed in the accompanying Affidavit of Dan Rosenthal, this notice was accomplished and an additional Notice in the form of email was also sent to each member of the Class.

47. Upon information and belief, all 3,663,651 members of the class were sent this dual electronic notice. I believe that the effectiveness of the notice program is reflected in the fact that almost 10% of the class visited the settlement website at some point. In my experience, this is a very large proportion of the class to visit a settlement website. I view the very limited number of objections and opt-outs to reflect very favorably on the settlement. I address certain relevant factual points within my own personal knowledge about the Objections below in Section V.

48. Also During the Notice Period, further details of the Foundation including all proposed formation documents were posted to the Settlement website. Included on the first page of the foundation documents was the identity of all three people who are proposed to be directors of the Foundation. *See* Rosenthal Aff. 10, Exh. D.

49. The language of the Foundation documents as well as the initial foundation directors was negotiated between the Parties pursuant to the terms of the Settlement Agreement. The three directors chosen were Chris Jay Hoofnagle, Larry Magid, and Tim Sparapani, individuals with superb credentials who are well-known and extremely well-regarded by other leaders in the privacy advocacy community.

    a. *Chris Jay Hoofnagle* is Director of the Information Privacy Programs at the Berkeley Center for Law and Technology and is a Senior Fellow at the Samuelson Law, Technology & Public Policy Clinic at Boalt Hall School of Law. He was formerly a fellow at Stanford Law Center for Internet & Society. His roles include educator, researcher, author, and

advisor to government and industry groups. He has published numerous academic articles, lectured worldwide, and testified before Congress on numerous occasions. During his six years as an attorney at the Electronic Privacy Information Center (EPIC) he served as Director of the West Coast Office and Senior Counsel.

b. *Larry Magid* is a journalist and Internet safety advocate. He is a board member of the National Center for Missing & Exploited Children and a member of the of the Obama administration's Online Safety & Technology Working Group ,where he chairs the education sub-committee. He is also on the advisory boards of GetNetWise.org and Family Online Safety Institute. He served on the Internet Safety Technical Task Force, formed by 49 state attorneys general and Fox Interactive/MySpace, based at Harvard University's Berkman Center for Internet & Society.

c. *Timothy D. Sparapan*i is Facebook's Director of Public Policy. He previously spent four years as an attorney at the American Civil Liberties Union, first as a Legislative Counsel on Privacy Rights, and then as a Senior Legislative Counsel. He has represented civil liberties groups before the U.S. Congress and the Executive Branch, testified before the Senate Commerce Committee about privacy rights, and drafted legislation to harness technology benefits while lessening burdens on individual privacy.

Each of these people are highly regarded in the consumer protection and civil rights affected by online privacy and security issues. It is interesting to note that Mr. Hoofnagle served as Director of the West Coast Office and Senior Counsel for the Electronic Privacy Information Center ("EPIC"). In identifying nominees to serve as the initial directors of the Foundation, I spoke to numerous, knowledgeable individuals in the private, public, and academic sectors. I have no question as to the personal capabilities or integrity of all three of the above-named people

50. As to any assumption or assertion that Mr. Sparapani's role at Facebook, *ipso facto*, I have seen absolutely no evidence to support the accuracy or wisdom of accepting such an position. My own due diligence gives me confidence in the skills and prospect of a cooperative

and productive presence I would expect him to bring to the Board, with an interest in furthering the operation of the foundation and the independence of its mission. I specifically negotiated for the terms of the Foundation to ensure independence of the Foundation. These terms included a prohibition on lobbying and litigation and a requirement that all succession plans must be unanimously decided among the initial directors. Given the distinct backgrounds of each of the initial directors, it is my belief that this serves the best interests of the public and class by creating a foundation that will be truly independent and provide an open opportunity for projects to be funded that serve the goals of the Foundation—even if such proposals do not originate from one of the established privacy organizations. Ultimately, work in the area of privacy being done in the public interest is not simply limited to a few closed Washington DC based organizations.

