Scott A. Kamber
*skamber@KamberLaw.com*
David A. Stampley
*dstampley@KamberLaw.com*
KamberLaw, LLC
11 Broadway, 22nd Floor.
New York, NY. 10004
Telephone: (212) 920-3072
Facsimile: (212) 202-6364

David C. Parisi (SBN162248)
*dparisi@parisihavens.com*
Suzanne Havens Beckman (SBN 188814)
*shavens@parisihavens.com*
Parisi & Havens LLP
15233 Valleyheart Drive
Sherman Oaks, California 91403
Telephone: (818) 990-1299
Facsimile: (818) 501-7852

Attorneys for Plaintiffs
(Additional attorneys listed on signature page)

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| SEAN LANE, *et al.*,<br><br>        Plaintiffs<br><br>v.<br><br>FACEBOOK, INC., *et al.*,<br><br>        Defendants. | **No. C 08-3845 RS**<br><br>[Assigned to the Hon. Richard Seeborg]<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Judge:      The Hon. Richard Seeborg<br>Date:       February 26, 2010<br>Time:       9:30 a.m.<br>Location:  Courtroom 8<br>               280 South First Street<br>               San Jose, California 95113 |

**NOTICE OF MOTION**

NOTICE IS HEREBY GIVEN that Plaintiffs will move the Court, pursuant to Federal Rule of Civil Procedure 23(e), to grant final approval of a proposed settlement in this consumer class action on February 26, 2010, at 9:30 a.m., or as soon thereafter as counsel may be heard by the above-entitled Court, located at 280 South First Street, San Jose, California 95113, in Courtroom 8, before the Honorable Richard Seeborg.

Plaintiffs seek final approval of this class action settlement as fair, reasonable and adequate. The Motion is based on this Notice of Motion; the accompanying Brief in Support of the Motion, the authorities cited therein, and the exhibits attached thereto; oral argument of counsel; and any other matter that may be submitted at the hearing.

Dated: February 10, 2010

KAMBERLAW, LLC
THE LAW OFFICE OF JOSEPH H. MALLEY
PARISI & HAVENS LLP


By: s/Scott A. Kamber
 SCOTT A. KAMBER
 One of the Attorneys for Plaintiffs, individually
 and on behalf of a Class of similarly situated
 individuals

# TABLE OF CONTENTS

NOTICE OF MOTION ................................................................................................. ii

TABLE OF AUTHORITIES ....................................................................................... iv

MEMORANDUM OF LAW ......................................................................................... 1

I.   NATURE OF THE LITIGATION ....................................................................... 2

    A. Lawsuit, Discovery, and Settlement ............................................................. 2

    B. Facebook's Position ..................................................................................... 3

II.  SETTLEMENT TERMS ...................................................................................... 3

    A. Class Definition ............................................................................................ 3

    B. Settlement Benefits ...................................................................................... 4

        1.  Injunctive Relief .................................................................................. 4

        2.  General Relief ...................................................................................... 4

        3.  Payment of Notice and Administrative Fees, Attorneys' Fees, and Expenses ........ 4

    C. Release ........................................................................................................... 5

III. CLASS NOTICE COMPORTS WITH DUE PROCESS AND RULE 23 ............. 5

IV. SETTLEMENT WARRANTS FINAL APPROVAL ............................................ 6

    A. Strength of Plaintiffs' Case .......................................................................... 7

        1.  Legal Claims against Facebook ........................................................... 7

    B. Risks of Continued Litigation ...................................................................... 8

    C. Risks of Maintaining Class Action Status ................................................. 10

    D. Amount Offered in Settlement .................................................................... 12

    E. Extent of Discovery Completed and Stage of Proceedings ......................... 13

    F. Experience and Views of Counsel ............................................................... 13

    G. Presence of Governmental Participant ........................................................ 14

    H. Incentive Fees ............................................................................................. 14

    I. Reactions of Class Members ....................................................................... 15

        1.  Objection by Ms. McCall (EPIC Staff Attorney) and Letter by EPIC, et al. ........ 17

        2.  Objections by Trotter and Marek ....................................................... 25

        3.  Burleson ............................................................................................. 26

        4.  Counsels' Conclusions Regarding Objections ................................... 27

V.   CONCLUSION ................................................................................................. 27

1

## TABLE OF AUTHORITIES

2

**Cases**

3  *Alvarez v. Eltman, Eltman & Cooper, P.C.*, 2006 WL 3681138 (E.D.N.Y.)....................................12

4  *Boyd v. Bechtel Corp.*, 485 F. Supp. 610 (N.D.Cal. 1979)....................................................13

5  *Boyd v. Cechtle Corp.*, 485 F. Supp. 610 (N.D. Cal. 1979) ..................................................16

6  *Chavez v. Netflix, Inc.*, 162 Cal.App.4th 43, 57 (2008). ..................................................25

7  *Churchill Village LLC v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) ..........................................15

8  *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974)............................................16

9  *Drennan v. Van Ru Credit Corp.,* No. 96 C 5789, 1997 WL 305298 (N.D. Ill. June 2, 1997) .......22

10 *Dunleavy v. Nadler*, 213 F.3d 454 (9th Cir. 2000) ....................................................8, 13

11 *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15 (N.D. Cal. 1980) ........................................16

12 *Francisco v. Numismatic Guaranty Corp. of America*, 2008 WL 649124 (S.D. Fla)....................12

13 *Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992)..............................................10

14 *Hanson v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ..................................6, 10, 20

15 *Hester v. Vision Airlines, Inc.*, 2009 WL 4893185 (D. Nev.) ..............................................10

16 Hopson v. Hanes Brands, Inc., 2009 WL 928133 (N.D.Cal.) ................................................11

17 *In re Mexico Money Transfer Litigation*, 164 F.Supp.2d 1002, 1031 (N.D. Ill. 2000), .................19

18 *In re OmniVision Tech. Inc.*, 559 F. Supp. 2d 1036 (N.D.Cal. 2008)...................................... passim

19 *In re Pacific Enters. Sec. Litig.*, 47 F.3d 373  (9th Cir. 1995)............................................13

20 *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517 ....................................................19

21 *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2009 WL 4263524 (N.D.Cal) ........10

22 *In re Three Mile Island Litig.*, 557 F.Supp. 96 (M.D.Pa.1982) ............................................22

23 *Kline v. Coldwell, Banker & Co.*, 508 F.2d 226 (9th Cir. 1974) ............................................11

24 *Lipuma v. Am. Express Co.*, 406 F.Supp.2d 1298 (S.D. Fla. 2005)....................................9

25 Lymburner v. U.S. Financial Funds, Inc., --- F.R.D. ----, 2010 WL 335791 (N.D.Cal.)..................11

26 *Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003) ....................................................7, 15, 18

27 *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 3064 (1950)............................................6

28

*Nat'l Rural Telecomms Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523 (C.D. Cal. 2004). ......................15

*Protective Comm. for Indep. Stockholders v. Anderson*, 390 U.S. 414 (1968) ................................7

*Saulic v. Symantec Corp.*, 596 F.Supp.2d 1323 (C.D. Cal. 2009) .......................................................6

*Silber v. Mabon*, 18 F.3d 1449 (9th Cir. 1994) ..................................................................................6

*State of California v. Levi Strauss & Co.*, 41 Cal.3d 460 (1986) .......................................................22

*State of New York v. Keds Corp.*, 1994 WL 97201 (S.D.N.Y.) ........................................................12

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) .................................................................6, 20

**Treatises**

Alba Conte and Herbert B. Newberg, Newberg on Class Actions § 10:17 (4th Ed. 2009) .............12

Alba Conte and Herbert B. Newberg, *Newberg on Class Actions* § 11:41 (4th Ed. 2009) ...............6

**MEMORANDUM OF LAW**

Fourteen months after this case was filed plaintiffs obtained preliminary approval of a settlement that was reached not simply through the devices of litigation but through particularly hard fought extrajudicial efforts.  After an initial motion to dismiss by defendant, this was a litigation that resulted in a tremendous and timely benefit to the class only in the wake of hard fought mediation, meetings between Plaintiffs' and Defendants' representatives to analyze the privacy implications of Facebook users' online experiences, protracted negotiations.  The result was a settlement (the Class Action Settlement Agreement, Dkt. 38-1, referred to herein as the "Settlement Agreement" or "Settlement") that was worthy of preliminary approval and for which plaintiffs now come before this Court for final approval of the Settlement as fair, reasonable and adequate.

