

**KEEPING THE INTERNET
OPEN • INNOVATIVE • FREE**

www.cdt.org

CENTER FOR DEMOCRACY
& TECHNOLOGY

1634 I Street, NW
Suite 1100
Washington, DC 20006

P +1-202-637-9800
F +1-202-637-0968
E info@cdt.org

February 10, 2010

Clerk of the United States District Court for the Northern District of California
San Jose Division
280 South First Street
San Jose, CA 95113

Attention: The Honorable Richard G. Seeborg

RE: Lane et al. v. Facebook, et al.,
Civil Action No. 5:08-cv-03845-RS

Dear Judge Seeborg:

The Center for Democracy and Technology submits this letter to the court in support of the proposed settlement in the above-captioned case. We believe that the settlement of $9.5 million for plaintiffs is a significant victory for consumer privacy protection and the proposed Privacy Foundation will be an effective mechanism for distributing those funds in support of the cause of online privacy.

The Center for Democracy and Technology (or "CDT") is a non-profit public interest group dedicated to maintaining an open, innovative and free Internet. Since our inception fifteen years ago, we have been one of the nation's leading privacy advocates.[1] In December of 2009, CDT launched its latest privacy initiative called "Take Back Your Privacy" in order to mobilize support for omnibus privacy legislation and for the development of products, services and business practices that give consumers better control over their own data. Among other things, the campaign offers consumers a Web browser tool that makes it easy to file complaints at the Federal Trade Commission about privacy violations.[2] Last month, the Federal Communications Commission published a Notice of Inquiry specifically seeking comments on privacy issues raised by CDT in relation to the FCC's National Broadband Plan and directly associated with many of the issues raised in this case.[3]

---

[1] CDT is supported by a wide range of companies, trade associations, philanthropic foundations, law firms and individuals. CDT has received a small amount of funding from Facebook, amounting in 2009 to $35,000 out of a total CDT budget of $4 million. In addition, CDT has in the past received funding from cy pres awards in the area of privacy, including funding resulting from the UCAN v. Bank of America litigation and from cy pres funds administered by the Rose Foundation and the California Consumer Protection Foundation. We have never received funding from the law firm or individual lawyers representing the plaintiffs in this case.

[2] Grant Gross, "CDT Launches Campaign to Help Consumers Demand Privacy," ComputerWorld, December 3, 2009, available at
http://www.computerworld.com/s/article/9141758/CDT_launches_campaign_to_help_consumers_demand_privacy.

[3] See Federal Communication Commission, Comments Sought on Privacy Issues Raised by the Center for Democracy and Technology, Public Notice, GN Docket Nos. 09-47, 09-51 & 09-137; DA 10-62 (Jan. 13, 2010), available at
http://hraunfoss.fcc.gov/edocs_public/attachmatch/DA-10-62A1.pdf.

CDT was an early critic of the Facebook Beacon program that is the subject of the present suit.[4] We argued in 2007 that, as a result of the Beacon program, Facebook had published the details of consumers' interactions on non-Facebook websites onto those consumers' Facebook profiles, often without the consumers' understanding or consent. We added that Facebook's efforts to tweak its disclosures to consumers, efforts that followed the explosion of the Beacon controversy, revealed the limitations of a notice-and-consent legal model. Given the nation's lack of clear law on privacy matters (with a few narrow sector-specific protections, including the Video Privacy Protection Act), companies too often bury disclosures about their use of consumer information where consumers are unlikely to notice or read them. This is why CDT has called for industry-wide privacy legislation to ensure that inconspicuous notices such as those at issue here cannot be relied upon by companies to share customers' private information without their permission or knowledge.

CDT has reviewed the proposed settlement agreement between plaintiffs and Facebook, and we believe that it provides for a reasonable and equitable settlement of the dispute. It is our conclusion that criticisms of the settlement amount and structure are unfounded. The $9.5 million dollar payment by Facebook represents one of the highest settlement amounts for any privacy case ever brought in this country, and given the high number of potential victims (Facebook has over 400 million users[5]), *cy pres* distribution is a reasonable usage of that payment. Moreover, the Privacy Foundation structure set forth in the settlement agreement appears to be a reasonable and efficacious way to distribute those funds, especially given the caliber of persons to have been appointed as directors.

