

May 27, 2010

**VIA FEDERAL EXPRESS**
Hon. Richard G. Seeborg
United States District Court for the
Northern District of California
San Jose Division
280 South First St.
San Jose, CA 95113



1718 Connecticut Ave NW

Suite 200

Washington DC 20009

USA

+1 202 483 1140 [tel]

+1 202 483 1248 [fax]

www.epic.org

<u>Re: Lane v. Facebook, No. 5:08-cv-03845-RS</u>

Dear Judge Seeborg,

On February 16, 2010, I wrote to the Court concerning *Lane v. Facebook*, No. 5:08-cv-03845-RS (N.D. Cal. filed Aug. 12, 2008). I enclosed a declaration, and asked that it be entered in the record. The declaration responds to Scott Kamber's February 26, 2010 declaration in this case. In that declaration, Mr. Kamber makes statements that are untrue, fraudulent, and defamatory.

I sent my letter and declaration by certified mail, and the Court received the package on February 18, 2010. The mail receipt and delivery confirmation are enclosed. Issues in the declaration were referenced during oral argument at the February 26, 2010 fairness hearing concerning the proposed settlement in this case.

Despite my timely submission and reference to the issues in my declaration at the fairness hearing, it appears that the clerk failed to docket my declaration. I respectfully request that the clerk docket my February 16, 2010 letter and declaration as soon as practicable. A copy is enclosed.

Sincerely,

Marc Rotenberg
EPIC President

Enclosures

**Certified Mail Receipt and Delivery Confirmation**

**U.S. Postal Service**™
**CERTIFIED MAIL**™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

O F F I C I A L   U S E

SAN JOSE CA 95113

| | | |
|---|---|---|
| Postage | $ | $9.55 | 0277 |
| Certified Fee | | $2.80 | 05 |
| Return Receipt Fee (Endorsement Required) | | $0.00 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 | |
| Total Postage & Fees | $ | $12.35 | 02/16/2010 |

Sent To Hon. Richard Seeborg

Street, Apt. No.; or PO Box No. 280 South First St.

City, State, ZIP+4 San Jose, CA 95113

PS Form 3800, August 2006                    See Reverse for Instructions

7006 2150 0001 7646 7257

 **UNITED STATES POSTAL SERVICE**®

Home | Help | Sign In

Track & Confirm | FAQs

# Track & Confirm

## Search Results

Label/Receipt Number: **7006 2150 0001 7646 7257**
Status: **Delivered**

Your item was delivered at 12:48 pm on February 18, 2010 in SAN JOSE, CA 95113. A proof of delivery record may be available through your local Post Office for a fee.

Additional information for this item is stored in files offline.

( Restore Offline Details > ) (?)    ( Return to USPS.com Home > )

**Track & Confirm**

Enter Label/Receipt Number.

( Go > )

**<u>Marc Rotenberg's February 16, 2010 Letter and Declaration</u>**

February 16, 2010

Hon. Richard G. Seeborg
United States District Court for the
Northern District of California
San Jose Division
280 South First St.
San Jose, CA 95113

      Re: Lane v. Facebook, No. C 08-3845 RS

Dear Judge Seeborg,

      Enclosed is a declaration that I ask be entered into the record in the above-captioned case.

      I did not intend to file a declaration in this case until I read the February 26, 2010 declaration of Scott Kamber. In that declaration, Mr. Kamber makes statements that are untrue, fraudulent, and defamatory.

      EPIC's January 15, 2010 letter to the court highlights the reasons the proposed settlement is not fair, reasonable or adequate.

      Mr. Kamber's declaration underscores the need to consider the concerns that EPIC and other privacy organizations have raised with the proposed settlement agreement.

                    Sincerely,

                    Marc Rotenberg
                    EPIC President

Enclosure

1  Marc Rotenberg, President

2  rotenberg@epic.org

3  EPIC

4  1718 Connecticut Ave., NW, Suite 200

5  Washington, DC 20009

6  ## UNITED STATES DISTRICT COURT

7  ## NORTHERN DISTRICT OF CALIFORNIA

8  ## SAN JOSE DIVISION

9  ## No. C 08-3845 RS

10  SEAN LANE, *et al.,*                          |

11       Plaintiffs                               |

12  v.                                            |

13  FACEBOOK, INC., *et al.,*                     |

14  _____|

15

16  ## DECLARATION OF MARC ROTENBERG

17  I, Marc Rotenberg, declare as follows:

18  ## INTRODUCTION

19      1.  I am a licensed attorney in six federal circuits and the U.S. Supreme Court,

20  President of the Electronic Privacy Information Center (EPIC), and Adjunct

21  Professor at Georgetown University Law Center, where I have taught Information

22  Privacy Law for twenty years.

23      2.  I routinely testify in Congress regarding emerging privacy and civil liberties

24  issues and frequently file amicus briefs in support of privacy claims and concerns.

25      3.  I have expertise in drafting non-profit bylaws and articles of incorporation,

26  and have served as a Board Member, Secretary, Treasurer, President, and Chair of

27  several nonprofit organizations, going back to 1974.

28      4.  I have read the "Declaration of Scott A. Kamber in Support of Plaintiff's

29  Motion for Final Approval of Class Action Settlement" submitted to the court.

1    5.  I have read the "Bylaw and Formation Documents Regarding the Foundation"

2    posted at http://www.beaconclasssettlement.com/CourtDocuments.htm.

3    6.  Mr. Kamber makes several statements in his Declaration regarding matters

4    of which I have personal knowledge or relevant expertise that are untrue,

5    defamatory, and/or fraudulent.

6    7.  Mr. Kamber made these statements to the court "under penalty perjury [sic]

7    under the laws of the United States of America that the foregoing is true and

8    correct."

9    **MR. KAMBER'S STATEMENTS REGARDING**

10   **PRIOR COMMUNICATIONS**

11   **AND THE POSITION OF EPIC IN THIS SETTLEMENT**

12   8.  Regarding the conversation that occurred on September 15, 2009, Mr.

13   Kamber does not accurately recount the participants in the call, the substance of the

14   conversation, the issues of concern to EPIC, or the statements that I made.

15   9.  He even misspells my name.

16   10. On September 15, 2009, Philip Friedman and I called Scott Kamber to discuss

17   Harris v. Blockbuster, a case pending in the Fifth Circuit in which EPIC was planning

18   to file an amicus brief in support of a petitioner who was attempting to enforce

19   federal privacy rights against a mandatory arbitration clause, arising from the

20   Facebook Beacon matter which is now before this court.

21   11. We expressed to Mr. Kamber our concern that his settlement in California

22   would eviscerate the rights of Facebook users that might otherwise be pursued in

23   the Texas case and elsewhere.

24   12. We also conveyed to Mr. Kamber our concern that the proposed structure of

25   the Privacy Foundation in his California settlement would fail to provide meaningful

26   relief to class members.

27   13. We emphasized our view that class members were entitled to relief under

28   the federal Video Privacy Protection Act of 1988, a law that I helped draft as counsel

29   to the Senate Judiciary Committee.

---

1    14. We did not at any time say or suggest that "no new foundation could ever be
2    independent." (Kamber Decl. 14).

3    15. We did not at any time say or suggest that "consumer privacy interests could
4    only be effectively served only [sic] by giving control of the Settlement fund to him,
5    as Executive Director of EPIC." (Kamber Decl. 14-15).

6    16. Our conversation with Mr. Kamber was repeatedly interrupted by Mr.
7    Kamber, who frequently disconnected, seemed disoriented and agitated, and was, at
8    times, incoherent.

9    17. During the course of the conversation, Mr. Kamber suggested that EPIC might
10   be less interested in the redress to class members if EPIC were aware that Mr.
11   Kamber had recently designated EPIC for a settlement award in a separate and
12   unrelated matter. (Exhibit 1, *In re ATI Tech. HDCP Litigation*, No. 5:06-CV-01303-JW
13   (Final Approval Order and Judgment) (N.D. Cal., Sept. 11, 2009).

14   18. We reiterated to Mr. Kamber that our concern was protecting the privacy of
15   Facebook users in the Beacon matter and whether the settlement would terminate
16   the Harris litigation against Blockbuster in Texas.

17   19. Subsequent to our conversation with Mr. Kamber, EPIC drafted and filed an
18   extensive amicus brief in the Fifth Circuit in support of Harris to preserve the
19   privacy interests of those Facebook users who had been adversely impacted by the
20   Beacon program. (Exhibit 2, EPIC Amicus Brief in Harris v. Blockbuster[1]).

21   20. In a letter sent to the court on January 15, 2010, EPIC made clear its views
22   regarding the Beacon settlement, which EPIC believed was inadequate to protect the
23   interests of the class members. (Exhibit 3, Letter from EPIC and Privacy Groups to
24   This Court, January 15, 2010[2]). EPIC expressly proposed distribution schemes for
25   the settlement funds involving multiple organizations. EPIC expressly described
26   how the defects in the current settlement could be cured, without regard to
27   distribution to EPIC or any other privacy organization.

27

[1] *Available at* http://epic.org/amicus/blockbuster/Blockbuster_amicus.pdf; *see also*
"EPIC – Harris v. Blockbuster, http://epic.org/amicus/blockbuster/default.html
(describing EPIC's interest in the Harris case).
[2] *Available at* http://epic.org/privacy/facebook/EPIC_Beacon_Letter.pdf.

21. EPIC'S letter to the court, submitted prior to Mr. Kamber's declaration, flatly contradicts the statements contained in Mr. Kamber's declaration.

22. Mr. Kamber's characterization of EPIC's position in this matter is untrue and fraudulent, and also defamatory as to the subsequent publication where no privilege attached.

23. Mr. Kamber's defamatory statements were reported by Zusha Elinson and published in The Recorder on February 11, 2010, and then subsequently republished on multiple web sites, including law.com and Corporate Counsel.

**MR. KAMBER'S STATEMENTS REGARDING**

**THE ROSE FOUNDATION EMAIL**

24. Regarding the position of the Rose Foundation, Mr. Kamber represented to the court that Rose Foundation Executive Director, Tim Little, "directed an email to my cocounsel complimenting the settlement . . ." That email is attached at Exhibit 4.

25. Nowhere in that email does Mr. Little express support for the settlement; he simply states that the Rose Foundation is available to help with the distribution of the funds.

**MR. KAMBER'S STATEMENTS REGARDING**

**THE PROPOSED OFFICERS FOR THE PRIVACY CORPORATION**

26. In his declaration, Mr. Kamber describes the qualifications of the three proposed members of the Privacy Foundation, but fails to make clear their actual job responsibilities or their ties to Facebook. (Kamber Decl. 12-14).

27. Mr. Kamber represented to the court that the foundation would be "independent" and that none of the funds would be used for "lobbying." (Kamber Decl. 13-14).

28. Timothy D. Sparapani is an employee of Facebook and the top lobbyist for the corporation. Mr. Kamber did not disclose the fact that although Facebook is headquartered in Palo Alto, CA, Mr. Sparapani is based in Washington, DC. Mr. Kamber also did not disclose that Mr. Sparapani is a registered lobbyist for the corporation.

1    29. Mr. Kamber recommended Mr. Magid without reservation and failed to note

2    any financial ties between Mr. Magid and Facebook.

3    30. Larry Magid is a co-director of "Connectsafely.org," an organization that is

4    funded directly by Facebook. (See "Connect Safely | Supporters Logos."[3])

5    31. Mr. Kamber recommended Mr. Hoofnagle without reservation and failed to

6    note any previous ties between Mr. Hoofnagle and Facebook.

7    32. Chris Hoofnagle has provided extensive advice to Facebook on privacy issues,

8    including presentations to Facebook employees for which he may have received

9    payment from Facebook as a consultant or advisor.[4]

10                  **MR. KAMBER'S STATEMENTS REGARDING**

11                  **THE INDEPENDECE OF THE CORPORATION**

12    33. Mr. Kamber represented to the court "I specifically negotiated for the terms

13    of the Foundation to ensure independence of the Foundation." (Kamber Decl. At 14.)