## V. OBJECTIONS AND CONCERNS VOICED TO COURT

51. Following Preliminary Approval of the Settlement, I was gratified to find my own confidence in its merit validated by comments I received from academics, government officials, consumer advocates, and attorney colleagues on both sides of the bar. However, I am well aware of the critical role objectors can play in illuminating the qualities of a settlement and was anxious to what the nature of any objections might be. I have also been aware that creating a new Foundation, one barred from litigation and lobbying—which I believe is essential to truly independent and open funding for privacy initiatives—would be likely to engender negative comments from existing organizations, especially well-established organizations that engage in litigation and lobbying.

52. For those reasons, I was not surprised on the morning of Friday, September 15, 2009—less than one week after our filing for preliminary approval of the Settlement—I received a call on my mobile phone from Mark Rotenberg of the Electronic Privacy Information Center (EPIC). I was driving and pulled over near the entrance of a parking garage to talk to him. He pointedly stated that the Settlement fundw should go to EPIC. He stated that no new foundation could ever be independent and that serve consumer privacy interests could only be effectively

1    served only by giving control of the Settlement fund to him, as Executive Director of EPIC. He

2    also expressed concern that the Foundation would lobby on behalf of Facebook. I assured him of

3    my confidence in the value of the Foundation as an independent organization and explained how

4    the terms of the Settlement Agreement and the formation documents of the Foundation precluded

5    the funding of lobbying and litigation. As we ended our call, I told Mr. Rotenberg I was available

6    to talk further and I encouraged him to feel free to let me know of any suggestions regarding

7    possible director candidates. Mr. Rotenberg did not contact me again.

8          53.      Therefore, I was not surprised to see some of the same point raised in EPIC's letter

9    to the Court on January 15, 2010. I was surprised, however, to see EPIC continue to express

10   skepticism regarding the independence of the Foundation, relying on nothing more than

11   unfounded assumptions, especially in light of the Foundation's structure.

12         54.      I was also surprised to see EPIC's proposal that, as an alternative to giving money

13   to EPIC, the funds be distributed by the Rose Foundation—whose leader has spoken supportively

14   to us about the Settlement. At almost the same time that Mr. Rotenberg had reached out to me,

15   Mr. Little of the Rose Foundation, directed an email to my cocounsel complimenting the

16   settlement and seeking a role for the Rose Foundation in distributing the funds of the Foundation.

17   Attached as Exhibit 2 is an email dated September 22, 2009, from Mr. Little to Mr. Malley. .

18         **55.**      We did, in fact, investigate whether it would be appropriate for the Rose

19   Foundation to have a role with the Foundation's administration. I learned that the Rose

20   Foundation funds a great many worthwhile privacy initiatives, but my information raised

21   concerns that the Rose Foundation does not have the kind of openness to supporting many

22   organizations that the Settlement Foundation is designed to foster. In addition, the Rose

23   Foundation, by its own charter, is required to have control of any funds it administers. We have

24   since learned that EPIC and at least some of the other signatories to EPIC's letter are recipients of

25   Rose Foundation funding .In what seems to be a connected event, I learned that Ginger McCall,

26   one of only four objectors (and one of only three represented by Counsel), is a staff attorney for

27   EPIC. *See* Exhibit 3, Ginger McCall Bio from EPIC website. Given the above context, I find it

28

more than a little disingenuous that Ms. McCall says that an independent privacy foundation is not needed and useless.

### VIII.  CONCLUSION

56. Having considered the foregoing, and evaluating defendants' likely defenses at trial, it is the informed judgment of plaintiffs and their counsel, based on all proceedings to date and their extensive experience in litigating complex actions and class actions, that the proposed settlement of this matter before this Court is fair, reasonable and adequate, and in the best interests of the class.

57. For all of the foregoing reasons, class counsel respectfully requests that this Court approve the settlement.

58. I declare under penalty perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 10, 2010 at Essex County, New Jersey.

>                                   By: s/Scott A. Kamber
>                                       SCOTT A. KAMBER
>                                       One of the Attorneys for Plaintiffs, individually
>                                       and on behalf of a Class of similarly situated
>                                       individuals