This lawsuit arose from the operation of Facebook's "Beacon" program, which Plaintiffs charge enabled Facebook to obtain information about consumers' transactions on affiliated, third-party websites without obtaining consumers' informed consent. Plaintiffs Sean Lane, Mohannaed Sheikha, Sean Martin, Ali Sammour, Mohammaed Zidan, Sara Karrow, Colby Henson, Denton Hunker, Firas Sheikha, Hassen Sheikha, Linda Stewart, Tina Tran, Matthew Smith, Erica Parnell, John Conway, Austin Muhs, Phillip Huerta, Alicia Hunker, and M.H., a minor, by and through her parent Rebecca Holey (collectively, "Plaintiffs" or "Class Representatives"), on their own behalves and on behalf of the proposed settlement class (the "Class" or "Class Members"), alleged in their August 12, 2008 complaint (the "Complaint") that Defendants Facebook, Inc. ("Facebook") and Beacon Merchants consisting of Blockbuster, Inc., Fandango, Inc., Hotwire, Inc., STA Travel, Inc., Overstock.com, Inc., Zappos.com, Inc., Gamefly, Inc. and Does 1-40 (collectively "Defendants") violated state and federal privacy laws, state consumer protection statutes, and common laws through the operation of Facebook's Beacon software. (Dkt. 1.)

On October 23, 2009, this Court granted preliminary approval (Dkt. 67) to the Class Action Settlement Agreement (the "Settlement Agreement" or "Settlement") (Dkt. 38-1), reached after two days of mediation sessions with Antonio Piazza that surrounded months of intense negotiation. As required by the notice plan approved by the Court, direct notice to each class

member was provided. Additionally, notice of the settlement was given by publication and to the required governmental agencies.

Given the strength of the settlement—the termination of the Beacon program as well as a $9.5 million fund to create a foundation dedicated to promoting consumers' privacy interests—it is not surprising that there is little opposition to the proposed settlement. Indeed, there has been only 108 opt-outs.  (Rosenthal Decl. ¶8.)  There were also four objections from the over 3.6 million class members, which is equal to approximately .0000011% of the total class.  (*See* Rosenthal Decl. ¶3.)

The complexity and novelty of Plaintiffs' claims, coupled with the vigorous defense promised and asserted by the Defendants, further supports the conclusion that this Court should find the results achieved in this litigation are "fair, reasonable, and adequate" and that the Settlement warrants final approval.

## I. NATURE OF THE LITIGATION

### A.    Lawsuit, Discovery, and Settlement

On August 12, 2008, after months of research and investigation, Plaintiffs filed an action captioned *Sean Lane, et al. v. Facebook, Inc. et al.*, No. 08-cv-03845, alleging claims for damages, injunctive, and declaratory relief arising out of Defendants' failure to provide appropriate notice and obtain informed consent before acquiring and transmitting personal information about consumers from Beacon-affiliated websites to Facebook. (Dkt 1.) On October 10, 2008, Facebook filed a motion to dismiss. (Dkt. 14.) Prior to the Plaintiffs' filing their opposition or the Court's issuing a decision on that motion, the parties agreed to enter into private mediation. (Kamber Decl. ¶21.)

On December 9, 2008 and July 28, 2009, counsel for the parties met in person in San Francisco, California for mediation with the assistance of Antonio Piazza of Gregorio, Haldeman, Piazza, Rotman, Frank & Feder. (Kamber Decl., ¶24.) In the months between the two mediation sessions, counsel for the parties engaged in dozens more hours of negotiations and were able to finalize and document the terms of the proposed settlement for which they now seek final approval from this Court. (*Id*. at ¶¶25-30.)

The Settlement provides strong injunctive relief in its prescription for the termination of Facebook's Beacon program—the operative component underlying Plaintiffs' allegations. The Settlement also provides for a fund of $9.5 million to create a privacy foundation which will benefit the Class by funding projects to promote consumers' privacy interests. The settlement fund will also be applied to settlement-related costs—including notice, settlement administration, incentive awards, and attorneys' fees and expenses.

**B.      Facebook's Position**

At all times, Facebook has denied and continues to deny: (1) each and all of the claims and allegations of wrongdoing made by the Plaintiffs and Class Members; (2) all charges of wrongdoing or liability against it arising out of any of the conduct, statements, acts or omissions alleged, or that could have been alleged, in the action; and (3) allegations that the Plaintiffs or any Class Member were harmed by any conduct by Facebook alleged in the action or otherwise.

Facebook contends it has acted properly, and denies that the Plaintiffs and the Class are entitled to any form of damages based on the conduct alleged in the Complaint. Kamber Decl. ¶18. In addition, Facebook maintains it has meritorious defenses to all claims alleged in the Complaint and is prepared to defend vigorously all claims asserted in this litigation. *See* Dkt. 14, Motion to Dismiss.

## II.   SETTLEMENT TERMS

The key terms of the Settlement Agreement (Dkt. 38-1) are as follows:

**A.      Class Definition**

On October 23, 2009, this Court certified the following Class for the purposes of Settlement (Dkt. 67):

> All Facebook members who, during the period of November 6, 2007 to the date this Order is entered [October 23, 2009], engaged in one or more activities on a website of any company, corporation, business enterprise, or other person that entered into an agreement with Facebook with respect to the Beacon functionality, which triggered Beacon, the program launched by Facebook on November 6, 2007 and all iterations thereof bearing the "Beacon" name.

Specifying, in addition:

> Excluded from the Class are any judicial officer to whom this action is assigned; Facebook and any of its affiliates; any current or former employees, officers, or directors of Facebook; any persons presently residing outside the United States; and all Persons who timely and validly request exclusion from the Class pursuant to the Notice disseminated in accordance with the Order

**B.    Settlement Benefits**

Facebook, on behalf of all Defendants, has agreed to provide the following relief:

### 1.    *Injunctive Relief*

Facebook has terminated Beacon, the Facebook software program through which the complained-of actions occurred. Facebook terminated Beacon as required by the terms of the Settlement upon the Court's grant of preliminary approval of the Agreement.

### 2.    *General Relief*

Upon final approval of the Settlement Agreement, Facebook will establish and administer a cash settlement fund of nine million, five hundred thousand dollars ($9,500,000), which will be used to establish and operate a privacy foundation devoted to funding and sponsoring programs designed to educate users, regulators, and enterprises regarding critical issues relating to protection of identity and personal information online through user control, and to protect users from online threats.

### 3.    *Payment of Notice and Administrative Fees, Attorneys' Fees, and Expenses*

Facebook, through the settlement fund described above, will cover the cost of all notice and administrative fees and attorneys' fees and expenses.

**C.**     **Release**

Upon the entry of a final order approving the Settlement and following the expiration of the time for appeal or the entry of a decision on such appeal, the Class Representatives, and each and every member of the settlement Class who have not timely filed requests to be excluded from the settlement Class, will release and forever discharge Facebook and all Beacon Merchants, and each of their respective past and present officers, directors, employees, insurers, agents, representatives, partners, joint-venturers, parents, subsidiaries, affiliates, attorneys, successors and assigns from any and all manner of claim for payment, non-economic, or injunctive relief of any kind or nature and any and all liabilities, demands, obligations, losses, actions, causes of action, damages, costs, expenses, attorneys' fees and any and all other claims of any nature whatsoever, whether known or unknown, that have been, could have been, or in the future might be asserted in the pending litigation or in any other court or proceeding, arising from or relating to any of the allegations or statements made in or in connection with, the Litigation (and including, without limitation, any and all claims based upon any of the laws, regulations, statutes, or rules cited, evidenced, and referenced by all such allegations and statements), or any other known or unknown claims arising from or relating to Beacon (including, without limitation, arising from or relating to the use of data gathered through Beacon) and shall be permanently barred and enjoined from instituting, prosecuting, or from asserting, either directly, indirectly, derivatively, or representatively any claims against Defendants, as further provided for in the Settlement Agreement.