In addition to the settlement amount and the form of the Privacy Foundation, at least one critic has also raised objections to the fees sought by plaintiffs' counsel. CDT has no particular expertise on the issue of attorneys' fees, and we take no position on this matter.

I. **The $9.5 Million Settlement Amount for *Cy Pres* Distribution is Appropriate**

CDT believes that the $9.5 million settlement amount to be paid by Facebook is an appropriate payment given the seriousness of the privacy violations in this case. The figure is one of the highest settlements (or, for that matter, judgments) ever for privacy violations. The only settlement figures we are aware of that outstrip this amount occur in a handful of cases involving disclosure of financial data or other information that was used to facilitate identity theft and fraud, which is not an issue in this case.[6] A more

---

[4] *See* Leslie Harris, Center for Democracy & Technology, "Facebook, Slouching Toward Clarity," November 30, 2007, *available at* http://www.cdt.org/blogs/leslie-harris/facebook-slouching-toward-clarity.

[5] *See* Mark Zuckerberg, "Six Years of Making Connections," *The Facebook Blog,* February 4, 2010, *available at* http://blog.facebook.com/blog.php?post=287542162130.

[6] *See e.g.,* Joshua Pantesco, "FTC imposes record fine on ChoicePoint in data-loss case," January 26, 2006, *available at* http://jurist.law.pitt.edu/paperchase/2006/01/ftc-imposes-record-fine-on-choicepoint.php; Federal Trade Commission, *In the Matter of The TJX Companies, Inc.,* March 2008, *available at* http://www.ftc.gov/opa/2008/03/datasec.shtm; Federal Trade Commission, *In the Matter of DSW, Inc,* December 2005, *available at* http://www.ftc.gov/opa/2005/12/dsw.shtm.



direct comparison was a settlement with a unit of the company Amazon that had to pay less than $2 million in 2001.[7]

While the existence of potential violations under the Video Privacy Protection Act (VPPA) could potentially give rise to stratospheric liquidated damages amounts, we are unaware of any case under the VPPA to have ever granted multiple liquidated awards against a single defendant. Without in any way offering an opinion on the merits of the claims in this case, we note that there were substantial issues to be litigated in the case, including whether Facebook qualifies as a "video tape service provider" under the VPPA and whether it provided a means to opt out of the information sharing that was "clear and conspicuous," as mandated by the statute. In light of the uncertainties attendant upon litigation, and in light of other settlements in privacy cases, we believe that the $9.5 million settlement amount is reasonable.

In addition to the amount of the settlement, we believe that *cy pres* distribution is a fair and effective use of the settlement funds. As noted by the settlement's critics, Facebook currently has over 400 million active users; it does not make sense for Facebook to pay a token amount to each person who had their activities on third party websites published to his or her Facebook profile by the Beacon program without knowledge or consent. Indeed, the critics of the settlement acknowledge that *cy pres* distribution is appropriate here. That is, their objection is not *cy pres* distribution *per se*, but to the Privacy Foundation that the settling parties have proposed to distribute those funds. We address those concerns in the next section.

## II. The Privacy Foundation Established by the Settlement Agreement Will Distribute Settlement Funds in an Independent and Efficient Manner

Although there could be any number of mechanisms to efficiently distribute the settlement funds on a *cy pres* basis, the proposed Privacy Foundation, as detailed in the settlement agreement and the Articles of Incorporation and By-Laws of the Foundation, is a perfectly valid structure. Critics' argument that the Privacy Foundation will be beholden to Facebook is unfounded.

The settlement agreement is clear that the distribution of the settlement funds will be administered by the Foundation, and not by Facebook: "the Privacy Foundation shall have sole and exclusive control over the management and disposition of those funds."[8] The agreement further notes that only one of the three board members of the Foundation may be affiliated with Facebook, thus ensuring the independence of the other two members.[9] Once incorporated, the two independent board members will have majority control and will be able to make decisions without the approval of the third board member.[10]

---

[7] See Douglas F. Gray, "Amazon Unit to Pay in Privacy Settlement," PCWorld, Apr 27, 2001, *available at* http://www.pcworld.com/article/48704/amazon_unit_to_pay_in_privacy_settlement.html.