14    <u>Board Size</u>

15    34. Mr. Kamber presented to the court a non-profit corporation with three

16    directors.

17    35. Virtually every treatise that addresses the issue of the number of directors in

18    the context of best practices for non-profit governance states that a non-profit board

19    of directors should have at least five members. *See, e.g.,* Better Business Bureau,

20    Standards for Charitable Accountability,[5] which states that:

21          The governing board has the ultimate oversight authority for any

22          charitable organization. This section of the standards seeks to ensure

23          that the volunteer board is active, independent <u>and free of self-</u>

24          <u>dealing</u>. To meet these standards, the organization shall have: . . . A

25          board of directors with a minimum of five voting members. (emphasis

26          added).

27    <u>Facebook Control of Board Decisions</u>

27

[3] http://www.connectsafely.org/our_supporters (last visited Feb. 16, 2010).
[4] Facebook, *"Privacy 2009: The Year Ahead,"* (at Facebook's headquarters in Palo Alto), Jan. 6, 2009, http://privacy2009.eventbrite.com/ (last visited Feb. 16, 2010).
[5] http://www.bbb.org/us/Charity-Standards/ (last visited Feb. 16, 2010).

36. Mr. Kamber named Facebook's top lobbyist, Mr. Sparapani, as the "co-President" of the corporation

37. According to the Articles of Incorporation presented by Mr. Kamber to the court as part of the settlement agreement, the President of the corporation, *i.e.* the top lobbyist for Facebook, shall "be the general manager and chief executive officer of this Corporation and shall, subject to the control of the Board, have general supervision, direction and control of the business and affairs of this Corporation." Art. V, Sect. 7 ("President").

38. Mr. Kamber made frequent use of unanimous voting requirements in the Articles of Incorporation to ensure that the Facebook officer, *i.e.* the top lobbyist for Facebook, would exercise control through the power of the veto of virtually every meaningful decision made by the corporation he proposed.

39. The voting requirements set out by Mr. Kamber to the court empower the Facebook officer with control over all plans for "succession for the Corporation's directors, including terms and nomination procedures." Art. IV, Sect. 4 ("Term").

40. The voting requirements set out by Mr. Kamber to the court empower the Facebook officer with control over "Any amendment of the By-Laws or the Articles of Incorporation." Art. IV, Sect. 11, ("Manner of Acting"); Art. XIV ("Amendments to Bylaws").

41. The voting requirements set out by Mr. Kamber to the court, empower the Facebook officer with control over "Any plan regarding the succession of the board." Id.

42. The voting requirements set out by Mr. Kamber to the court empower the Facebook officer with control over "the initial members of the Legal Advisory Board." Art. VII, Sect. 2 ("Membership.")

Lobbying by Corporation

43. Mr. Kamber further represented to the court that the corporation would not engage in any lobbying. (Kamber Decl. 14).

44. Article III(b) of the proposed Articles of Incorporation ("Purposes and Powers") expressly reserves to the corporation the right to engage in such activities

---

1   as "carrying out propaganda" and "attempting to influence legislation," consistent
2   with IRS section 501(h).
3   <u>Payment to Board Members</u>
4       45. The provisions concerning compensation to the directors contained in the
5   Articles of Incorporation set out by Mr. Kamber are unusually generous for a non-
6   profit corporation.
7       46. Art. IV, Sect. 16 states that the "Compensation. Directors as such shall not
8   receive any stated salaries for their services, but by resolution of the Board a just
9   and reasonable fixed sum and expenses of attendance, if any, may be allowed for
10  attendance at each regular or special meeting of the Board or any committee of the
11  Board; but, subject to the restrictions of Section 3 of Article IV of these Bylaws,
12  nothing contained in this section shall be construed to preclude any director from
13  serving this Corporation in any other capacity and receiving just and reasonable
14  compensation therefore." ("Compensation").
15      47. Art. IV, Sect. 1(b) states that the Board of Directors shall have the authority
16  the create a committee for the purpose of, among other things, "The fixing of
17  compensation of the directors for serving on the Board or on any committee."
18  ("Committee of Directors").
19      48. By contrast, the members of the "Legal Advisory Board," "shall not be
20  compensated by the Corporation for their service as members of the Legal Advisory
21  Board." Art. VII, Sect. 3 ("Compensation").
22      49. Board members of voluntary organizations do not typically receive
23  compensation for their time working on behalf of the organization. Reimbursement
24  for actual expenses, such as travel to meetings, is the standard.
25      50. As one organization expert in board compensation explains: "Although
26  nonprofit board service is usually a volunteer activity, reasonable fees for service
27  are permissible if the bylaws state so or the majority of the board so determines.
28  However, such compensation is quite rare. According to a recent BoardSource

---

1    survey, only 3 percent of the respondents compensate their board members."

2    ("BoardSource: Building Effective Nonprofit Boards"[6]).

3        51. BoardSource further explains, "Board compensation is more common in

4    particularly complex nonprofits, such as health care systems or large foundations.

5    Many organizations believe that a fee is appropriate when the responsibilities of

6    board members are especially time consuming or when legal requirements make

7    the service unusually demanding. Also, compensation can make it possible for

8    individuals of very limited financial means to participate in board service." *Id.*

9        52. Another authority warns that in such circumstances where compensation is

10   provided, the determination should be made by independent parties, and not a

11   committee of the board. "If compensation is authorized, it is advised that

12   compensation amounts be set by independent directors or an independent

13   compensation committee with input from outside advisors. It needs to be clear that

14   compensation does not imply monetary profit." (Should Board Members of

15   Nonprofit Corporations be Compensated? – Whitepapers – Publications and

16   Resources – ASAE & The Center for Association Leadership[7]).

**MR. KAMBER'S STATEMENTS REGARDING**

**THE TERMINATION OF THE BEACON SERVICE**

19       53. The Beacon service which gave rise to this litigation was effectively

20   terminated by Facebook nearly a year before the initiation of plaintiff's lawsuit and

21   obviously before the creation of the settlement agreement. (Kamber Decl. at 4-5).

22       54. Mark Zuckerberg, Facebook CEO, published an extensive apology on his blog

23   site in December 2007 for the impact of Beacon, stating "We simply did a bad job

24   with this release, and I apologize for it." Mr. Zuckerberg further stated "Last week

25   we changed Beacon to be an opt-in system, and today we're releasing a privacy

26   control to turn off Beacon completely." (Zuckerberg, "Thoughts on Beacon," Dec. 5,

27   2007[8]).

---

27

[6] http://www.boardsource.org/Knowledge.asp?ID=3.96 (last visited Feb. 16, 2010).
[7]http://www.asaecenter.org/PublicationsResources/whitepaperdetail.cfm?ItemNumber=22981 (last visited Feb. 16, 2010).
[8] http://blog.facebook.com/blog.php?post=7584397130 (last visited Feb.16, 2010).

---

Declaration of Marc Rotenberg               8               No. C 08-3845 RS

1    55. Mr. Zuckerberg's statements followed the efforts of Facebook users, EPIC,

2    and several other organizations to draw attention to the problems with the Beacon

3    service. *See, e.g.,* EPIC, *Facebook Caves to Privacy Demands, Adopts Limited Opt-In*,

4    Nov. 30, 2007 ("In response to complaints from EPIC, the Center for Digital

5    Democracy, Moveon.org, and thousands of users, Facebook will now ask that users

6    opt-in before broadcasting their details.); [9] *see also EPIC: Facebook Privacy*

7    (Providing a detailed description of the privacy problems with Beacon.)[10]

8    56. Zuckerberg's statement and the changes in Beacon were widely reported in

9    the national press in December 2007.

10    57. Many of the privacy organizations that wrote to the court in January 2010

11    regarding the unfairness of the proposed settlement were actively involved in the

12    campaign to terminate Beacon and praised the decision of the company to

13    effectively end the service in December 2007. I stated at the time "Facebook is

14    learning that privacy matters. It's signaling that it does care about how it's viewed

15    and how important trust is to online businesses." Forbes, *Facebook's Overblown*

16    *Privacy Problems*, Dec. 5, 2007;[11] *see also* "Is Facebook still all up in your business?"

17    MSNBC, Dec. 6, 2007 ("Then there's Marc Rotenberg of the Electronic Privacy

18    Information Center, who said, 'Facebook is learning that privacy matters.'").[12]

19    58. Mr. Kamber commenced his lawsuit in August 2008. (Kamber Decl. at 2).

20    **THE LETTER FROM THE CENTER FOR DEMOCRACY AND TECHNOLOGY**

21    59. On February 10, 2010, a Washington-based organization called "The Center

22    for Democracy and Technology" sent a letter to the court in which it stated "We

23    believe that the settlement of $9.5 million for plaintiffs is a significant victory for

24    consumer privacy protection and the proposed Privacy Foundation will be an

---

24

[9] http://epic.org/privacy/socialnet/default.html (last visited Feb. 16, 2010).
[10] http://epic.org/privacy/facebook/ (last visited Feb. 16, 2010).
[11] http://www.forbes.com/2007/12/05/facebook-beacon-opt-tech-internet-cx_ag_1205techfacebook.html (last visited Feb. 16, 2010).
[12] http://www.msnbc.msn.com/id/22137744/ns/technology_and_science-tech_and_gadgets/ (last visited Feb. 16, 2010).

---

1   effective mechanism for distributing those funds in support of the cause of online

2   privacy."

3       60. CDT received funding from Facebook in 2008.[13]

4       61. CDT received funding from Facebook in 2009. [14]

5       62. "Tim Sparapani/Facebook" is one of the top sponsors of CDT's 2010

6   fundraising dinner and Sheryl Sandberg, the Chief Operating Officer for Facebook, is

7   the keynote speaker.[15]

8       63. CDT has received funding from other corporate clients to oppose the privacy

9   interests of Internet users in class action settlements. *See, e.g., The Author's Guild v.*

10  *Google*, No. No. 05-CV-8136 (CDT, Brief in Support of Settlement) (S.D.N.Y. Sept. 4,

11  2009). ("I. The Proposed New Services Would be Extraordinarily Valuable, and the

12  Proposed Settlement Should Be Approved.");[16] *compare with The Author's Guild v.*

13  *Google*, No. No. 05-CV-8136 (EFF, Privacy Authors and Publishers' Objections to the

14  Proposed Settlement) (S.D.N.Y. Sept. 8, 2009)   ("The class member authors and

15  publishers . . . hereby object to the proposed Settlement because it fails to safeguard

16  reader privacy, and thus, is unfair, unreasonable, and inadequate to protect the

17  interests of the class."[17])

17

[13] CDT, *Center for Democracy and Technology 2008,* http://opt-out.cdt.org/mission/2008funding.jpg (last visited Feb. 16, 2010).
[14] CDT, *CDT Funding Chart 2009,* http://www.cdt.org/files/chart.png (last visited Feb. 16, 2010).
[15] CDT, *CDT's 2010 Annual Dinner,* http://www.cdt.org/event/cdts-2010-annual-dinner (last visited Feb. 16, 2010).
[16] *Available at* http://www.cdt.org/files/pdfs/CDT-GoogleAmicusFinal_5.pdf.
[17] *Available at* http://www.eff.org/files/filenode/authorsguild_v_google/File%20Stamped%20Brf. pdf.

**CONCLUSION**

1

2    64. In the February 26, 2010 declaration, Mr. Kamber made statements that are

3    untrue, fraudulent, and/or defamatory.

4    65. I declare under penalty of perjury under the laws of the United States that

5    the foregoing is true and correct.