Access to the full text of the release was available to all Class Members in the Settlement Agreement document posted on the Settlement website (www.Beaconclasssettlement.com).

Even without consideration of the complexity of the litigation and uncertainty of some of Plaintiffs' legal claims, the negotiated settlement is more than fair, reasonable, and adequate and is deserving of the Court's approval.

### III. CLASS NOTICE COMPORTS WITH DUE PROCESS AND RULE 23

Before final approval of a class action can issue, notice of the settlement must be provided to the class. Fed. R. Civ. P. 23(e)(1). Rule 23 requires the class receive "the best notice practicable under the circumstances, including individual notice to all members who can be identified

through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Actual notice, however, is not required. *Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994). Notice to the class must be "reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *Saulic v. Symantec Corp.*, 596 F.Supp.2d 1323, 1327 (C.D. Cal. 2009) (notice via defendants' customer email lists appropriate).

As detailed in the declaration of the Notice Administrator, pursuant to the Court's Preliminary Approval Order, Facebook caused the Notice to be sent by email to each of the approximately 3,663,651 potential Class Members identified through Facebook's records.  Rosenthal Decl. ¶¶3-4. In addition, Facebook posted the Notice in the "Updates" section of each identified user's personal account Inbox on Facebook.  *Id*. at ¶4. Notice was also published in *USA Today*. *Id*. at 6. The Notice was further published on the Settlement website, www.BeaconClassSettlement.com.  *Id*. at ¶7. This Court previously ruled at the preliminary approval hearing that such direct notice and notice by publication would clearly and conspicuously apprise the Class as required by Rule 23 and meets due process requirements. (Dkt. 67.)

### IV.  SETTLEMENT WARRANTS FINAL APPROVAL

Pursuant to Federal Rule of Civil Procedure Rule 23(e), "[t]he court must approve any settlement, voluntary dismissal, or compromise of the claims, issues or defenses of a certified class" and such approval may occur "only after a hearing and on finding that the settlement, voluntary dismissal, or compromise is fair, reasonable, and adequate." Fed. R. Civ. P. 23; *In re OmniVision Tech. Inc.*, 559 F. Supp. 2d 1036, 1040 (N.D.Cal. 2008) (citing *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003)). While a number of factors must be balanced when considering the final approval of a class action settlement, courts in the Ninth Circuit presume fairness if the negotiations were at arm's length, there was sufficient discovery, the counsel are experienced in similar litigation, and there are only a small number of objectors. Alba Conte and Herbert B. Newberg, *Newberg on Class Actions* § 11:41 (4th Ed. 2009); *Hanson v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

As provided above, the Settlement Agreement, to which there have been only four objections, is the product of substantial effort by experienced counsel with sufficient discovery, and only after extensive arm's-length negotiations and two mediation sessions with Antonio Piazza. (Kamber Decl. ¶¶21-30.)  Accordingly, the Court's analysis of the factors listed below should be examined with a presumption that the Settlement Agreement is fair.

It is well-settled that in analyzing the fairness, reasonableness, and adequacy of a class action settlement, the Court may consider the following non-exhaustive list of factors:

> (1) [T]he strength of plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed, and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003); *see also In re OmniVision*, 559 F.Supp.2d at 1040-41. In the instant case, each of the factors militates in favor of approving the settlement.

**A.      Strength of Plaintiffs' Case**

"Basic to [analyzing a proposed settlement] in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of the litigation." *Protective Comm. for Indep. Stockholders v. Anderson*, 390 U.S. 414, 424-25 (1968). In this matter, the strengths of the Plaintiff's case, notwithstanding its merits, fail to outweigh the significant benefits and mitigation of risk presented by the Settlement discussed below, based on factors that include the following:

**1.      *Legal Claims against Facebook***

Early in this litigation, Defendant Facebook filed a motion to dismiss (Dkt. 14) in which its assertions included the following:

a.      Plaintiffs' claims under the Wiretap Act provisions of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 fail because the communications satisfy the consent exception of § 2511(2)(d) and Plaintiffs did not allege a criminal or tortious purpose sufficient to negate the exception;

b.     Plaintiffs' claims as to Facebook's liability under Video Privacy Protection Act, 18 U.S.C. § 2710 (VPPA), fail because they cannot be held secondarily liable under VPPA; aiding and abetting and civil conspiracy as to violations of the Video Privacy Protection Act, 18 U.S.C. § 2710 fail because the Act does not allow for secondary liability;

c.     Plaintiffs failed to allege requisite damages under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030;

d.     Plaintiffs failed to alleged violations of California's Consumer Legal Remedies Act, California Civil Code § 1750 (CLRA), with sufficient particularity as to fraudulent conduct and, due to the gratuitous nature of Facebook's services, Plaintiffs are not "consumers" as defined in the CLRA;

e.     Plaintiffs failed to allege compensable damages required under California's Computer Crime Law, Penal Code § 502.

a.     In addition, although none of the Beacon Merchants filed motions to dismiss, Class Counsel note that, in the matter of *Harris v. Blockbuster, Inc.*, case number 3:09-cv-217, United States District Court, Northern District of Texas.  Blockbuster was successful in mounting an aggressive defense, including attempts to defend its arbitration clause, sufficient to halt forward movement in that litigation.

Here, Class Counsel remain confident that Plaintiffs' claims are meritorious and that the strength of certain of Defendant Facebook's defenses could be mitigated by amending the Complaint. At the same time, informed by their experience in class action litigation and their continuing evaluation of this matter throughout the course of litigation, Counsel recognize that the Settlement Agreement resolves material litigation uncertainties. (Kamber Decl. ¶¶31-39.) Plaintiffs' case is not so strong that the Settlement Agreement is unreasonable. Accordingly, this factor favors approval of the settlement.

**B.     Risks of Continued Litigation**

The next factor this Court must consider is "the risk of continued litigation balanced against the certainty and immediacy of recovery from the Settlement." *In re OmniVision*, 559, F.Supp.2d at 1041 (citing *Dunleavy v. Nadler*, 213 F.3d 454, 458 (9th Cir. 2000)). "The Court

1   should consider the vagaries of litigation and compare the significance of immediate recovery by

2   way of the compromise to the mere possibility of relief in the future, after protracted and expen-

3   sive litigation. In this respect, it has been held proper to take the bird in hand instead of a prospec-

4   tive flock in the bush." *Lipuma v. Am. Express Co.*, 406 F.Supp.2d 1298, 1323 (S.D. Fla. 2005).

5   Here, in the absence of the Settlement, and assuming Plaintiffs prevailed in obtaining cer-

6   tification of the class, Plaintiffs would face a number of certain risk-laden obstacles in litigating

7   this matter.

8   It is certain that the expense, duration, and complexity of the protracted litigation that

9   would result from the claims and defense alleged in this litigation would be substantial. It would

10  be necessary to undertake full document and deposition discovery, expert discovery, and disposi-

11  tive motion practice at the conclusion of discovery, and this case could easily require an addi-

12  tional two to three years to reach a conclusion. Significant costs would be incurred were this

13  matter to proceed to trial, including expenses for expert witnesses, technical consultants, and the

14  myriad of other costs necessitated by the trial of a class action. (Kamber Decl. ¶¶36-39.) Given

15  the complexity of the issues, the defeated party would likely appeal.