[8] See Settlement Agreement, *Lane et al. v. Facebook, Inc. et al.*, Case No. 5:08-CV- 03845-RS, Section 4.6 (hereafter "Settlement Agreement").

[9] See Bylaws of Digital Trust Foundation, Article IV, Sections 2 and 3 *available at* http://www.beaconclasssettlement.com/Files/ByLawAndFormation.pdf.

[10] See *id.*, Section 11.


www.cdt.org

3

The only remaining criticism of the Foundation is that both Facebook and plaintiffs' counsel must mutually agree upon the Foundation's three board members. Absent any indication that plaintiffs' counsel has been or will be an inadequate representative of the representative class, it is hard to see why this mutual decision necessarily favors Facebook.

More importantly, any hypothetical objections to the Privacy Foundation's leadership should have been dispelled when the settling parties announced the three directors to lead the Foundation last month. Those three individuals, Chris Hoofnagle, Larry Magid, and Tim Sparapani, are outstanding choices to lead the Privacy Foundation, and they are extraordinarily well-qualified to make informed and pro-consumer decisions about how to distribute the Foundation's funds.

Hoofnagle and Magid are well-known privacy advocates and are absolutely unimpeachable in their independence and their dedication to and experience in protecting consumer privacy online. It beggars belief to suggest that either will direct the foundation not with the public interest in mind but as shills for Facebook. Hoofnagle is the Director of the Berkeley Center for Technology and Public Policy and has written numerous books and scholarly articles on the misuse of consumer information online. He has recently published articles detailing widespread consumer confusion about and opposition to the sharing of personal information among unaffiliated companies. Larry Magid is one of the most respected journalists covering consumer technology and he has written extensively about social networking sites and privacy issues. He is also an expert on children's safety – an important goal of privacy efforts – and is the co-director of the online child safety resource ConnectSafely.org. Both Hoofnagle and Magid were critical of Facebook's Beacon program when it was released in late 2007.[11]

Notably, none of the criticisms of the settlement that we are aware of have had anything at all to say against these two individuals or their ability to lead the proposed Privacy Foundation.

It should also be noted that the third director, Tim Sparapani, while affiliated with Facebook as the company's Director of Public Policy, also has an outstanding background as a civil liberties and privacy advocate. Prior to joining Facebook, he was Senior Legislative Counsel to the American Civil Liberties Union where he worked on data mining and other technology privacy issues.[12]

Finally, we note that the Privacy Foundation's Statement of Purpose – "to fund projects and initiatives that promote the cause of online privacy, safety, and security"[13] –

---

[11] See e.g., Chris Hoofnagle and Jennifer King, Samuelson Law, Technology & Public Policy Clinic, UC Berkeley, "Consumer Information Sharing: Where the Sun Still Don't Shine," December 2007, available at http://www.truststc.org/pubs/323/sb27report.pdf; Larry Magid, "Watch Out For Your Personal Info Online," CBS News, December 3, 2007, available at http://www.cbsnews.com/stories/2007/12/13/scitech/pcanswer/main3617664.shtml?tag=contentMain;contentBody.

[12] See Brad Stone, "Facebook Gets New Public Policy Director," NYTimes.com, March 24, 2009, available at http://bits.blogs.nytimes.com/2009/03/24/facebook-gets-new-public-policy-directo/.

[13] Settlement Agreement, Section 4.19.


www.cdt.org
4

properly defines the goals of the Foundation as a redress to the privacy violations committed by Facebook, while giving the Foundation appropriate latitude to administer the funds to a range of worthy projects.

We appreciate the Court's consideration of this letter, and we urge the Court to approve the proposed settlement.

Sincerely,

Leslie Harris
President and CEO
Center for Democracy and Technology

Ari Schwartz
Vice President and COO
Center for Democracy and Technology

Justin Brookman
Senior Fellow
Center for Democracy and Technology

cdt  www.cdt.org
5