6

7                                    By:

8

9

10                                         MARC ROTENBERG

11                                         On behalf of himself

---

EXHIBIT 1

*In re ATI Tech. HDCP Litigation*, No. 5:06-CV-01303-JW (Final Approval Order and Judgment) (N.D. Cal., Sept. 11, 2009)



IT IS SO ORDERED
AS MODIFIED
*James Ware*
Judge James Ware

1
2
3
4
5
6
7

8    UNITED STATES DISTRICT COURT

9    NORTHERN DISTRICT OF CALIFORNIA

10    SAN JOSE DIVISION

11

IN RE ATI TECH. HDCP LITIGATION          Case No. 5:06-CV-01303-JW
12
                                          [PROPOSED] FINAL APPROVAL
13    _____     ORDER AND JUDGMENT

14    This Document Relates to:           Hon. James Ware
                                          Courtroom 8, 4th Floor
      ALL ACTIONS
15

16

17

18        This matter having come before the Court for hearing, pursuant to the Order of this Court,

19    dated April 7, 2009 (Docket No. 136), on the application of the Settling Parties for approval of

20    the settlement set forth in the Settlement Agreement dated as of January 30, 2009 (Docket No.

21    130-2) ("Agreement"), and due and adequate notice having been given to the Class as required in

22    said Order, and the Court having considered all papers filed and proceedings had herein and

23    otherwise being fully informed in the premises and good cause appearing therefore, IT IS

24    HEREBY ORDERED, ADJUDGED, AND DECREED that:

25

26

27

28
                                                        [PROPOSED] FINAL APPROVAL ORDER AND
                                          1                        JUDGMENT
                                                                5:06-CV-01303-JW

LA\1923049.3

1.      As used in this Final Approval Order and Judgment the capitalized terms not otherwise defined herein have the meanings set forth in the Agreement.

2.      This Court has jurisdiction over the subject matter of the Actions and over all Class Members, and to consider and enter this Final Approval Order and Judgment.

3.      The notice given to the Class of the Settlement and the other matters set forth therein was the best notice practicable under the circumstances, including individual notice to all Class Members who could be identified through reasonable effort. Said notice provided due and adequate notice of these proceedings and of the matters set forth in the Agreement, including the proposed Settlement, to all Persons entitled to such notice, and said notice fully satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure and due process.

4.      The Court has been advised of any objections to the Settlement and has given fair consideration to any such objections.

5.      The Settling Parties conducted arm's length negotiations in good faith which resulted in the proposed Settlement reflected in the Agreement.

6.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, this Court hereby approves the Settlement as set forth in the Agreement, finds that said Settlement, including the Distribution Plan, is, in all respects, fair, reasonable, and adequate with respect to the Class, and directs that the Settlement, including the Distribution Plan, be consummated in accordance with the terms and conditions set forth in the Agreement.

7.      The Actions are hereby dismissed with prejudice, and without costs (except as set forth in the Agreement), as to all Defendants.

8.      Upon this Judgment becoming Final, the Plaintiffs and each Class Member, on behalf of themselves, their successors and assigns, and any other Person claiming (now or in the future) through or on behalf of them, and regardless of whether any such Plaintiff or Class

2

**[PROPOSED] AMENDED FINAL APPROVAL ORDER AND JUDGMENT**
5:06-CV-01303-JW

Member ever seeks or obtains by any means, including, without limitation, by submitting a Proof of Claim and Release, any distribution from the Net Settlement Fund established pursuant to the Agreement, shall be deemed to have, and by operation of this Judgment shall have, fully, finally, and forever released, relinquished, and discharged all Released Claims against the Releasees and shall have covenanted not to sue the Releasees with respect to all such Released Claims, and shall be permanently barred and enjoined from instituting, commencing, prosecuting or asserting any such Released Claim against the Releasees.

9.     This Judgment is a final judgment in the Actions as to all claims among Defendants, on the one hand, and the Plaintiffs and all Class Members, on the other.  This Court finds, for purposes of Rule 54(b) of the Federal Rules of Civil Procedure, that there is no just reason for delay and expressly directs entry of judgment as set forth herein.

10.     As provided for in paragraphs 20 and 21 of the Agreement, the Court approves an award from the Settlement Amount of **$ 3,367,422.47**          to pay Class Counsel's attorneys' fees, plus **$ 32,577.53**          to reimburse Class Counsel for payment of costs and expenses reasonably incurred in prosecuting and settling the Actions

11.     As provided for in paragraph 18 of the Agreement, the Court approves an award of all sums remaining in the Net Settlement Fund in equal amounts to the following *cy pres* recipients: Computers for Youth; Consumer Action; School on Wheels, Inc.; SeniorNet; Bet Tzedek (Los Angeles, California); East Bay Community Law Center; Electronic Privacy Information Center; Legal Aid Society of San Diego; National Consumer Law Center; One Laptop per Child; Public Counsel (Los Angeles, California); Public Justice Foundation; and, Public Law Center (Orange, California); Katharine & George Alexander Community Law Center and Stanford Public Interest Law Foundation.

**[PROPOSED] AMENDED FINAL APPROVAL**
**ORDER AND JUDGMENT**
**5:06-CV-01303-JW**

LA\1923049.3

12. Without affecting the finality of this Judgment in any way, this Court hereby retains exclusive jurisdiction over (a) implementation of the Settlement; (b) any award or distribution of the settlement fund established pursuant to the Agreement, including interest earned thereon; and (c) all other proceedings related to the implementation and enforcement of the terms of the Agreement and/or the Settlement. The time to appeal from this Judgment shall commence upon its entry. Without limiting the generality of the foregoing, any dispute concerning the provisions of this Judgment, including but not limited to any suit, action or proceeding in which the provisions of this Judgment are asserted as a defense in whole or in part to any claim or cause of action asserted by any Class Member or otherwise raised as an objection, shall constitute a suit, action or proceeding arising out of or relating to this Judgment. Solely for purposes of any such suit, action or proceeding, to the fullest extent possible under applicable law, the Defendants and the Class Members are deemed to have irrevocably waived and to have agreed not to assert, whether by way of motion, as a defense or otherwise, any claim, argument or objection that they are not subject to the jurisdiction of this Court or that this Court is in any way an improper venue or an inconvenient forum.

13. In the event that this Judgment does not become Final, this Judgment shall be rendered null and void and shall be vacated, *nunc pro tunc*, and the provisions of ¶ 28 of the Agreement shall apply.

4

[PROPOSED] AMENDED FINAL APPROVAL
ORDER AND JUDGMENT
5:06-CV-01303-JW

LA\1923049.3

14.    Without further order of the Court, the Settling Parties may agree to reasonable extensions of time to carry out any of the provisions of the Agreement.

The Clerk shall close this file.

**IT IS SO ORDERED:**

Dated:  September 11, 2009

_____
Hon. James Ware
United States District Court Judge

[PROPOSED] AMENDED FINAL APPROVAL
ORDER AND JUDGMENT
5:06-CV-01303-JW

LA\1923049.3

EXHIBIT 2

EPIC AMICUS BRIEF IN HARRIS v. BLOCKBUSTER

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

NO. 09-10420

CATHRYN ELAINE HARRIS, on behalf of herself and all others
similarly situated; MARIO HERRERA, on behalf of himself and all
others similarly situated; AND MARYAM HOSSEINY, on behalf of herself
and all others similarly situated,
Plaintiffs-Appellees,

vs.

BLOCKBUSTER INC.,

Defendant-Appellant.

*AMICUS CURIAE* BRIEF OF ELECTRONIC PRIVACY INFORMATION
CENTER (EPIC) IN SUPPORT OF PLAINTIFFS-APPELLEES AND URGING
AFFIRMANCE

On Appeal from the United States District Court
for the Northern District of Texas, Dallas Division
No. 3:09-cv-217-M, Hon. Barbara M.G. Lynn, Judge Presiding

MARC ROTENBERG
Counsel of Record
JOHN VERDI
JARED KAPROVE
GINGER MCCALL
KIMBERLY NGUYEN*
MATTHEW PHILLIPS
Electronic Privacy Information Center
1718 Connecticut Ave., NW Suite 200
Washington, DC 20009
(202) 483-1140

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to 5th Cir. R. 28.2.1 & 29.2, the cause number and style number are as follows: *Cathryn Harris, on behalf of herself and all others similarly situated; Mario Herrera, on behalf of himself and all others similarly situated; and Maryam Hosseiny, on behalf of herself and all others similarly situated* v. *Blockbuster Inc.,* No. 09-10420 in the United States Court of Appeals for the Fifth Circuit. Amicus Curiae, Electronic Privacy Information Center ("EPIC"), is a District of Columbia corporation with no parent corporation. No publicly held company owns 10% or more of the stock of EPIC. EPIC does not have a financial interest in the outcome of this case. The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal.

- Appellant Blockbuster Inc. is a Delaware corporation headquartered in Dallas, Texas. Blockbuster Inc. does not have a parent corporation, and no publicly-held corporation owns 10% or more of its own stock.
- The following attorneys have appeared on behalf of Appellant either before this Court or in the district court:

Thomas S. Leatherbury
Michael L. Raiff
Frank C. Brame
VINSON & ELKINS LLP
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201
Telephone: 214-220-7792
Facsimile: 214-999-7792

- Appellees Cathryn Harris, Mario Herrera, and Maryam Hosseiny are individuals residing in Dallas, Texas.

- The following attorneys have appeared on behalf of Appellees either before this Court or in the district court:

Thomas M. Corea
Jeremy R. Wilson
THE COREA FIRM, P.L.L.C.
The Republic Center
325 North St. Paul Street, Suite 4150
Dallas, Texas 75201
Telephone: 214-953-3900
Facsimile: 214-953-3901

George A. Otstott
Ann Jamison
OTSTOTT & JAMISON, P.C.
Two Energy Square
4849 Greenville Avenue, Suite 1620
Dallas, Texas 75206
Telephone: 214-522-9999
Facsimile: 214-828-4388

J. Mark Mann
THE MANN FIRM
300 West Main Street
Henderson, Texas 75652
Telephone: 903-657-8540
Facsimile: 903-657-6003

Respectfully submitted,

_____/s/_____

Marc Rotenberg
*Attorney of Record for Amicus*
*Electronic Privacy Information Center*

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................ i

TABLE OF AUTHORITIES ..................................................................... ii

INTEREST OF THE *AMICUS CURIAE* ................................................ 1

SUMMARY OF THE ARGUMENT........................................................ 3

ARGUMENT ........................................................................................... 5

   I.  The Video Privacy Protection Act Purposefully Provides a Private Right of Action ........................................................................................................ 5

   II.  Privacy Laws Routinely Provide Private Rights of Action........................... 10

   III.  Privacy Scholars Have Routinely Noted the Importance of a Private Right of Action in Privacy Laws.................................................................................. 14

   IV.  Mandatory Arbitration Clauses Undercut the Video Privacy Protection Act's Consumer Privacy Safeguards ................................................................ 20

      A.  Mandatory Arbitration Clauses in Consumer Contracts Can Be Invalidated for a Variety of Reasons .............................................................................. 20

      B.  Courts Have Specifically Held That Mandatory Arbitration Is Not a Sufficient Substitute for Statutory Privacy Rights........................................... 26

      C.  Mandatory Arbitration of VPPA Claims Is Impermissible....................... 27

CONCLUSION ........................................................................................ 31

CERTIFICATE OF COMPLIANCE ....................................................... 32

CERTIFICATE OF SERVICE ................................................................ 33

# TABLE OF AUTHORITIES

## CASES

*Amchem Prods. Inc. v. Windsor*, 521 U.S. 591 (1997)............................................29

*AutoNation USA Corp. v. Leroy*, 105 S.W.3d 190 (Tex. App. 2003) ....................29

*Dale v. Comcast Corp.*, 498 F.3d 1216 (11th Cir. 2007)..................................23, 28

*Department of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749 (1989)........................................................................................................6

*Doctor's Assocs. v. Casarotto*, 517 U.S. 681 (1996)............................................22

*Doe v. Chao*, 540 U.S. 640 (2004)........................................................................13

*Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991)..............................21

*Green Tree Fin. Corporation-Alabama v. Randolph*, 531 U.S. 79 (2000).............22

*Hooters of Am., Inc. v. Phillips*, 173 F.3d 933 (4th Cir. 1999) ..............................22

*Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165 (9th Cir. 2003)...........................25