16  These predictable obstacles to timely resolution must considered in light of risks with less

17  certain consequences but, potentially, far more costly outcomes. For example, Plaintiffs face risks

18  of dismissal at the pleading stage and in proving liability and damage at trial. Further, critical to

19  the analysis here, it is impossible to predict how a trier of fact would construe the evidence and

20  testimony. Here, the expense, complexity and likely duration of the litigation fully support the

21  Settlement, and the substantial and immediate relief provided to the Class under the Settlement

22  weigh heavily in favor of its approval compared to the inherent risk of continued litigation, trial,

23  and appeal.

24  Finally, the substantial and unique value of the Settlement could not be achieved, even if

25  trial were successful, given that  Facebook's funding of the privacy foundation confers a tremen-

26  dous benefit for the class and the broader consumer population in a way that could not be im-

27  posed unilaterally by the Court as post-trial remedy. As such, the substantial and immediate relief

28

1   provided to the Class under the Settlement weighs heavily in favor of its approval compared to

2   the inherent risk of continued litigation, trial, and appeal.

3   **C.      Risks of Maintaining Class Action Status**

4          The Court's October 23, 2009 Order certified a nationwide class for settlement purposes

5   only. (Dkt. 67.) However, if the Court fails to grant final approval to the Settlement Agreement

6   for any reason, the conditional certification of the class will automatically become void. (*Id.*)

7   Although Plaintiffs and Class Counsel believe they would be successful in obtaining certification

8   of an adversarial class absent the Settlement Agreement, Defendants have made it clear that, in

9   the absence of the agreement, they would vigorously oppose adversarial certification. Further,

10  even if Plaintiffs were successful in a motion for class certification, absent the Settlement Agree-

11  ment, Defendants could move for decertification of the class before or during trial and likely

12  would challenge certification on appeal.

13         In its Order granting Preliminary Approval, this Court requested that Counsel address the

14  issues of typicality in detail at the time of final approval, especially as it relates to the VPPA. To

15  meet the typicality prerequisite of Rule 23(a), the claims or defenses of the class representative

16  must be typical of the claims or defenses of the class. Fed R. Civ. P. 23(a)(3). The test is

17  "'whether other members have the same or similar injury, whether the action is based on conduct

18  which is not unique to the named plaintiffs, and whether other class members have been injured

19  by the same course of conduct.'" *In re Static Random Access Memory (SRAM) Antitrust Litig.*,

20  2009 WL 4263524 *4 (N.D.Cal) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th

21  Cir. 1992). To meet the standards of typicality, neither the claims nor the damages have to be

22  identical, just "reasonably co-extensive." *Id.* (citing *Hanlon.*, 150 F.3d at 1020; *In re Vitamins*

23  *Antitrust Litig.*, 209 F.R.D. 251, 261 (D.D.C. 2002)). A disparity in damages between class repre-

24  sentatives and other class members does not defeat a finding of typicality. *Hester v. Vision Air-*

25  *lines, Inc.*, 2009 WL 4893185 *4 (D. Nev.).

26         Here, the VPPA claims are not the only statutory claims in the litigation.  All class mem-

27  bers in the case possess significant statutory claims under ECPA ($100 a day for each day of

28  violation or $10,000, whichever is greater).  This difference in amount does not defeat typicality.

1     *See Hopson v. Hanes Brands, Inc.*, 2009 WL 928133 (N.D.Cal.) (Judge Laporte) ("That injuries

2     may differ in amount does not defeat typicality*"). See also Lymburner v. U.S. Financial Funds,*

3     *Inc.*, --- F.R.D. ----, 2010 WL 335791 (N.D.Cal.) (typicality not defeated because remedies may

4     be different). The Beacon program shared information and worked in the same way for each

5     member of the class irrespective of the website from which the browsing commenced. Simply

6     put, the conduct was identical.

7           The relative strengths of the ECPA and VPPA claims are in fact quite similar, although at

8     the time of preliminary approval the emphasis on the Proposed Intervenors was squarely on the

9     VPPA claims. But in actuality, the opportunity for recovery on any statutory theory was far from

10    certain in this action as was made clear in the motion to dismiss by Facebook as well as the brief

11    filed earlier this evening by Blockbuster. (See Dkt. 102.) Blockbuster has numerous defenses to

12    the VPAA claims and the likely annihilative nature also must be taken into account when evaluat-

13    ing whether to pass on a quality settlement in order to head down a particularly uncertain road.

14    There can be little doubt that a successful prosecution of VPPA claims would annihilate Block-

15    buster. *See Kline v. Coldwell, Banker & Co.*, 508 F.2d 226, 235 (9th Cir. 1974).

16          Significantly, the settlement was negotiated on behalf of representative plaintiffs from

17    each of the released defendants. One of the representative plaintiffs in this action had their in-

18    formation shared through Beacon as a result of his use of Blockbuster. He consented to the set-

19    tlement and was consulted as part of the settlement process. Further, the *Harris* plaintiffs also

20    used Beacon through Blockbuster. The *Harris* plaintiffs now being fully informed of the settle-

21    ment and the arguments for and against VPA and ECPA have a better appreciation for the unlike-

22    lihood of recovery against Blockbuster and now admit that, indeed, this settlement adequately

23    addresses the interests of the Beacon Blockbuster users. (Wilson Decl. ¶¶3, 5-7). It is safe to say

24    that had there been a sufficiently strong claim to pursue, the *Harris* plaintiffs would have had

25    every incentive to pursue their claims and object to this Settlement. Rather, the *Harris* plaintiffs

26    have now dismissed their case in settlement with Blockbuster and expressly support this settle-

27    ment as fair, reasonable and adequate to the *Harris* Plaintiffs as well as all other Beacon Block-

28    buster users. (Wilson Decl. ¶¶8-9).

1    Accordingly, this factor weighs heavily in favor of approving the Settlement Agreement,

2  because if at any point the Class failed to become certified or if certification were reversed, the

3  Class, having foregone the benefit of the Settlement, would be face with the possibility of no

4  relief, or relief only at an unsupportable cost of individual litigation.

5  **D.    Amount Offered in Settlement**

6    The next factor relevant to a consideration of the reasonableness of the Settlement Agree-

7  ment is the amount offered by Defendants. In addition to the substantial injunctive relief obtained

8  by the settlement—the termination of the Beacon program—the settlement also provides for a

9  settlement fund of nine million, five hundred thousand dollars ($9,500,000) to establish a privacy

10  foundation devoted to funding and sponsoring programs designed to educate users, regulators,

11  and enterprises regarding critical issues relating to protection of identity and personal information

12  online through user control and to protect users from online threats.

13    "When a litigated or settled aggregate class recovery cannot feasibly be distributed to in-

14  dividual class members . . . the court may direct that such funds be applied prospectively to the

15  indirect benefit of the class." *Newberg on Class Actions* § 10:17. In cases such as this, where any

16  potential recovery per Class member would be small and where injunctive provisions represent a

17  large part of the potential recovery, a *cy pres* resolution, such as the one proposed here, is reason-

18  able and adequate. *State of New York v. Keds Corp.*, 1994 WL 97201 at *3 (S.D.N.Y.); *Francisco

19  v. Numismatic Guaranty Corp. of America*, 2008 WL 649124 (S.D. Fla). Courts have also found

20  settlements of statutory actions fair and reasonable where the class representatives received statu-

21  tory damages, and the remainder of the settlement was distributed as a *cy pres* payment. *Reade-

22  Alvarez v. Eltman, Eltman & Cooper, P.C.*, 2006 WL 3681138 (E.D.N.Y.).

23    Moreover, the certainty and relative immediacy of the benefit under the Settlement

24  Agreement, when compared with the risk associated with seeking the further benefits but receiv-

25  ing nothing, further justifies the reasonableness of accepting less than the maximum potential

26  recovery. *See In re OmniVision*, 559 F. Supp. 2d at 1042.

27

28

E.      **Extent of Discovery Completed and Stage of Proceedings**

The next factor requires that the Court consider the extent of the discovery conducted to date and the stage of the litigation as indicators of class counsel's familiarity with the case and ability to make informed decisions. *In re OmniVision*, 559 F. Supp. 2d at 1042 (citing *Dunleavy*, 213 F.3d at 459).