*Kristian v. Comcast Corp.*, 446 F.3d 25 (1st Cir. 2006).......................................23

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614 (1985).........22

*Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1 (1983) .................................................................................................................21

*Olmstead v. United States*, 277 U.S. 438 (1928) .....................................................6

*Parks v. IRS*, 618 F.2d 677 (1980).......................................................................29

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967) ...............21

*Schmidt v. U.S. Dep't of Veterans Affairs*, 218 F.R.D. 619 (ED Wis. 2003) ...26, 27

*Stirlen v. Supercuts, Inc.*, 60 Cal. Rptr. 2d 138 (Ct. App. 1997)...........................25

*Wilko v. Swan*, 346 U.S. 427 (1953) ....................................................................21

## STATUTES

18 U.S.C. § 2708 (2008)..................................................................................10, 28

Cable Communications Policy Act, 47 U.S.C. § 551 (2008)............................13, 14

Electronic Communications Privacy Act, 18 U.S.C. § 2707 (2008)......................12

Federal Arbitration Act,9 U.S.C. § 2 (2008)........................................................20

Federal Wiretap Act, 18 U.S.C. § 2520 (2008) ....................................................12

N.Y. Civ. Rights Law § 51 (Consol. 2009) ............................................... 19

Privacy Act of 1974, 5 U.S.C. § 552a (2008) .................................... 12, 13

Telephone Consumer Protection Act, 47 U.S.C. § 227 (2008) ............................. 11

Texas Medical Privacy Act, Tex. Health & Safety Code Ann. § 181 (2008) ......... 14

Video Privacy Protection Act of 1988 (VPPA), 18 U.S.C. § 2710 (2008) ........... 5, 7

## OTHER AUTHORITIES

134 Cong. Rec. S16312 (1988) ................................................... 5, 9, 10

A. Westin, Privacy and Freedom (1967) ............................................... 6

Alan M. White & Cathy Lesser Mansfield, *Literacy and Contract*, 13 Stan. L. &
   Pol'y, Rev. 233 (2002) ......................................................... 24

Anita L. Allen, Privacy Law and Society (2009) ..................................... 14

Christine Jolls, Cass R. Sunstein, & Richard Thaler, *A Behavioral Approach to
   Law and Economics*, 50 Stan. L. Rev. 1471 (1997) ............................... 25

Daniel J. Solove & Chris Jay Hoofnagle, *A Model Regime of Privacy Protection*,
   2006 U. Ill. L. Rev. 357 (2006) ............................................... 15

Daniel J. Solove, Marc Rotenberg, & Paul M. Schwartz, Information Privacy Law
   (2006) ........................................................................ 14

Ely R. Levy & Norman I. Silber, *Nonprofit Fundraising and Consumer Protection:
   A Donor's Right to Privacy*, 15 Stan. L. & Pol'y Rev 519 (2004) ............... 18

Frank P. Anderano, *The Evolution of Federal Computer Crime Policy*, 27 Am.
   J.Crim. L. 81 (1999) .......................................................... 15

Frederick Z. Lodge, Note, *Damages Under the Privacy Act of 1974: Compensation
   and Deterrence*, 52 Fordham L. Rev. 611 (1984) ............................. 16, 19

H.R. Rep. No. 93-1416 (1974) ...................................................... 16

Haeji Hong, Esq., *Dismantling the Private Enforcement of the Privacy Act of 1974:
   Doe v. Chao*, 38 Akron L. Rev. 71 (2005) ...................................... 15

Hearing on H.R. 2221, the Data Accountability and Trust Act; H.R. 1319, the
   Informed P2P User Act Before the Subcomm. on Commerce, Trade and
   Consumer Protection of the H. Comm. on Energy and Commerce, 111th Cong.
   (2009) ........................................................................ 19

Irwin S. Kirsch et al., U.S. Dep't of Education, Adult Literacy in America: A First
   Look at the Results of the National Adult Literacy Survey (1993) ............... 24

James P. Nehf, *Recognizing the Societal Value in Information Privacy*, 78 Wash L. Rev. 1 (2003) ........................................................................................ 18

Jay Weiser, *Measure of Damages for Violation of Property Rules: Breach of Confidentiality*, 9 U. Chi. L. Sch. Roundtable 75 (2002) .................................. 16

Jean R. Sternlight & Elizabeth J. Jensen, *Using Arbitration to Eliminate Consumer Class Actions: Efficient Business Practice or Unconscionable Abuse?*, 67 SPG L. & Contemp. Probs. 75 (2004) .............................................................. 23, 28

Jean R. Sternlight, *Creeping Mandatory Arbitration: Is It Just?*, 57 Stan. L. Rev. 1631 (2005)................................................................................... passim

Jerry Kang, *Information Privacy Transactions in Cyberspace*, 50 Stan. L. Rev. 1193 (1998)............................................................................................. 17

Michael Dolan, *The Bork Tapes Saga*.............................................................. 5

Paul M. Schwartz, *Property, Privacy, and Personal Data*, 117 Harv. L. Rev. 2055 (2004) ................................................................................................... 17

Richard M. Alderman, *Pre-dispute Mandatory Arbitration in Consumer Contracts: A Call for Reform*, 38 Hous. L. Rev. 1237 (2001) ........................................... 24

S. Rep. No. 100-599 (1988)....................................................... 5, 6, 8, 27

S. Rep. No. 93-1183 (1974) ........................................................................ 16

Samuel Warren & Louis Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193 (1890) ..................................................................................................... 19

Shaun B. Spencer, *Reasonable Expectations and the Erosion of Privacy*, 39 San Diego L. Rev. 843 (2002)......................................................................... 18, 19

*Video and Library Privacy Protection Act of 1988: Joint Hearing on H.R. 4947 and S.2361 Before the H. Comm. on the Judiciary and the S. Comm. on the Judiciary*, 100th Cong. (1988)................................................................ passim

William Catron Jones, *Three Centuries of Commercial Arbitration in New York: A Brief Survey*, 1956 Wash. U. L.Q. 193 (1956)...................................................21

William McGeveran, *Disclosure, Endorsement, and Identity in Social Marketing*, 2009 U. Ill. L. Rev. 1105 (2009) ................................................................. 19

## RULES

Telemarketing Sales Rule, 67 Fed. Reg. 4491 (proposed Jan. 30, 2002) (to be codified at 16 C.F.R. pt. 310) ..................................................................... 11

# INTEREST OF THE *AMICUS CURIAE*[1]

The Electronic Privacy Information Center (EPIC) is a public interest research center in Washington, D.C. EPIC was established in 1994 to focus public attention on emerging privacy and civil liberties issues. EPIC has participated as *amicus curiae* in several cases before the U.S. Supreme Court and other courts concerning privacy issues, new technologies, and Constitutional interests, including *Flores-Figueroa v. United States*, 129 S. Ct. 1886 (2009); *Herring v. United States*, 129 S. Ct. 695 (2009); *Crawford v. Marion County Election Board*, 128 S. Ct. 1610 (2008); *Hiibel v. Sixth Judicial Circuit of Nevada*, 542 U.S. 177 (2004); *Doe v. Chao*, 540 U.S. 614 (2003); *Smith v. Doe*, 538 U.S. 84 (2003); *Department of Justice v. City of Chicago*, 537 U.S. 1229 (2003); *Watchtower Bible and Tract Society of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150 (2002); *Reno v. Condon*, 528 U.S. 141 (2000); *National Cable and Telecommunications Association v. Federal Communications Commission*, 555 F.3d 996 (D.C. Cir. 2009); *Kohler v. Englade*, 470 F.3d 1104 (5th Cir. 2006) 470 F.3d 1104 (5th Cir. 2006); *United States v. Kincade*, 379 F.3d 813 (9th Cir. 2004), *cert. denied* 544 U.S. 924 (2005); and *State v. Raines*, 857 A.2d 19 (Md. 2003).

EPIC has a strong interest in protecting consumer privacy and ensuring the full protections set out in federal privacy law. Mandatory arbitration clauses, such

---

[1] All parties have consented to the filing of this brief. Fed. R. App. P. 29(a).

as Blockbuster's provision at issue in this case, prevent consumers from seeking

remedies set out in federal law. With respect to the Video Privacy Protection Act,

it is clear that Congress intended to ensure that a private right of action be available

to consumers. To permit companies to substitute unilaterally mandatory arbitration

clauses for the express language set out in federal statute will undermine privacy

safeguards, contribute to further privacy harms, and frustrate the intent of

Congress.

# SUMMARY OF THE ARGUMENT

Congress passed the Video Privacy Protection Act of 1988 to prevent the wrongful disclosure of video rental information by companies that collect detailed personal information from customers. To achieve this goal, Congress established a private right of action to ensure that there would be a meaningful remedy when companies failed to safeguard the data they collected. The Congress recognized that absent a private right of action, there would be no effective enforcement, no remedy for violations, and no way to ensure that companies complied with the intent of the Act.

Private rights of action are routinely found in federal and state privacy laws because they help ensure that the legislative intent to safeguard privacy is fulfilled. Congress, courts, and scholars have recognized the importance of private rights of action in enforcing privacy laws. Indeed, in the absence of a private right of action, it is doubtful that Congress would even legislate to safeguard privacy, as there would be little purpose to a law that regulated business practices but lacked a means of enforcement.

Mandating arbitration of violations of federal privacy laws through consumer contracts is especially problematic. Courts have held that Congress may make claims nonarbitrable; permitting mandatory arbitration agreements in this context would violate Congress' intent to provide a private right of action as the

3

exclusive remedy for violations of the Act. Moreover, mandatory arbitration would prevent aggrieved parties from effectively vindicating their statutory rights. Finally, mandatory arbitration agreements in consumer contracts implicate serious public policy concerns, many of which are especially compelling in this context. Given the growing risk of identity theft and security breaches, and American consumers' ongoing concerns of about the protection of their personal information, the attempt to undo a clear congressional intent to establish meaningful enforcement for violations of federal law by an mandatory arbitration provision is both unconscionable and unlawful.

# ARGUMENT

## I. The Video Privacy Protection Act Purposefully Provides a Private Right of Action

Congress made clear its intent to enact a robust privacy law. As the Senate Judiciary Committee report explained, "The Video Privacy Protection Act follows a long line of statutes passed by the Congress to extend privacy protection to records that contain information about individuals." S. Rep. No. 100-599, at 2 (1988) [hereinafter *Committee Report*]; *see* Video Privacy Protection Act of 1988 (VPPA), 18 U.S.C. § 2710 (2008). Congress passed the act in the wake of the well-publicized scandal in which Supreme Court nominee Robert H. Bork's video rental records were published by a Washington, D.C newspaper the year before. 134 Cong. Rec. S16312, 16313–14 (1988); *see also* Michael Dolan, *The Bork Tapes Saga*[2] (last visited October 26, 2009). Describing the purpose of the bill, Representative McCandless testified that "[a]t the heart of the legislation is the notion that all citizens have a right to privacy—the right to be let alone—from their Government and from their neighbor." *Video and Library Privacy Protection Act of 1988: Joint Hearing on H.R. 4947 and S.2361 Before the H. Comm. on the Judiciary and the S. Comm. on the Judiciary*, 100th Cong. 27 (1988) [hereinafter *Hearing Record*] (statement of Rep. McCandless). Thus, the bill was intended to

---

[2] *Available at* http://www.theamericanporch.com/bork2.htm

"protect[] the privacy of consumers of content-based materials," by building "a brick wall—a Federal privacy right—around the individual." *Id.*

The Congress recognized the paramount importance of the privacy right protected by the Act: "Every day Americans are forced to provide to businesses and others personal information without having any control over where that information goes. These records are a window into our loves, likes, and dislikes." *Committee Report*, at 6–7 (quoting Sen. Paul Simon, 134 Cong. Rec. S5400-01 (May 10, 1988)). Indeed, our legal system has long recognized and protected the right of personal privacy. The Constitution's drafters "conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized man. To protect that right, every unjustifiable intrusion by the Government upon the privacy of the individual, whatever the means employed, must be deemed a violation" of constitutional principles. *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting).