In this matter, counsel, assisted by Plaintiffs, initiated their own factual and technical investigation three months before filing the complaint. In preparing the case and in preparing for mediation, counsel conducted research and consulted with experts on issues of industry standards and best practices for managing users' privacy expectations and presenting notice and choice to users in various online environments. In the course of mediation and continuing throughout the protracted negotiations process, representatives of the parties held cooperative discussions and exchange of information regarding Facebook's technology and users' experiences with it, particularly regarding notice and choice relating to users' personal information. Thus, Class Counsel was adequately familiarized with the case to advocate for the interests of the class and effectively negotiate the merits of the Settlement Agreement. (*See* Kamber Decl., ¶¶23-30, 31.) Accordingly, this factor, too, favors approval of the Settlement Agreement.

F.      **Experience and Views of Counsel**

The sixth factor has the Court consider Class Counsel's experience and views about the adequacy of the Settlement. *See In re OmniVision*, 559 F. Supp. 2d at 1043. In fact, "[t]he recommendations of plaintiff's counsel should be given a presumption of reasonableness." *Id.* (quoting *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D.Cal. 1979)). Reliance on such recommendations is premised on the fact that "parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation." *In re Pacific Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995). Class Counsel, as well as other members of KamberLaw, LLC and Parisi & Havens LLP that were actively involved in the litigation of this matter, have regularly engaged in major complex litigation, and have had extensive experience in prosecuting consumer class action lawsuits of similar size and complexity. Through their investigation, consultation with experts, review of discovery materials, litigation,

mediation, and settlement, Class Counsel have an intimate understanding of the instant litigation and believe the settlement to more than exceed the "fair, adequate, and reasonable" standard required for the Court's approval. (Kamber Decl. ¶¶7-10.) This fact, therefore, also favors the Court's final approval of the Settlement Agreement.

**G.     Presence of Governmental Participant**

In this matter, Plaintiffs' counsel made themselves available and cooperated fully in responding to informal, background inquiries by representatives of government enforcement agencies.

**H.     Incentive Fees**

The incentive fees for the named class representatives are reasonable and should be approved.  Incentive fees to class representatives are favored and encouraged.  Some findings on this issue are as follows:

●In a report which analyzed 374 opinions from 1993 to 2002, the authors found that "granting an incentive award is common in classes of cases with very low recoveries, mostly consumer credit cases and antitrust cases resembling consumer credit cases."  T. Eisenberg & G. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, New York University School of Law (2005).

●This study also found that [t]he average award per class representative was $15,992 and the median award per class representative was $4,357."  (Id.)

●In another report which looked at incentive awards in four federal districts it was found that "median amount of all awards to class representatives" in four federal districts were $7,500, $12,000, $7,500, and $17,000.  Federal Judicial Center, Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules by T. Willging, L. Hooper & R. Niemic (1996).

●One report on consumer class actions explained that "[i]t has become commonplace for the named representatives to request a special payment for having borne the flag and headed a class action.  Most courts are receptive to this because they feel that private attorneys general should be encouraged, and such incentives further the goals of federal and state laws."  S. Savett,

R. Liebenberg & R. Wellington, Consumer Class Actions: Class Certification Issues, Including Ethical Considerations and Counsel Fees and Incentive Payments to Named Plaintiffs, Practicing Law Institute (April 1996).

Here, one named plaintiff requests a $15,000 incentive fee, two request a $7,500 fee, and the remaining named plaintiffs request $1,000.  Mr. Lane seeks a higher incentive award based upon the extraordinary time he in particular committed to this litigation.  (Malley decl., ¶3.)

The Named Plaintiffs were the only persons of over 3 million persons to be affected who took the time and energy to search out counsel to rectify what they correctly perceived as a viola-tion of their rights.  Even the staff attorney from EPIC who now objects failed to come forward. Courts recognize that this type of conduct should be commended and encouraged.  *See* 4 New-berg on Class Actions § 11:38 (4th ed.) and cases cited therein.  An incentive fee is certainly needed where a meritorious class action may otherwise never have been brought.  In view of these facts, the requested incentive awards are fair and reasonable.

**I.     Reactions of Class Members**

The final factor in the Court's determination of the fairness, adequacy, and reasonableness of the Settlement Agreement is the reaction of the class to the settlement. *Molski,* 318 F.3d at 953. "It is established that the absence of a large number of objections to a proposed class action set-tlement raises a strong presumption that the terms of a proposed class action settlement are favor-able to the class members." *Nat'l Rural Telecomms Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528-29 (C.D. Cal. 2004). The small number of objections from the class members to the Settlement Agreement further favors its approval. *Churchill Village LLC v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004).

In this case, the court-approved notice procedures utilized by the parties sent direct notice to over 3.6 million potential class members *via* email, notice was published in one national publi-cation, notice was posted in the "Updates" section of the Inbox section of Facebook users' per-sonal accounts , a dedicated website and phone toll-free phone line was setup, and yet this yielded only four objections and only 108 requests for exclusion to date. (Rosenthal Decl. ¶8.) This reac-

1   tion is particularly impressive when one considers that almost 10% of the class members who

2   received notice visited the settlement website. (Rosenthal Decl. ¶7).

3          Four persons objected to the settlement (and one group, EPIC, sent a letter to the Court,

4   though it does not represent any class members).  The fact that less than .000001 percent of Class

5   Members objected to the Settlement should weigh heavily in favor of the Court approving this

6   Settlement. *See Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980) (fact that

7   only three out of 2,500 class members maintained objections to the settlement showed an "over-

8   whelming sentiment of the class in favor of the [d]ecree, a factor which provides strong support

9   for the fairness of its terms"); *Boyd v. Cechtle Corp.*, 485 F. Supp. 610, 624 (N.D. Cal. 1979)

10  (finding that objections from only 16 percent of the class was persuasive that the settlement was

11  adequate). A finding of fairness, adequacy, and reasonableness does not require zero objections to

12  the class action settlement. Here, the minimal number and cursory nature of the written objections

13  received to date weighs strongly in favor of the Settlement.

14         One prefatory observation is in order. The objections received are largely based on specu-

15  lations, opinions, suspicions and innuendos, not hard facts. None of the objections raises a single

16  new fact or provides any evidentiary support for these reiterations of earlier arguments and form

17  objections. In fact, the short response to all of these objections should be the same as made by the

18  Second Circuit in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 464 (2d Cir. 1974):

19              In general the position taken by the objectors is that by merely ob-
               jecting, they are entitled to stop the settlement in its tracks, without
20              demonstrating any factual basis for their objections, and to force the
               parties to expend large amounts of time, money and effort to answer
21              their rhetorical questions, notwithstanding the copious discovery
               available from years of prior litigation and extensive pre-trial pro-
22              ceedings. To allow the objectors to disrupt the settlement on the ba-
               sis of nothing more than their unsupported suppositions would
23              completely thwart the settlement process. On their theory no class
               action would ever be settled, so long as there was at least a single
24              lawyer around who would like to replace counsel for the class and
               start the case anew. To permit the objectors to manipulate the distri-
25              bution of the burden of proof to achieve such an end would be to
               permit too much.

26  With this point in mind, Class Counsel will respond to the various objections.

27

28

1   **1.   Objection by Ms. McCall (EPIC Staff Attorney) and Letter by EPIC,** *et al.*

2   The little opposition that has been voiced to the Settlement seems to emanate from a

3   EPIC.  EPIC sent this Court a letter[1] with regard to the settlement.  (Dkt. No. 92.)  Objector Gin-

4   ger McCall is a staff attorney with EPIC.  *See* Kamber Decl., Exh. 3 (Ms. McCall's biography on

5   her employer's website.)

6   While Ms. McCall claims to value her privacy, her objection reveals—in a far more public

7   way than the injury she claims to have incurred—precisely the movie information in her declara-

8   tion that she claims she did not authorize revealed to her friends as part of the Beacon program,

9   plus personal details that are unrelated to the Beacon program.