As the Supreme Court noted, "both the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person." *Department of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 763 (1989); *see also* A. Westin, Privacy and Freedom 7 (1967) ("Privacy is the claim of individuals . . . to determine for

themselves when, how, and to what extent information about them is communicated to others").

Recognizing the important privacy rights at issue, the VPPA provides a private right of action that is integral to fulfilling Congress's intent in passing the bill. The relevant portion of the Act reads as follows:

> (1) Any person aggrieved by any act of a person in violation of this section may bring a civil action in a United States district court.
> (2) The court may award—
>    (A) actual damages but not less than liquidated damages in an amount of $2,500;
>    (B) punitive damages;
>    (C) reasonable attorneys' fees and other litigation costs reasonably incurred; and
>    (D) such other preliminary and equitable relief as the court determines to be appropriate.
> (3) No action may be brought under this subsection unless such action is begun within 2 years from the date of the act complained of or the date of discovery.
> (4) No liability shall result from lawful disclosure permitted by this section.

18 U.S.C. § 2710(c) (2008).

The civil action described in subsection (c) is the only enforcement mechanism provided by Congress in the statute. The Senate Committee Report emphasized the importance of the civil remedy section:

> *The civil remedies section puts teeth into the legislation, ensuring that the law will be enforced by individuals who suffer as the result of unauthorized disclosures.* It provides that an individual harmed by a violation of the Act may seek compensation in the form of actual and punitive damages, equitable and declaratory relief and attorneys' fees and costs.

> Statutory damages are necessary to remedy the intangible harm caused by privacy intrusions. Similar remedies exist in the federal wiretap statute as revised by this committee in 1986. The absence of such a remedy in the Privacy Act of 1974 is often cited as a significant weakness.

*Committee Report* at 8 (emphasis added).

Testimony during a joint congressional hearing on the bill also made clear the importance of the enforcement mechanism. Senator Paul Simon, a co-sponsor of the Act, stated about the original bill, which also contained provisions to safeguard library record information:

> The Video and Library Privacy Act of 1988 takes an important step in ensuring that individuals will maintain control over their personal information when renting or purchasing a move or when borrowing a library book. *The bill specifically provides for a federal cause of action* in the event a list which identifies the books we read or the movies we watch is released.

*Hearing Record* at 131–32 (statement of Sen. Paul Simon) (emphasis added).

Senator Simpson, another cosponsor of the Act, stated:

> It is that cherished American right of privacy that we are protecting with this legislation. People in the country may not even be able to read or understand the Constitution, but they surely can understand the concept of privacy in their personal lives. Plain old unmitigated unvarnished privacy. The right to be left alone. That is why such diverse groups are working on this bill in order to ensure its passage.

*Id.* at 134 (statement of Sen. Alan K. Simpson).

Even the Video Software Dealers Association, an industry group representing companies that would be subject to the law, endorsed the version of the bill that included the civil remedy:

> We support H.R. 4947 and S. 2361, which would prohibit the disclosure of individual customer rental or sales records, except in very limited circumstances. In our view, rental and sales records are privileged matters between the retailer and the customer. That is the firm policy of VSDA and its members.

*Id.* at 81 (statement of Vans Stevenson, for the Video Software Dealers Ass'n and Erol's Inc.). Mr. Stevenson went on to state "We applaud the proposed bills to formally protect a reasonable right of privacy for the video customer. We believe that the legislation will help to strengthen our company's policy as well as other similar policies practiced by the other video retailers in VSDA." *Id.* at 86. By implication, Mr. Stevenson made clear that substituting a weaker privacy mechanism would lead companies to establish weaker privacy policies.

When Senator Leahy, the bill's original sponsor, introduced the bill, he denounced the revelation of Bork's records as "outrageous" and described the Act as "a bill that will extend privacy protection to all Americans." 134 Cong. Rec. S16312, 16313 (1988) (statement of Sen. Leahy). Senator Grassley, another member of the Committee on the Judiciary and a co-sponsor of the bill, also spoke in favor of the bill, discussing how civil liability was intended to shape the behavior of video stores and their employees:

This bill imposes liability on the video store where the information is knowingly disclosed in violation of the bill's requirements. And under the common law of agency, an employer may be liable for the actions of its employees where the employee acts within the scope of his employment. A video store would, therefore, be best advised to educate its employees about the bill's provisions and discipline employees for unauthorized disclosures. A court would, no doubt, take such employers' actions into account in determining whether the employee was acting within the scope of his job in the event of a prohibited disclosure.

*Id.* at 16314 (statement of Sen. Grassley).

The text and the legislative history make Congressional intent abundantly clear: the private right of action called for in subsection (c) is the exclusive method chosen by the legislature for enforcement of the VPPA.

Indeed, Congress took an additional step to protect the judicial remedies set out in the bill when it chose to codify the Act at 18 U.S.C. § 2710 (2008). This section falls within Chapter 121 of Title 18 and therefore makes the Act subject to the "Exclusivity of remedies" provision set out in 18 U.S.C. § 2708 (2008). Section 2708 states that, "The remedies and sanctions described in this chapter are the only judicial remedies and sanctions for non-constitutional violations of this chapter." *Id.* It is difficult to imagine that Congress could have done anything more to safeguard the private right of action established by the Video Privacy Protection Act.

## II.      Privacy Laws Routinely Provide Private Rights of Action

Private rights of action are a central feature in privacy statutes because they help ensure enforcement of privacy rights. This is particularly important in privacy law, as it may be difficult to otherwise vindicate privacy claims.

Private rights of action have traditionally been a key component in privacy statutes. Aside from the Video Privacy Protection Act, many other privacy laws provide a right of action or civil remedy component, which allow victims to seek remedies in court.

The Telephone Consumer Protection Act ("TCPA"), which was enacted to combat problems associated with telemarketing, auto-dialers and junk faxes, states that "[a] person or entity may . . . bring in an appropriate court of that State . . . an action based on a violation of this subsection or the regulations prescribed under this subsection." 47 U.S.C. § 227(b)(3) (2008). Plaintiffs can recover their actual monetary loss from such a violation or receive $500 in damages for each such violation, whichever is greater. *Id.* Moreover, if the court finds that the defendant willfully or knowingly violated the statute, the court is authorized to triple the amount of the award. *Id.* Actions brought under the TCPA allow consumers to vindicate privacy claims and led to the creation of the very successful Do Not Call list. *See* Telemarketing Sales Rule, 67 Fed. Reg. 4491 (proposed Jan. 30, 2002) (to be codified at 16 C.F.R. pt. 310).

The Federal Wiretap Act allows "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used" in violation of the statute to pursue "a civil action [to] recover from the person or entity, other than the United States, which engaged in that violation such relief as may be appropriate." 18 U.S.C. § 2520(a) (2008). Complainants may then recover appropriate preliminary and other equitable or declaratory relief, damages (including punitive damages in appropriate cases), and reasonable attorney's fees and litigation costs. *Id.*

Similarly, the Electronic Communications Privacy Act ("ECPA"), which prohibits providers of electronic communications services from disclosing the contents of stored communications, states that aggrieved individuals or entities "may, in a civil action, recover from the person or entity, other than the United States, which engaged in that violation such relief as may be appropriate." 18 U.S.C. § 2707, (a) (2008). The ECPA allows complainants to collect appropriate preliminary and other equitable or declaratory relief, damages (not including punitive damages), and reasonable attorney's fees and litigation costs. *Id.*

The Privacy Act, which limits the collection, disclosure, and use of personal information by government agencies, creates a private right of action against agencies that violate the Act. 5 U.S.C. § 552a(g)(1) (2008). If any agency violates the Privacy Act, "an individual may bring a civil action against the agency, and the

district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection." *Id.* The Act allows for remedies in three situations: when the agency refuses to correct records, when the agency refuses to disclose records to an individual who is entitled to them, and when the agency willfully or intentionally discloses records in violation of the statute. *Id.* In all three situations, the Act allows for courts to compel the agency to act in accordance with the statute and allows for aggrieved parties to recover reasonable attorney's fees and litigation costs. *Id.* In the case of a wrongful disclosure that is willful or intentional, the statute authorizes recovery of "actual damages sustained by the individual as a result of the refusal or failure, but in no case shall a person entitled to recovery receive less than the sum of $1,000." *Id. See generally, Doe v. Chao,* 540 U.S. 640 (2004) (holding that actual damages are necessary to recover under the Privacy Act but affirming the civil damages provision.).

The Cable Communications Policy Act prohibits cable television companies from using the cable system to collect personal information about its subscribers without their prior consent, and generally bars the cable operator from disclosing such data. 47 U.S.C. § 551(f) (2008). "Any person aggrieved by any act of a cable operator in violation of this section may bring a civil action in a United States district court." *Id.* The court may award actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000,

13

whichever is higher. The court may also award punitive damages and reasonable attorney's fees and litigation costs. *Id.* The Act notes that "[t]he remedy provided by this section shall be in addition to any other lawful remedy available to a cable subscriber." *Id.*

State laws protect individuals' privacy regarding library records, medical records, employment records, genetic information records, and many other kinds of records. The statutes often contain private rights of action, along with liquidated damages. The Texas Medical Privacy Act,[3] Tex. Health & Safety Code Ann. § 181 (2008), for example, protects sensitive, personal information from improper use or disclosure. The Act also provides civil penalties to help ensure that the Act's provisions are enforced. *Id.* § 181.201.

### III.  Privacy Scholars Have Routinely Noted the Importance of a Private Right of Action in Privacy Laws

Privacy scholars have routinely noted the private right of action in the Video Privacy Protection Act. *See, e.g.,* Anita L. Allen, Privacy Law and Society 628 (2009) ("The Act contains a civil remedy provision that allows an aggrieved party to bring an action in the United States District Court within two years of the date of discovery of an alleged violation."); *see also,* Daniel J. Solove, Marc Rotenberg, & Paul M. Schwartz, Information Privacy Law 661 (2006) ("The VPPA's private

---

[3] http://www.law.uh.edu/healthlaw/perspectives/privacy/010830texas.html

right of action permits recovery of actual damages and provides for liquidated damages in the amount of $2,500.").

Scholars have also stressed the importance of private rights of action in privacy statutes generally. *See, e.g.*, Daniel J. Solove & Chris Jay Hoofnagle, *A Model Regime of Privacy Protection*, 2006 U. Ill. L. Rev. 357, 382 (2006) ("There should be minimum liquidated damages provisions for companies that violate their privacy policies or that suffer a security breach due to negligence. Statutes must provide for individual redress"). Scholars have cited a variety of reasons for supporting private rights of action. Two of the most commonly cited reasons for supporting private rights of actions are that private rights of action place enforcement in victims' hands and that private rights of action deter would-be violators. Frank P. Anderano, *The Evolution of Federal Computer Crime Policy*, 27 Am. J.Crim. L. 81, 98 (1999).

Concerning the federal Privacy Act, scholars have argued that private rights of action are important because "federal agencies have little incentives to enforce the Privacy Act." Haeji Hong, Esq., *Dismantling the Private Enforcement of the Privacy Act of 1974: Doe v. Chao*, 38 Akron L. Rev. 71, 102 (2005) (citing 120 Cong. Rec. 36,645 (remarks of Rep. Abzug), *reprinted in* Joint Comm. on Gov't Operations, Legislative History of the Privacy Act of 1974: Source Book on Privacy 887 (1976) [*hereinafter Source Book*]). Thus, Congress provided the civil

15

remedy in that Act in order to "encourage the widest possible citizen enforcement through the judicial process." S. Rep. No. 93-1183, at 83 (1974), *reprinted in Source Book* at 236. One Congressman described the "constant vigilance of individual citizens backed by legal redress" as the "best means" to enforce the Act. H.R. Rep. No. 93-1416, at 15 (1974), *reprinted in Source Book*, at 308. *See generally* Frederick Z. Lodge, Note, *Damages Under the Privacy Act of 1974: Compensation and Deterrence*, 52 Fordham L. Rev. 611, 613 (1984) (arguing that "Congress repeatedly emphasized the overwhelming importance of privacy, and that "[t]hrough its civil remedy, the Act is aimed at deterring future intrusions on this critical right and at compensating the victims of illegal invasions of privacy"). Professor Jay Weiser has written that federal privacy statutes attempt to resolve the difficulty in calculating damages through liquidated damages provisions, which in turn saves enforcement costs. Jay Weiser, *Measure of Damages for Violation of Property Rules: Breach of Confidentiality*, 9 U. Chi. L. Sch. Roundtable 75, 100 (2002).