10   Sitting by silently for years but seemingly maintaining a careful log of her online activi-

11   ties, Ms. McCall never chose to pursue her VPPA claims that she now states are strong enough to

12   justify not releasing even in exchange for a 9.5 million dollar settlement. The internal inconsis-

13   tencies of her filing and this action at this particular time suggests that her motives may be more

14   related to her employer than her personal views or concerns.

15   At the bottom line, Ms. McCall's objection and EPIC's letter offer no useful information

16   as to the character of the settlement and most appropriately should be considered in the factual

17   context of Mr. Kamber's conversation with Mark Rotenberg of EPIC, in which Mr. Rotenberg

18   was quite plain about the interests he sought to promote, and in light of favorable comments made

19   to Mr. Malley by a Rose Foundation representative. Kamber Decl. ¶¶ 52-55.

20   It is unfortunate that the EPIC letter and the McCall Objection fail to review the actual

21   terms of the Foundation that guarantee its independence and instead selectively cite the single

22   director chosen by Facebook, consistent with the Settlement Agreement.  There is simply no

23   argument that either Mr. Magid nor Mr. Hoofnagle are not independent and respected national

24   leaders in issues of privacy, so Ms. McCall and EPIC simply ignore them.  In fact, both objections

25   ignore all the facts that seem inconvenient to them.

26

27   [1] EPIC does not have standing to object to the settlement.  *In re Equity Funding Corp. of America*
     *Sec. Lit.* (9th Cir.1979) 603 F.2d 1353, 1360 (a nonparty to a class action who is not a member of

28   the class lacks standing to object to or appeal from the challenged order).

####    a.    *This is not a case where the class receives no relief*

Ms. McCall's argument that there is no relief for the class is simply wrong.  Objectors' reliance on the court's denial of class certification in *Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003) and *In re TD Ameritrade Accountholder Litig.*, Case No. 07-2852 (N.D. Cal.) is wholly misplaced.  In *Molski*, a class action was brought under the Americans with Disabilities Act in an effort to force the defendant to make its facilities accessible to the mobility impaired.  As a result of the proposed settlement, defendant agreed to make its facilities accessible, which it was already required to do under the law, and make tax deductible, charitable donations.  Plaintiffs, on the other hand, broadly agreed to release all past and present claims for damages other than physical injury.  Critically, *Molski* was brought as a Rule 23(b)(2) class action and thus, class members received no personal notice of the settlement nor the opportunity to opt-out despite giving up their monetary claims. Indeed, the court's greatest concern with the *Molski* settlement was not what class members did or did not receive but rather the substantial claims that they were required to give up *without* their consent or notice.  Additionally, the terms of the settlement, including attorneys fees and the incentive award, were negotiated nearly ten months *before* class allegations were even added to the complaint.  Here, the case was investigated and filed as a class action with a focus on protecting all class members' interests, notice of the settlement was provided directly to each class member and was published nationally.  Moreover, in the instant litigation, each class member could have opted out of the proposed settlement if they believed the relief provided to be personally inadequate.

Similarly, the *TD Ameritrade* litigation is distinguishable.  The *Ameritrade* case involved a lapse of security resulting in the disclosure of email addresses.  Judge Walker made certain findings of fact brought to light by a withdrawn objection by a state Attorney General.  Where modifications to the settlement satisfied the objecting Attorney General, the court was not persuaded.  The trial court determined that it could not conclude that the breach in security was corrected or that the offer of six million copies of anti-spam software with a MSRP of $69.95 had real value to the class.  In contrast, here Facebook has terminated the Beacon program at issue, thus insuring that no individual will experience the invasion of privacy complained of here.  Further, this set-

tlement provides a *cy pres* component which was specifically designed to "fund projects and initiatives that promote the cause of online privacy, safety and security."  Dkt. No. 38-1, Settlement Agreement, ¶¶4.19, 4.20.  Further, no state Attorney General or other governmental agency has raised any objection.

### b.    *Lack of individual monetary compensation*

Ms. McCall further appears to argue that the settlement funds should be distributed to the class members rather than distributed under the *cy pres* doctrine.

The approval of a fund "does not depend on its being composed of unclaimed or residual funds."  *In re Mexico Money Transfer Litigation*, 164 F.Supp.2d 1002, 1031 (N.D. Ill. 2000), citing *Keele v. Wexler*, 149 F.3d 589, 592 (7th Cir. 1988) (approving *cy pres* contribution to legal aid foundation).  Moreover, as Ms. McCall admits, *cy pres* awards are appropriate where class members would only receive a small individual recovery otherwise.  *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1031, 1305 (9th Cir. 1990).

*Cy pres* distributions are appropriate where distribution to individual class members is not feasible (*In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 534, 2008-1 Trade Cas. (CCH) ¶ 76157, 76 Fed. R. Evid. Serv. 606 (6th Cir. 2008), cert. denied, 129 S. Ct. 1673, 173 L. Ed. 2d 1037 (2009) ("Fluid recovery refers to the distribution of unclaimed or unclaimable funds to persons not found to be injured but who have interests similar to those of the class.").

Use of *cy pres* distributions are appropriate where the cost to distribute would significantly erode the settlement funds or where, due to the size of the award, class members are unlikely to come forward.  *See In re Microsoft Corp. Antitrust Litigation*, 185 F. Supp. 2d 519, 523, 2002-1 Trade Cas. (CCH) ¶ 73539 (D. Md. 2002) ("Although the *cy pres* approach is most frequently used for the purpose of distributing the residue of a class settlement fund, it has also been utilized as a means for distributing the entirety of a class fund where the proceeds cannot be economically distributed to the class members.") (internal citations omitted).

Here, there are 3,663,651 class members.  (Rosenthal Decl., ¶3.)  It is estimated that it will cost between $.45 and $.60 per class member to distribute funds.  (Kamber Decl., ¶23.)  Given the number of class members, this would mean the cost to distribute funds would be approxi-

1    mately $2.2 million.  Assuming that the total available fund is $6.3 million, each class member

2    would receive a check for approximately $1.12.  This *de minimis* amount can be used more effec-

3    tively in mass as a *cy pres* benefit than individually.  *New York v. Reebok Int'l Ltd.*, 903 F.Supp.

4    532, 536-537 (S.D.N.Y. 1995) (holding settlement fair that distributed to charitable purposes eight

5    million dollar recovery for overcharging of athletic shoes, where each individual claims ranged

6    from $1-$4 and cost of administering individual recovery would be around $2.50 per claimant).

7    　　　　Moreover, as explained more fully in the declaration of Jeremy Wilson and the brief filed

8    by Blockbuster (Dkt. No. 102), the VPPA claims by those class members with Blockbuster ac-

9    counts simply cannot be realistically valued at anywhere near $2,500 per claim as asserted by the

10   objector.  (Wilson decl., ¶9.)

11   　　　　Blockbuster has resolved its litigation which was pending in Texas, *Harris v. Blockbuster,*

12   *Inc.*  (Wilson decl., generally.)  As part of the settlement, Blockbuster has agreed to a number of

13   remedial relief measures.  As a result, counsel for the plaintiffs in the *Harris* action have "con-

14   cluded that the relief proposed in the Settlement Agreement is the best practical relief to the

15   Class."  Wilson decl., ¶10.)

16   　　　　Finally, Blockbuster is having well-documented financial difficulties.  (Wilson decl., ¶7

17   and Exh. 1 thereto.)  This Court is obligated to determine whether a proposed class action settle-

18   ment is fundamentally fair, adequate, and reasonable.  *Staton,* 327 F.3d at 959, *citing Hanlon v.*

19   *Chrysler Corp.,* 150 F.3d 1011, 1026 (9th Cir.1998).  A factor to consider in this analysis is the

20   "ability of the defendants to withstand a greater judgment."  *In re Oracle Sec. Litig.*, 829

21   F.Supp.1176, 1179 (N.D. Cal. 1993); *Curtis-Bauer v. Morgan Stanley & Co.*, 2008 WL 4557090,

22   *3 (N.D. Cal. 2008) (citing financial ability factor); *In re Manufacturers Life Ins. Co. Prem. Litg.*,

23   1998 WL 1993385, *18-19 (S.D.Cal.).  Given these facts, the objector's argument, based on

24   speculation and a dearth of facts, that final approval should not be granted due to the VPPA

25   claims, should carry no weight.