More generally, scholars have argued that statutory private rights of action are essential to protecting privacy rights through deterrence. "Private rights of action, including class actions . . . can be highly effective in increasing compliance with statutory standards. . . . In addition, it overcomes the weaknesses of the privacy tort, which generally has not proved useful in responding to violations of

16

information privacy." Paul M. Schwartz, *Property, Privacy, and Personal Data*, 117 Harv. L. Rev. 2055, 2112–15 (2004) (advocating for the formation of a statute regulating data trading that "should track language found in statutes such as the Video Privacy Protection Act, Driver's Privacy Protection Act, and Cable Communications Act, and should permit liquidated damages"). A private right of action "encourages litigation, the specter of which may deter infringements of privacy. It will also allow others who are not parties to the litigation to benefit from improved privacy practices that follow successful litigation." *Id.* at 2083; *see also* Jerry Kang, *Information Privacy Transactions in Cyberspace*, 50 Stan. L. Rev. 1193, 1272 (1998) ("[T]he information collector must be subject to sanction through civil action in federal court and administrative enforcement by the Federal Trade Commission.").

Scholars have observed that private rights of action "encourage companies to keep privacy promises by setting damages high enough to deter potential violators and encourage litigation to defend privacy entitlements. In addition, damages support a privacy commons by promoting social investment in privacy protection." *Schwartz, supra* at 2109.

Other scholars have recommended that charitable donors' privacy rights should be protected by a private right of action due to "important concerns" such as "the scarce resources of state attorneys general to enforce, the principal

17

incentives to share information notwithstanding the express wishes of donors, and the overarching risk that disregarding donor privacy rights could undermine confidence in the nonprofit sector. . . ." Ely R. Levy & Norman I. Silber, *Nonprofit Fundraising and Consumer Protection: A Donor's Right to Privacy*, 15 Stan. L. & Pol'y Rev 519, 570–71 (2004).

Other scholars have persuasively argued that privacy rights require *more* protection than private rights of action and other market forces provide. *See* James P. Nehf, *Recognizing the Societal Value in Information Privacy*, 78 Wash L. Rev. 1, 8 (2003) (arguing for "regulation similar to the European model of privacy protection, in which the issue is framed as a foundation of social protection"); Shaun B. Spencer, *Reasonable Expectations and the Erosion of Privacy*, 39 San Diego L. Rev. 843, 890–909 (2002) (arguing for "broad structural measures empowering individuals to claim their own privacy").

In the context of private rights of action, liquidated damages provisions, such as the one provided for by the VPPA, are essential:

> Schemes providing for liquidated damages will assist the operation of the privacy market and the construction and maintenance of a privacy commons. It will encourage companies to keep privacy promises by setting damages high enough to deter potential violators and encourage litigation to defend privacy entitlements. In addition, damages support a privacy commons by promoting social investment in privacy protection. Such damages may also reduce the adverse impact of collective action problems in the privacy market by allowing consumers who do not litigate to benefit from the improved privacy practices that follow from successful litigation.

*Id.* at 2109. One central problem in privacy cases is the difficulty for the aggrieved party to establish quantifiable damages in the absence of a statute containing a liquidated damages provision. *See* William McGeveran, *Disclosure, Endorsement, and Identity in Social Marketing*, 2009 U. Ill. L. Rev. 1105, 1141 (2009) (discussing the privacy problems inherent in social marketing and noting that "the emotional or psychic harms caused by disclosures in social marketing are difficult to quantify and, in any case, are likely small. Injured parties who file lawsuits to enforce their rights under privacy law often encounter great difficulty proving damages"); Lodge, *supra*, at 612. This problem was well understood by Samuel Warren and Louis Brandeis, the authors of the famous article that provided the basis for the privacy tort and that led to the statutory formulation of privacy claims. Samuel Warren & Louis Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193, 219 (1890) ("Even in the absence of special damages, substantial compensation could be allowed for injury to feelings as in the action of slander and libel."); N.Y. Civ. Rights Law § 51 (Consol. 2009).

The private right of action is particularly important as technology continues to progress, allowing for the easier dissemination of personal information. *See, e.g.*, Hearing on H.R. 2221, the Data Accountability and Trust Act; H.R. 1319, the Informed P2P User Act Before the Subcomm. on Commerce, Trade and Consumer Protection of the H. Comm. on Energy and Commerce, 111th Cong. 5–6 (2009)

(statement of Marc Rotenberg, Executive Director, EPIC) (". . . the Committee [should] add a private right of action to the bill with a stipulated damage award, as is found in many other privacy laws. Not only would this provide the opportunity for individuals who have been harmed by security breaches to have their day in court, it would also provide a necessary backstop to the current enforcement scheme which relies almost entirely on the Federal Trade Commission, acting on its own discretion and without any form of judicial review, to enforce private rights.").

IV.   **Mandatory Arbitration Clauses Undercut the Video Privacy Protection Act's Consumer Privacy Safeguards**

A.   *Mandatory Arbitration Clauses in Consumer Contracts Can Be Invalidated for a Variety of Reasons*

Voluntary binding arbitration between parties with similar bargaining power has a long history, and courts have historically supported such agreements. Accordingly, the Federal Arbitration Act (FAA) in 1925, provides that arbitration agreements in contracts involving interstate commerce "shall be valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract," and requires courts to grant motions to compel arbitration pursuant to such agreements. 9 U.S.C. § 2 (2008). However, voluntary binding arbitration agreements were historically entered into by parties with similar bargaining power—for example, contracts between businesses or between

20

management and unions. *See generally* Jean R. Sternlight, *Creeping Mandatory Arbitration: Is It Just?*, 57 Stan. L. Rev. 1631, 1643–44 (2005) (discussing history of arbitration generally) [hereinafter "*Creeping Mandatory Arbitration*"]; William Catron Jones, *Three Centuries of Commercial Arbitration in New York: A Brief Survey*, 1956 Wash. U. L.Q. 193, 219 (1956) (reviewing uses of arbitration in New York beginning in the 1600s and concluding that "[t]he primary function of arbitration is to provide for merchants fora where mercantile disputes will be settled by merchants"). In contrast, Congress did not appear to intend mandatory arbitration clauses in consumer contracts to fall under the rubric of the FAA when it was passed, *see Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 412–15 (1967) (Black, J., dissenting) (discussing legislative history of the FAA), and an early Supreme Court decision held that such clauses were impermissible in the context of securities fraud claims. *See Wilko v. Swan*, 346 U.S. 427, 435–36 (1953).

More recently, however, the Supreme Court reversed its previous position, holding that federal policy favors arbitration of commercial disputes, even in consumer contracts. *See Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24–25 (1983); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 35 (1991). Nonetheless, the Court has made clear that Congress has the power to make claims nonarbitrable if it "has evinced an

21

intention to preclude a waiver of judicial remedies for the statutory rights at issue." *Green Tree Fin. Corporation-Alabama v. Randolph*, 531 U.S. 79, 90 (2000) (citing *Gilmer*, 500 U.S. at 26; *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 628 (1985)).

Moreover, the Court has held that an arbitration clause should not be enforced if the challenger can show that it was written in a way that "preclude[s] a litigant . . . from effectively vindicating her federal statutory rights in the arbitral forum." *Green Tree Fin.*, 531 U.S. at 90; *see Mitsubishi Motors Corp.*, 473 U.S. at 637. *See generally Creeping Mandatory Arbitration, supra*, at 1643–44 (reviewing successful federal statutory challenges to arbitration agreements). For instance, in *Green Tree Fin. Corporation-Alabama v. Randolph*, the Court held that "the existence of large arbitration costs" could prevent a litigant from effectively vindicating her statutory rights. *Green Tree Fin.*, 531 U.S. at 90–91.

Similarly, "[g]enerally applicable contract defenses, such as . . . unconscionability, may be applied to invalidate arbitration agreements." *Doctor's Assocs. v. Casarotto*, 517 U.S. 681, 682 (1996); *see also, e.g., Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 938 (4th Cir. 1999) (finding unconscionable an arbitration provision that, inter alia, limited discovery and available remedies and bound only the employee). *See generally Creeping Mandatory Arbitration, supra*, at 1644–45 ("as the Supreme Court has frequently stated, arbitration clauses can be

invalidated on standard common law grounds"); Jean R. Sternlight & Elizabeth J.

Jensen, *Using Arbitration to Eliminate Consumer Class Actions: Efficient Business*

*Practice or Unconscionable Abuse?*, 67 SPG L. & Contemp. Probs. 75, 77–78

(2004) ("While the Supreme Court views arbitration favorably, it has always made

clear that unconscionable arbitration clauses should not be enforced."). Thus,

several courts have held that arbitration agreements which preclude class actions

are unconscionable under certain circumstances. *See Dale v. Comcast Corp.*, 498

F.3d 1216, 1224 (11th Cir. 2007) ("based on the totality of circumstances, we

conclude the Comcast class action waiver is unconscionable to the extent it

prohibits the subscribers from bringing a class action"); *Kristian v. Comcast Corp.*,

446 F.3d 25, 59 (1st Cir. 2006) ("Because of the presence of the bar on class

mechanisms in arbitration, Plaintiffs cannot be compelled to arbitrate their antitrust

claims, both state and federal, if that bar remains in place."). *See generally*

Sternlight & Jensen, *supra* at 85–92 (arguing that courts are more likely to

invalidate clauses as unconscionable where individual claims would not be feasible

either financially or due to lack of information as to the merits of the claim or the

nature of arbitration; where individual suits "would not result in full enforcement

of the law;" or where "administrative enforcement would not be an adequate

substitute for the class action.").

Public policy also weighs against mandatory arbitration in consumer contracts where it would prevent the consumer from effectively vindicating statutory rights. *See generally Creeping Mandatory Arbitration, supra,* at 1648–53 (reviewing criticisms of mandatory arbitration from the individual perspective).

First, mandatory consumer arbitration agreements are inherently nonconsensual. *See id.* at 1648–49; Richard M. Alderman, *Pre-dispute Mandatory Arbitration in Consumer Contracts: A Call for Reform,* 38 Hous. L. Rev. 1237, 1249 (2001) ("as a general rule, it is safe to assume that pre-dispute mandatory arbitration has been imposed on the consumer with an absence of any meaningful choice"). Consumers rarely read, much less understand, boilerplate agreements. *See* Irwin S. Kirsch et al., U.S. Dep't of Education, Adult Literacy in America: A First Look at the Results of the National Adult Literacy Survey 17, fig. 1.1 (1993) (Only 3% of the American adult population has "documentary" literacy skills at the level necessary to, for example, compare the substantive differences between two contracts.); Alan M. White & Cathy Lesser Mansfield, *Literacy and Contract,* 13 Stan. L. & Pol'y, Rev. 233 (2002) ("Most consumers cannot and do not understand the preprinted forms when they sign a consumer contract. Actual assent is not just a fiction because of voluntary choices by consumers; it is effectively impossible."). Moreover, behavioral research indicates that individuals may be largely incapable of properly balancing the costs and benefits of arbitration clauses and may

24

undervalue their right to sue. *See* Christine Jolls, Cass R. Sunstein, & Richard

Thaler, *A Behavioral Approach to Law and Economics*, 50 Stan. L. Rev. 1471,

1541–43 (1997) ("Overoptimism" and "salience" are problems arising from one's

"insufficient ability to process accurately the information one possesses insofar as

that information bears on one's own risks. . . . People sometimes do mispredict

their utility at the time of decision, and on conventional grounds, this phenomenon

raises serious problems for the idea of consumer sovereignty.").