26

27

28

Plaintiffs' Notice of Motion and Motion for　　　20　　　　　　　　　　No. C 08-3845 RS
Final Approval

c.    *The argument that Termination of Beacon is meaningless shows a misunderstanding of this lawsuit*

Ms. McCall's argument that the termination of the Beacon program is meaningless shows a clear misunderstanding of the facts of this case, and of Ms. McCall's claims in particular.  Termination of the Beacon program as a result of this settlement is a victory for consumers.  The Beacon program was designed to be an opt-out program. http://blog.facebook.com/blog.php?post=7584397130.  By the end of November 2007, Facebook tried to change to program to be an opt-in program.  *Id.*  However, this change never worked properly.  Ms. McCall is a perfect example of this.  Twice after the program became an opt-in system, she experienced Beacon triggering events and her video rentals were disclosed to Facebook users. Moreover, if terminating Beacon was such a meaningless non-event, then why did the FTC fail to accomplish this or any Attorneys Generals.

McCall also objects on the ground that the settlement does not prevent Facebook from launching a similar program which violates rights.  This is a spurious argument.  The Settlement Agreement explicitly provides that "Facebook shall terminate the Beacon program in its entirety." Dkt. No. 38-1, p. 13 of 24.  The Settlement Agreement terminates the offending conduct.  The Agreement did not release future acts.  If Facebook launches the same program, it can be sued for violation of the settlement agreement.  If Facebook launches a similar program, depending on the similarity, it can either be sued for violation of the settlement agreement or violation of any laws which are violated by the program.

d.    *Objector's contention that the Privacy Foundation provides no value is simply wrong and shows that Ms McCall's own employment may make her unrepresentative of the class.*

Ms. McCall's argument that Privacy Foundation provides no value arises from numerous incorrect assumptions.

First, clearly it is within this court's discretion to approve the creation of a foundation. "Federal courts have broad discretionary powers in shaping equitable decrees for distributing unclaimed class action funds."  *Six Mexican Workers*, 904 F.2d 1307.  The Ninth Circuit Court

1   further held that "the district court's choice among distribution options should be guided by the

2   objectives of the underlying statute and the interests of the silent class members. *Id*. at 1307

3   *citing State of California v. Levi Strauss & Co.*, 41 Cal.3d 460 (1986).

4         Ms. McCall contends that the Foundation is unneeded.  Of course, this is the same argu-

5   ment made by Ms. McCall's employer, EPIC, which contends that it or some similar organization

6   should be given the money.  Dkt. No. 92. Kamber Decl. ¶ 52.

7         Simply because consumer privacy and security organizations exist, such as EPIC, does not

8   mean that there is no need for an additional privacy rights organization with its mission to "fund

9   and sponsor programs designed to educate users, regulators and enterprises regarding critical

10  issues relating to protection of identity and personal information online through user control, and

11  the protection of users from online threats."  Settlement Agreement, ¶¶4.19, 4.20.  More signifi-

12  cantly, unlike the non-profits which seek the *cy pres* benefits, the Foundation will be in a position

13  to fulfill its mission through the most fitting assembly of projects and organizations it can iden-

14  tify, with a long life over which to monitor success and function as an important source of support

15  for a variety of programs.

16        McCall's reliance on *In re Folding Carton Antitrust Litigation*, 744 F.2d 1252, 1253-1255

17  (7th Cir. 1984) is misplaced.[2]  *In re Folding* Carton clearly involved a different set of facts.  There,

18  in the context of an antitrust case dealing with price fixing among manufacturers of folding car-

19  tons, a foundation was to be established to conduct "research on complex antitrust litigation and

20  on various substantive aspects of the antitrust laws" when such research existed and would not

21  benefit the class members.  *Id*. at 1254.  On the other hand, where *cy pres* funds will be used to

22  create a foundation administered by highly qualified individuals with the experience and subject-

23  matter expertise to direct the disbursement of funds, with a "clear directive that the funds be used

24  _____

25  [2] Approval of a *cy pres* fund does not depend on its being composed of unclaimed or residual
    funds. *In re Mexico Money Transfer Litigation*, 164 F.Supp.2d 1002,1031, *citing Keele v. Wexler*,

26  149 F.3d 589, 592 (7th Cir.1998) (approving *cy pres* contribution to legal aid foundation); *Dren-
    nan v. Van Ru Credit Corp.,* No. 96 C 5789, 1997 WL 305298, at *1 (N.D. Ill. June 2, 1997)

27  (same); *In re Three Mile Island Litig.*, 557 F.Supp. 96, 97 (M.D.Pa.1982) (approving settlement
    that provided for $20 million to claimants and $5 million to finance public health studies and

28  evacuation planning).

1   to benefit entities whose primary purposes include service to [the class members' claims]," the

2   creation of such a foundation is proper.  *In re Mexico Money Transfer Litigation*, 164 F.Supp.2d

3   1002, 1031-1032 (N.D.Ill. 2000).

4          The *Mexico Money Transfer* action is instructive because of it's similarities with this ac-

5   tion.  There, *cy pres* funds were to be used to create two funds to distribute moneys to charitable

6   or public interest organizations that serve the community of persons injured by the conduct at

7   issue.  The directors of the fund included persons with substantial records of service with a "clear

8   directive" that the funds be used to help those who were harmed.  Moreover, the Court found that

9   the objection that the defendant would be in a position to dictate the use of the funds because one

10  of its representative would be on the board was of no consequence because non-biased persons

11  with a clear public interest were also on the board.  *Id.*  Finally, the Court approved the proposed

12  *cy pres* relief because distribution to individual members could have "substantially increased

13  administrative expenses."  *Id.*

14              **e.**      ***Claims that Facebook will exert "unwarranted" influence are unfounded***

15                          ***and unseemly.***

16         Ms. McCall's assertion, as if it were fact, that Facebook will retain "unwarranted" influ-

17  ence over the foundation is, at best, intellectually dishonest.  The objector makes much of the fact

18  that one of the three directors of the foundation is a Facebook employee—seemingly suggesting

19  that a matter of justice to hinge on a collection of obviously inappropriate assumptions.  This

20  particular director is also a well respected former Senior Legislative Counsel at the American

21  Civil Liberties Union who specialized in privacy rights and who has represented civil liberties

22  groups before Congress and the Executive Branch.  (Kamber Decl., ¶49-50.)  Further, the argu-

23  ment is dishonest because it conveniently ignores the fact that the two other directors are also

24  very distinguished in the privacy field, and certainly no puppets of Facebook.  Chris J. Hoofnagle

25  is the Director of the Information Privacy Programs at the Berkeley Center for Law and Technol-

26  ogy, and a Senior Fellow at the Samuelson Law, Technology & Public Policy Clinic.  Kamber

27  Decl. ¶49.  Mr. Hoofnagle has published numerous academic articles, lectures worldwide, has

28  testified before Congress many times.  *Id.*  Moreover, Mr. Hoofnagle was for six years the Direc-

tor of the West Coast Office and Senior Counsel of EPIC.  *Id.*  Likewise, Mr. Larry Magid is an Internet safety advocate.  He is a board member of the National Center for Missing & Exploited Children and a member of the of the Obama administration's Online Safety & Technology Working Group where he chairs the education sub-committee.  He is also on the advisory boards of both GetNetWise.org and Family Online Safety Institute and served on the Internet Safety Technical Task Force, formed by 49 state attorneys general and Fox Interactive/MySpace and based at Harvard University's Berkman Center for Internet & Society.  Kamber Decl, ¶49.

In addition, the Foundation was set up specifically with three directors with the requirement that there be unanimous votes so that any one director may prevent the foundation from veering in the wrong direction.  The civil rights attorney who is also a Facebook employee is not the "key board member."