Second, many arbitration agreements substantively favor companies rather

than consumers through "arbitrator selection, imposition of high costs, and

limitation of remedies." *Creeping Mandatory Arbitration, supra*, at 1650.

Finally, some arbitration clauses "limit plaintiffs' access to substantive

relief" by, for example, shortening statutes of limitations, barring recovery of

certain damages, or barring injunctive relief. *Creeping Mandatory Arbitration,*

*supra*, at 1652–53; *see Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1175 (9th

Cir. 2003) (arbitration agreement unconscionable where it shortened the applicable

statute of limitations); *Stirlen v. Supercuts, Inc.*, 60 Cal. Rptr. 2d 138, 142–43 (Ct.

App. 1997) (arbitration agreement unconscionable where it precluded injunctive

relief).

### B.  Courts Have Specifically Held That Mandatory Arbitration Is Not a Sufficient Substitute for Statutory Privacy Rights

Courts have specifically addressed whether arbitration is a sufficient alternate forum for privacy related disputes and have determined that it is not. In *Schmidt v. U.S. Dep't of Veterans Affairs*, 218 F.R.D. 619 (ED Wis. 2003), the court considered the case of several employees whose social security numbers were disclosed by their employers, the Veterans Administration, in violation of the Privacy Act. The disclosure in question had already been the topic of collective bargaining arbitration because privacy rights were protected under the employees' contract. *Id.* at 625. The plaintiffs argued that the arbitration decision should preclude the court from considering the matter de novo. *Id.* at 627. But the court determined that an arbitration decision did not provide a sufficient alternative to judicial proceedings, citing the following reasons:

> Collective-bargaining arbitration may be an efficient and effective way to settle contract disputes, but it is not an adequate or reliable substitute for judicial proceedings when it comes to determining whether the Privacy Act has been violated. First . . . the labor arbitrator's competence pertains to her knowledge of the law of the shop, not the law of the land . . . knowing the law of the shop does not require an arbitrator to be conversant with the legal considerations which underlie a complex public law like the Privacy Act. . . . Most labor arbitrators, who are not attorneys, are under pressure to pivide a quick turnaround with decisions, and, consequently, they cannot be expected to make fully-informed decisions about whether an agency violated the Privacy Act.
>
> Second, labor arbitrators derive their authority from the collective-bargaining agreement and are required to enforce the

agreement. . . . The arbitrator has no authority to 'invoke public laws which conflict with bargain between the parties.' . . .

Finally, arbitral fact-finding is not as complete as judicial fact-finding. Arbitrations typically do not follow rules of evidence, discovery, compulsory process, cross examination, and testimony under oath is severely curtailed.

Id. at 628–29.

### C.    *Mandatory Arbitration of VPPA Claims Is Impermissible*

Mandatory arbitration imposed by consumer contracts in the context of the VPPA is particularly pernicious, as it would countermand congressional intent, would prevent aggrieved parties from effectively vindicating their statutory rights, and would implicate many of the public policy concerns that weigh against enforcing such agreements.

The Court has repeatedly recognized that Congress can make claims nonarbitrable if it evinces the intent to do so. Here, Congress has made abundantly clear its intent to make a private right of action the exclusive method for enforcement of the VPPA. As Representative McCandless testified, the purpose of the Act was to build a "brick wall—a Federal privacy right—around the individual." *Hearing Record* at 27. Through the civil remedies section, Congress intended to "put[] teeth into the legislation, ensuring that the law will be enforced." *Committee Report* at 9. By empowering the victims of privacy violations, Congress protected the privacy rights that have long been recognized as paramount by courts and scholars. If consumers were instead forced to arbitrate these sensitive privacy

claims, the "brick wall" that Congress intended to create would be reduced to rubble.

Moreover, Congress expressly provided that "[t]he remedies and sanctions described in this chapter are the only judicial remedies and sanctions for nonconstitutional violations of this chapter." 18 U.S.C. § 2708 (2008) ("Exclusivity of remedies"). In that section, Congress plainly contemplates the potential remedies for a violation of the VPPA and provides that the exclusive remedy shall be the ones provided for by statute, which includes liquidated damages but which does not include arbitration. *See id.* Thus, this court should respect Congress' intent in enacting the VPPA and find that the arbitration of claims under it is unenforceable.

Moreover, the arbitration agreement at issue precludes class actions, a provision that several courts have found to be unconscionable. *See, e.g., Dale v. Comcast Corp.*, 498 F.3d at 1224. In this case, class action preclusion is particularly problematic because even successful individual suits would not fully enforce the law. Individual suits, and especially individual arbitrations, are unlikely to lead to company-wide reform of policies that violate the VPPA. *See generally* Sternlight & Jenson, *supra*, at 90 ("A company may find it more worthwhile to pay off a few individual claims but keep its overall policy."). Furthermore, class actions provide a variety of benefits to plaintiffs, from protecting less-informed

28

consumers to making claims more financially viable. *See Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 617–18 (1997) (explaining financial viability justification). *See generally Creeping Mandatory Arbitration, supra,* at 1651–52 (discussing value of class actions).

Although Texas courts have found that class action waivers may not be unconscionable under certain circumstances, they admit the possibility that a waiver "may rise to the level of fundamental unfairness." *AutoNation USA Corp. v. Leroy*, 105 S.W.3d 190, 200 (Tex. App. 2003). The fundamental unfairness of class action waivers is especially prominent in the context of privacy rights, as consumers forced into arbitration and out of class actions will be unable to achieve the ultimate goal that animates the VPPA—the protection of consumers' privacy.

Private rights of action, including class actions, are particularly crucial in the context of privacy rights. Because privacy rights are very sensitive, they are difficult to vindicate without statutory civil remedies. *See Parks v. IRS*, 618 F.2d 677, 685 (1980). Moreover, in the VPPA, as in the Privacy Act, the "best means" of enforcing the statutory remedies is through private rights of action because they are likely to increase compliance with statutory standards. The statutory liquidated damages provided for in the VPPA are also essential to deter companies from violating consumers' privacy rights. Indeed, private rights of action are arguably

29

the *bare minimum* that can be done to protect privacy rights, and more vigorous protection may be necessary to effectively protect individuals' privacy.

Finally, many of the public policy concerns that weigh against mandatory arbitration clauses in general are present in the VPPA context. The agreement containing the arbitration clause in this case was part of a "clickwrap" online agreement. Consumers who wished to sign up for Blockbuster's services were required to click a box on Blockbuster's website that appeared next to the following statement: "I have read and agree to the blockbuster.com (including Blockbuster Online Rental) Terms and Conditions and certify that I am at least 13 years of age." Appellant's Brief at 6. However, consumers were not required to actually read, much less understand, the terms and conditions, and could merely click the box and continue the sign-up process. Public policy concerns regarding the inherently nonconsensual nature of consumer arbitration agreements are exacerbated in this context, where consumers are not even required to examine the contents of the agreement. Moreover, as discussed, the arbitration agreement substantively favors Blockbuster by precluding the use of class actions, a provision which implicates serious public policy concerns. Thus, public policy concerns weigh heavily against arbitration of VPPA claims.

30

# CONCLUSION

At issue in this case is the enforcement of statutory provision that is the cornerstone of an important federal privacy law. If that provision is removed, the statutory scheme collapses. *Amicus Curiae* respectfully request this Court to grant Appellee's motion to sustain the decision of the lower court.

Respectfully submitted,

_____/s/_____
Marc Rotenberg
John A. Verdi
Jared Kaprove
Ginger McCall
Kimberly Nguyen*
Matthew Phillips
Electronic Privacy Information
   Center (EPIC)
1718 Connecticut Ave. NW
Suite 200
Washington, DC 20009
(202) 483-1140

November 3, 2009

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of 7,000 words of Fed. R. App. P. 29(d) and Fed. R. App. P. 32(B)(i). This brief contains 6,750 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2007 in 14 point Times New Roman style.

Dated:  November 3, 2009

_____/s/_____

Marc Rotenberg
John A. Verdi
Jared Kaprove
Kimberly Nguyen*
Matthew Phillips
Electronic Privacy Information
    Center (EPIC)
1718 Connecticut Ave. NW
Suite 200
Washington, DC 20009
(202) 483-1140

# CERTIFICATE OF SERVICE

I hereby certify that on this third day of November, 2009, seven copies of

the foregoing Brief of *Amicus Curiae* were filed with the Clerk of the Court by

overnight delivery service, and two copies were shipped by commercial carrier for

next-day delivery upon the following:

Thomas S. Leatherbury
Michael L. Raiff
Frank C. Brame
VINSON & ELKINS LLP
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201
Telephone: 214-220-7792
Facsimile: 214-999-7792

J. Mark Mann
THE MANN FIRM
300 West Main Street
Henderson, Texas 75652
Telephone: 903-657-8540
Facsimile: 903-657-6003

Dated:  November 3, 2009

Thomas M. Corea
Jeremy R. Wilson
THE COREA FIRM, P.L.L.C.
The Republic Center
325 North St. Paul Street, Suite 4150
Dallas, Texas 75201
Telephone: 214-953-3900
Facsimile: 214-953-3901

George A. Otstott
Ann Jamison
OTSTOTT & JAMISON, P.C.
Two Energy Square
4849 Greenville Avenue, Suite 1620
Dallas, Texas 75206
Telephone: 214-522-9999
Facsimile: 214-828-4388

                    /s/
Marc Rotenberg
John A. Verdi
Jared Kaprove
Matthew Phillips
Kimberly Nguyen*
Electronic Privacy Information
  Center (EPIC)
1718 Connecticut Ave. NW
Suite 200
Washington, DC 20009
(202) 483-1140

EXHIBIT 3

LETTER FROM EPIC AND PRIVACY GROUPS TO THIS COURT, JANUARY 15, 2010

January 15, 2010

Clerk of the United States District Court for the Northern District of California
San Jose Division
280 South 1st Street
San Jose, CA 95113

Attention: The Honorable Richard G. Seeborg

Re:    Lane et. al v. Facebook et. al, proposed settlement
       Case No. 5:08-cv-03845-RS

Dear Judge Seeborg:

The signatories of this letter are privacy and consumer protection non-profit organizations who oppose the Facebook Beacon settlement, as currently proposed, on the grounds that the representative plaintiffs have not adequately and fairly represented the interests of the class during the settlement negotiations. Pursuant to the requirements of the Federal Rules of Civil Procedure, the representative parties must be "fairly and adequately protect[ing] the interests of the class."[1]

This letter seeks first to identify the various ways in which the Settlement Agreement is deficient and counter to the interests of the represented class, and then second to urge you to condition your approval of the Settlement Agreement on modification of those terms so that the Agreement will more adequately represent those interests.

I.   The Representative Plaintiffs Did Not Adequately and Fairly Represent the Interests of the Represented Class.

A. The amount of the settlement is insufficient.

The parties have set forth a proposed settlement with several provisions. First, Facebook "denies any and all wrongdoing," but agrees to terminate the Beacon program.[2] The settlement also establishes a settlement fund totaling $9.5 million, that is likely to leave approximately $6 million after attorneys fees and administrative costs are deducted.[3] This is significantly smaller than the potential liability Facebook and its affiliates are exposed to under just one of the allegedly violated statutes—the Video Privacy Protection Act (VPPA). Under the VPPA, each violation is punishable by "(A) actual damages but not less than liquidated damages in an amount of $2,500; (B) punitive

---

[1] Fed. R. Civ. P. 23(a)(4).
[2] *See* Settlement Agreement at 6, 12.
[3] *Id.* at 8.

damages; (C) reasonable attorneys' fees and other litigation costs reasonably incurred; and (D) such other preliminary and equitable relief as the court determines to be appropriate."[4] Facebook currently boasts more than 350 million active users.[5] If only 350,000 users—0.1% of the total user base—had their rights violated under the VPPA, Facebook would be exposed to $875 million in liquidated damages. The $6 million figure proposed is clearly insufficient, and most significantly, the class members currently receive $0.