Moreover, the suggestion that the charter of the Foundation does not relate to the allegations in the complaint makes little sense.  The lawsuit was filed because Facebook members who accessed certain Beacon related websites found their action published on their Facebook pages, thus improperly disclosing personal information.  The foundation has as its purpose to "fund and sponsor programs designed to educate users, regulators and enterprises regarding critical issues relating to protection of identity and personal information online . . ."  Foundation Bylaws, http://www.beaconclasssettlement.com/Files/ByLawAndFormation.pdf.

Ms. McCall also erroneously relies on *In re Microsoft Corp. Antitrust Litig.*, 185 F. Supp. 2d 519 (D. Md. 2002) to challenge the foundation created by the proposed settlement.  In the *Microsoft* antitrust action, Microsoft agreed to fund a foundation that would provide computers, as well as Microsoft software, to underserved schools.  While this conferred a benefit to the schools, it also benefitted Microsoft by further flooding a sector of the market with its products to the exclusion of its competitors.  Thus, the court found this fact to be of significant concern given that very lawsuit was an antitrust action against Microsoft.  The opinion clearly has no application here, where the existence of the privacy foundation and indeed, the participation of a person selected by Facebook in the Foundation does nothing to undermine the goals of this suit, but rather furthers them.  Moreover, the construct of the Foundation requires unanimous decision-

1    making by the board members, thereby safeguarding against any particular member exerting

2    undue influence on the direction of the Foundation.

3        **f.      *Finally, the settlement of the Harris action in Fifth Circuit eliminates the***

4                 ***objector's argument that the release inappropriately affects that action.***

5        Ms. McCall contends that the release is overbroad because it affects the *Harris* action.

6    The parties to the *Harris* action have now settled and class counsel in that action support this

7    settlement.  Wilson Decl..  Prior sections of this brie as well as the Wilson Declaration set forth in

8    great detail why the settlement of these claims is completely reasonable.  Accordingly, this objec-

9    tion carries no weight.  Moreover, the suggestion that the summary notice was inadequate because

10   all the terms of the settlement were not in the notice is misguided.  As one court recently held,

11   class members who received a summary notice can be "assumed to know how to navigate be-

12   tween the summary notice and the web site."  *Chavez v. Netflix, Inc.*, 162 Cal.App.4th 43, 57

13   (2008).

14       **2.      Objections by Trotter and Marek**

15       The objections by Trotter and Marek are long on law and short on factual ties to this law-

16   suit.  Trotter and Marek contend that the Privacy Foundation "is to be administered by Facebook

17   and its minions . . ." without any oversight.  (Dkt. No. 88, p. 6 of 17.)  As explained more fully

18   above, the organizational structure was specifically created so that any board member may pre-

19   vent any untoward agendas by the board.

20       Trotter and Marek contend that they should be allowed to see the bylaws.  The bylaws, ar-

21   ticles of incorporation, and supporting documents are available on the settlement page at

22   http://www.beaconclasssettlement.com/Files/ByLawAndFormation.pdf.

23       Trotter and Marek suggest that the funds should be distributed to the Facebook members.

24   As explained above, this is simply impractible.

25       Additionally, the objectors assert that the release is too broad, but provide no basis for this

26   contention.  In fact, the objectors suggest that the Court scrutinize the release, suggesting that

27   they have not done so.  This objection provides no assistance to the court and is lacking in any

28   substance for counsel to respond.

1    Trotter and Marek also contend that this Court should use a lodestar analysis when analyz-

2    ing the fees.  Class Counsel presents such an analysis in the fee brief and in fact do not rely on a

3    percentage analysis.

4    Trotter and Marek further contend, without basis, that the results obtained do not warrant a

5    "substantial fee."  As explained fully in the application for attorneys fees, the fees requested with

6    a 2.0 multiplier, are well within reason.  It may be that the limited exposure that they have had to

7    class actions has made it difficult to understand the time, risk and expense that goes into a litiga-

8    tion of this magnitude each month and that a 16 month commitment to a litigation will necessarily

9    result in a substantial investment of time and expense by counsel.  The objectors, in a contorted

10   fashion, assert that the attorneys fees must be based on the "actual value" of the non-cash award,

11   and they claim this was not done here.  This argument, of course, cites no case law and only has a

12   passing reference to CAFA.  Moreover, contrary to the objectors argument, this is not a coupon

13   settlement but one of cash plus injunctive relief.  The funds will be distributed on a *cy pres* basis.

14   Clearly the benefit for the class obtained by class counsel, which benefit may include a cy pres

15   distribution, forms in part the basis for attorneys fees.  *See, e.g., Tarlecki v. Bebe Stores, Inc.,*

16   2009 WL 1364340 *4 (N.D. Cal. 2009).

17   Finally, the objections to the incentive awards have no merit.  The objectors even insinu-

18   ate, with no evidence, that the named plaintiffs were promised some unethical amount in their

19   retainer agreements.  This simply did not happen and such baseless speculation is sanctionable.

20   **3.    *Burleson*[3]**

21   Ms. Burleson's objections are based on incorrect assumptions and speculation and, thus,

22   should be overruled.  First this objector contends because no monetary compensation is being

23   personally distributed to class members, the settlement should not be approved.  This argument

24   ignores the concept that *cy pres* awards are appropriate where class members would only receive

25   a small individual recovery otherwise.  *Six Mexican Workers*, 904 F.2d at 1305.  Ms. Burleson

26   also suggests that the Foundation is in adequate because it may not itself commence lawsuits.

27

28   [3] Ms. Burlson does not list counsel on the papers but gives her own phone number as a law office.
     Thus, this objection is addressed as if it is *pro se*.

Since the Foundation has broad funding criteria, this objection carriers little weight.  These objections also contradict Ms. Burleson's agreement that class counsel achieved an "adequate result" and should be awarded $2 million in attorney's fees.  Dkt. No. 94, p. 4 of 7.

     **4.**    ***Counsels' Conclusions Regarding Objections***

In this day of professional objectors and cynicism about class actions, the fact that there were so few requests for exclusion and an extremely small number of objections says much about the appropriateness of granting final approval of the settlement. It should also be noted that CAFA Notice was given and no governmental entity objected. Accordingly, this and the other factors each favor this Court entering final approval of the settlement.

**V.   CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully ask that the Court grant final approval of the proposed settlement agreement, approve the form and manner of notice described above, enter the proposed order separately submitted (a copy of which is also included as Exhibit E to the Settlement Agreement), and grant such further relief the Court deems reasonable and just.

1    Dated: February 10, 2010                    KAMBERLAW, LLC
2                                                THE LAW OFFICE OF JOSEPH H. MALLEY
                                                 PARISI & HAVENS LLP
3

4                                                By: s/Scott A. Kamber
5                                                    SCOTT A. KAMBER
                                                     One of the Attorneys for Plaintiffs, individually
6                                                    and on behalf of a Class of similarly situated
                                                     individuals
7

8    Scott A. Kamber
     *skamber@KamberLaw.com*
9    David A. Stampley
     *dstampley@KamberLaw.com*
10   KAMBERLAW, LLC
     11 Broadway, 22nd Floor.
11   New York, NY. 10004
     Telephone:  (212) 920-3072
12   Facsimile:  (212) 202-6364

13
     Joseph H. Malley
14   *malleylaw@gmail.com*
     Law Office of Joseph H. Malley
15   1045 North Zang Blvd
     Dallas, TX 75208
16   Telephone:  (214) 943-6100
     Facsimile:  (214) 943-6170
17

18   Co-Lead Counsel For the Class

19   David Parisi (Cal. Bar. No. 162248)
     *dparisi@parisihavens.com*
20   Suzanne Havens Beckman (SBN 188814)
     *shavens@parisihavens.com*
21   Parisi & Havens LLP
     15233 Valleyheart Drive
22   Sherman Oaks, California 91403
     Telephone:  (818) 990-1299
23   Facsimile:  (818) 501-7852

24

25

26

27

28