## B.  As structured, the proposed Privacy Foundation would not satisfactorily represent the interests of the class.

If the Settlement Agreement is approved as written, Facebook will deposit the sum in "a separate bank account specifically established by Facebook for purpose of this Settlement."[6] The settlement also provides for the formation of a Privacy Foundation. Under the terms of the settlement, a Privacy Foundation will be established "to fund projects and initiatives that promote the cause of online privacy, safety, and security. . . ."[7]

While the goal of protecting online consumer privacy through a non-profit foundation is commendable, the "Privacy Foundation" described in the Settlement Agreement will not achieve these goals, because Facebook's influence will be too great. The foundation will have three directors, "chosen by mutual agreement of the parties."[8] Future directors will be "nominated and selected in accordance with the charter and by-laws of the foundation."[9] The foundation will also have a two-member Board of Legal Advisors, who will "offer nonbinding advice on compliance with the provisions of this Agreement, attend all formal meetings and offer nonbinding advice to the officers and directors."[10] The initial Advisors will be Michael Rhodes, counsel of record for Facebook, and Scott Kamber, one of two counsels of record for the representative plaintiffs, or their designees.[11] In its first year, the Board of Legal Advisors will determine a plan for selecting future Advisors.[12]

With this structure, the proposed Privacy Foundation will not be sufficiently independent of Facebook to serve as an effective tool for consumer privacy protection. In fact, for several reasons, the foundation as proposed is likely to become a public relations organization for Facebook. Facebook will have a direct hand in selecting the foundation's directors. Future directors will be selected based on the foundation's charter, which

---

[4] 18 U.S.C. § 2710(c) (2006).

[5] Facebook, *Statistics*, http://www.facebook.com/press/info.php?statistics (last visited Dec. 9, 2009).

[6] Settlement Agreement at 12.

[7] *Id.* at 11–12.

[8] *Id.* at 12.

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

Facebook will presumably create while forming the foundation, and the foundation's bylaws, which the inaugural, Facebook-selected directors will presumably write. Moreover, the named counsel representing Facebook has a powerful position as a member of the Board of Legal Advisors. Under these conditions, it is nearly inevitable that the foundation will express views on privacy issues that are consistent with the goals of its key board member. As such, it will become a branch of Facebook's public relations department, clothed in the garb of an independent non-profit.

The Settlement Agreement's description of the goals of the proposed foundation demonstrates this approach as well. The Agreement states that the foundation is "to fund and sponsor programs designed to educate users, regulators, and enterprises regarding critical issues relating to protection of identity and personal information online through user control, and to protect users from online threats."[13] This reads like public relations and lobbying efforts on behalf of Facebook.

Facebook is not accused of failing to effectively "educate" users and regulators. Facebook is accused of inappropriately disclosing its users' personal information in direct violation of state and federal law. A foundation whose primary goal is the education of users regarding business practices is not an appropriate remedy where it is the business practices that caused the harm.

II.   <u>Approval of the Settlement Agreement Should Be Conditioned on Modifications that Will Protect the Interests of the Class.</u>

As discussed, the $9.5 million fund set aside by the settlement is insufficient, particularly in light of the number of potential class members and the potential for statutory liquidated damages. The amount should be amended to more accurately reflect the damages inflicted by the Beacon program, as well as the defendants' potential liability exposure.

If, however, the Court decides not to augment the amount of money set aside by the settlement, the Court should treat the money as a *cy pres* remedy and ensure that it adheres to the principles animating that remedy. "[T]he term 'cy pres' derives from the Norman French expression *cy pres comme possible*, which means 'as near as possible.'"[14] The *cy pres* doctrine arose in the law of equity and originated as a rule of construction to save a testamentary charitable gift that would otherwise fail, allowing "the 'next best' use of the funds to satisfy the testator's intent 'as near as possible.'"[15]

Courts have also utilized *cy pres* distributions "[w]hen a class action involves a large number of class members but only a small individual recovery, the cost of separately proving and distributing each class member's damages may so outweigh the

---

[13] *Id*. at 11.
[14] *Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n*, 84 F.3d 451, 455 n.1 (D.C. Cir. 1996).
[15] *Id.*

potential recovery that the class action becomes unfeasible."[16] In such cases, a *cy pres* award "avoids these difficulties by permitting aggregate calculation of damages, the use of summary claim procedures, and distribution of unclaimed funds to indirectly benefit the entire class."[17] The purpose of the equitable *cy pres* remedy is to benefit members of a class, and the public, indirectly by distributing the funds to interested third parties who will advance and promote the interests of the class.

In this case, the class action involves a large number of class members and, because of the inadequacy of the settlement fund, only a small potential individual recovery. If the amount of funds set aside by the settlement is not augmented, the Court should treat the funds as a *cy pres* remedy. And, for the foregoing reasons, the proposed distribution of the funds do not adhere to *cy pres* principles because the proposed foundation does not satisfactorily represent the interests of the class. In order to adhere more closely to the principles of the *cy pres* remedy, the settlement should be disbursed directly to existing privacy advocates or distributed through a neutral third party-trustee. At minimum, the proposed foundation should be restructured as a truly independent entity.

### A. The settlement funds should be distributed directly to non-profit organizations working to safeguard consumer privacy.

The best way to fairly and adequately represent the interests of the class is to allocate the *cy pres* money among the several well-established non-profits that already serve the functions proposed to be served by the new foundation. The proposed foundation will ostensibly "educate users, regulators, and enterprises regarding critical issues relating to protection of identity and personal information online through user control, and to protect users from online threats."

The Electronic Privacy Information Center (EPIC) has a long history of effectively accomplishing very similar goals. EPIC is a public interest research center established in 1994 to focus public attention on emerging privacy and civil liberties issues. EPIC has issued a wide range of publications and reports intended to educate the public regarding the state of privacy, security, and civil liberties.[18] EPIC has long been a leading voice regarding privacy and social networking,[19] and, more specifically, privacy and Facebook.[20]

However, EPIC is certainly not alone among non-profits that work with emerging online privacy issues, and the proposed foundation would, at best, unnecessarily duplicate their efforts as well. Among the organizations in this field are the Privacy Rights Clearinghouse, the Consumer Federation of America, the Center for Digital Democracy,

---

[16] *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 1990).

[17] *Id.* (citing *Developments in the Law - Class Actions*, 89 Harv.L.Rev. 1318, 1517 (1976)).

[18] EPIC, *EPIC Reports*, http://epic.org/reports (last visited Dec. 9, 2009).

[19] EPIC, *Social Networking Privacy*, http://epic.org/privacy/socialnet (last visited Dec. 9, 2009).

[20] EPIC, *Facebook Privacy*, http://epic.org/privacy/facebook (last visited Dec. 9, 2009).

the World Privacy Forum, the Electronic Frontier Foundation, and the American Civil Liberties Union. All of these organizations would be appropriate recipients for funds intended to protect the interests of the class.

### B.   Alternatively, the settlement sum should be distributed to existing organizations by a neutral third-party trustee.

Moreover, there is a well-established process for identifying deserving organizations and awarding them *cy pres* settlement funds, particularly in the context of consumer privacy rights. The Rose Foundation[21] administers the Consumer Privacy Rights Fund, which "was created from a series of legal settlements involving consumer privacy issues. It awards grants to support privacy-related research, education, advocacy and policy development. Since its inception in 2002, the Fund has awarded over $4.5 million to support privacy protection in California and throughout the US."[22] Thus, if the parties to the proposed settlement wish to dedicate funds to the protection of consumer privacy, channeling funds through the Rose Foundation provides a well-established way of doing so.

If the Consumer Privacy Rights Fund is not specific enough for the parties' needs, the Rose Foundation also has considerable experience acting as trustee over specialized funds based on requirements of individualized settlements. Because of the quantities involved here, this may be the best solution for this settlement." Even in cases where a settlement mandates the support of specifically designated projects, the Foundation's centralized administration, experience, and accountability can add considerable value to the process."[23]

### C.   In the alternative, the proposed Privacy Foundation should be restructured to protect the interests of the class.

If the court decides that the establishment of a true independent foundation to improve and protect online privacy for consumers would actually be a good use of the settlement funds, the proposed foundation must be restructured in order to achieve true independence.

First, Facebook should not have so much influence on the selection of the board of directors of the foundation. For this to be a true settlement, Facebook should have no influence at all on the foundation. Rather than filling the directorships as the Agreement describes, the directors should instead be appointed by neutral third parties. These appointments could be made by any number of disinterested entities, including the court, government actors (e.g. the director of the California Department of Consumer Affairs), academia (e.g. the Stanford Center for Internet and Society or the Berkeley Center for

---

[21] Rose Foundation, *Index*, http://www.rosefdn.org (last visited Dec. 9, 2009).

[22] Rose Foundation, *Consumer Privacy Rights Fund*, http://www.rosefdn.org/article.php?id=260 (last visited Dec. 9, 2009).

[23] Rose Foundation, *How We Administer Restitution and Cy Pres Funds*, http://www.rosefdn.org/article.php?list=type&type=112 (last visited Dec. 9, 2009).

Law & Technology), or experts in the world of nonprofit foundations (e.g. the Rose Foundation, discussed above). Similarly, once the foundation is established, it should select its own legal advisers, or find counsel willing to serve in a pro bono capacity, rather than rely on the parties' counsel for legal advice.

Second, the charter of the foundation should be changed. If the foundation is going to be any use at all in redressing the sort of violations at issue in this case, its mission must be broader. Instead of focusing primarily on the education of users, regulators, and enterprises, the foundation should focus on protecting consumer privacy. User education should be the responsibility of Facebook itself. And the Settlement Agreement's proposed "programs to educate . . . regulators" can be more aptly described as lobbying. Without these changes, the proposed foundation will be nothing more than a non-profit wing of Facebook, presenting public relations in the form of "education" and failing to represent the interests of class members.

Conclusion

Regardless of the solution chosen, we urge you to condition acceptance of the settlement on modification of the terms of the proposed Settlement Agreement in order to more fairly and adequately represent the interests of the class, as required by the Federal Rules of Civil Procedure.

Sincerely,


Electronic Privacy Information Center

Center for Digital Democracy

Consumer Action

Consumer Federation of America

Privacy Rights Clearinghouse

Patient Privacy Rights


cc: Michael G. Rhodes, Cooley Godward Kronish LLP
Scott A. Kamber, KamberEdelson, LLC
David A. Stampley, KamberEdelson, LLC
Joseph H. Malley, Law Office of Joseph H. Malley

EXHIBIT 4

EMAIL FROM ROSE FOUNDATION EXECUTIVE DIRECTOR

From: **Tim Little** <tlittle@rosefdn.org>
Date: Tue, Sep 22, 2009 at 6:49 PM
Subject: Facebook privacy foundation
To: malleylaw@gmail.com

Dear Mr. O'Malley,

I got your name from Jeff Chester at the Center For Digital Democracy. I want to introduce myself and the Rose Foundation because we administer a Consumer Privacy Rights Fund that has utilized millions of dollars in cy pres settlements to fund consumer privacy work throughout the US. One of the strongest themes in the privacy fund has been online privacy. I've looked over the Facebook settlement, and I think that the Rose Foundation could be a great fit to house and launch this new fund.

Here is a link to our website that describes our work in handling more than 150 restitution and cy pres funds, enabling more than $10 million in grants to consumer and environmental organizations:
http://www.rosefdn.org/article.php?list=type&type=75

To give you the specific flavor of the privacy grants, I've also attached the list from last year's grants round, where we awarded $1.5 million to support consumer privacy.

I recognize that you may be receiving a lot of inquiries. Thank you for considering this one. Please let me know if you would like to explore a role for the Rose Foundation in launching the Privacy Foundation. I hope to hear from you.

Sincerely,

Tim Little